## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **Sixta Gladys Peña Martínez; Nélida Santiago Álvarez; Juan Ramón Vélez Marrero; María Luisa Aguilar Galíndez; Gamaly Vélez Santiago; Victor Ramón Ilarraza Acevedo; Maritza Rosado Concepción; Rosa Maria Ilarraza Rosado; Ramón Luis Rivera Rivera;** and **Yomara Valderrama Santiago**<br><br>        Plaintiffs,<br><br>    v.<br><br>**Alex Azar**, in his official capacity as Secretary of Health and Human Services; **U.S. Department of Health and Human Services**; **Sonny Perdue**, in his official capacity as Secretary of Agriculture; **U.S. Department of Agriculture**; the **Commissioner of Social Security**; **Nancy A. Berryhill**, in her official capacity as Deputy Commissioner for Operations of Social Security; and the **Social Security Administration**,<br><br>        Defendants. | Case No. _____ |

## COMPLAINT

**Introduction**

1.      Citizens of the United States who live in Puerto Rico are suffering challenges of staggering dimensions from the combined effects of two recent devastating hurricanes and the loss of basic services that followed in their wake.  This lawsuit focuses on one part of the background to the current challenges:  the U.S. Government's express policies awarding lower federal benefits to U.S. citizens who reside in Puerto Rico than to similarly situated and equally needy U.S. citizens residing in any of the fifty States of the United States.  The effects of this facial discrimination against Puerto Ricans violate the U.S. Constitution's guarantee of equal protection.  The courts can no longer treat such a constitutional violation as beyond judicial redress.

2.      Hurricane Maria swept across Puerto Rico on September 20, 2017.  The storm ravaged the island, destroying the electrical grid, knocking out communications, flooding towns and infrastructure, wrecking homes and buildings, and killing over 1,000 people.[1]  Preliminary estimates indicate that Hurricane Maria caused at least $115 billion in damage—more than Puerto Rico's annual GDP.[2]  It has been six months since Hurricane Maria landed, yet many still lack running water and permanent shelter,[3] and thousands of businesses remain closed.[4]  Meanwhile, the number of people in need of governmental food assistance has surged.[5]  For months, hundreds

---

[1]  Frances Robles, *et al.*, *Official Toll in Puerto Rico: 64.  Actual Deaths May Be 1,052.*, N.Y. Times (Dec. 9, 2017), https://tinyurl.com/y7gyv2lp.

[2]  Rebecca Spalding, *Puerto Rico Economists See Bleak Picture of Island's Future*, Bloomberg (Nov. 16, 2017), https://tinyurl.com/yajnzkdx.

[3]  Danica Coto, *6 Months After Hurricane Maria, Puerto Rico Pleads for Help*, Associated Press (Mar. 16, 2018), https://tinyurl.com/ycgtfeyc.

[4]  Arian Campo-Flores, *For Puerto Rico, the Return to Business as Usual Is Slow*, Wall St. J. (Mar. 19, 2018), https://tinyurl.com/y8582dc7.

[5]  Editorial Board, *Puerto Tico's Second-Class Treatment on Food Aid*, N.Y. Times (Nov. 9, 2017), https://tinyurl.com/yb7uz6fg; Elham Khatami, *Puerto Rico Probably Can't Provide Enough Food Assistance for Hurricane Recovery*, ThinkProgress (Oct. 6, 2017), https://tinyurl.com/y9d5qms8.

of thousands of residents were without power—the longest blackout in U.S. history—and, to this day, roughly 10% of the island's population remains in the dark.[6]  The lack of electricity crippled hospitals and medical facilities, causing many to operate intermittently or shut down completely. "Because of the electricity situation, a lot of people died, and are still dying," said the daughter of a man who died as a result of the storm; in Puerto Rico, "[y]ou can't get sick now."[7]  Even now, six months after Hurricane Maria's landfall, "people are still dying in Maria's wake," especially "those who lack basic services like electricity."[8]  The bleak result is that thousands of American citizens are "living in Third World conditions six months after a natural disaster."[9]

3.     Even before Hurricane Maria's devastation, it was dangerous to get sick in Puerto Rico due to a decade-long recession and a fiscal crisis that forced hospitals to suffer through "electricity or water shortages" and "to delay and prioritize payments to provide basic care for [their] patients."[10]

4.     For more than 80 years, federal tax policy had provided strong incentives for U.S. corporations to locate subsidiaries in Puerto Rico, prompting considerable investment in the Puerto Rican economy.  In 1996, however, President Clinton signed a bill phasing out the incentives over

---

[6]     Frances Robles, *Contractors Are Leaving Puerto Rico, Where Many Still Lack Power*, N.Y. Times (Feb. 26, 2018), https://tinyurl.com/yb5yw54t; Kyla Mandel, *Puerto Rico Recovery Efforts Plagued by Power Company's Financial Troubles* (Feb. 20, 2018), https://tinyurl.com/y9gchp8w; C.K., *More Puerto Ricans Leave for the Mainland*, The Economist (Mar. 16, 2018), https://tinyurl.com/y8a6vxdj.

[7]     Frances Robles, *Puerto Rico's Health Care Is in Dire Condition, Three Weeks After Maria*, N.Y. Times (Oct. 10, 2017), https://tinyurl.com/ybfr6ymt.

[8]     John D. Sutter, *'We Are the Forgotten People': It's Been Almost Six Months Since Hurricane Maria, and Puerto Ricans Are Still Dying*, CNN (Mar. 15, 2018), https://tinyurl.com/y84ottm3.

[9]     Danica Coto, *6 Months After Hurricane Maria, Puerto Rico Pleads for Help*, Associated Press (Mar. 16, 2018), https://tinyurl.com/ycgtfeyc.

[10]     Vann R. Newkirk II, *Will Puerto Rico's Debt Crisis Spark a Humanitarian Disaster?*, The Atlantic (May 13, 2016), https://tinyurl.com/y82koyea.

10 years.  In 2006, when the incentives lapsed, Puerto Rico fell into a recession that continues to this day.  The unemployment rate has hovered above 10 percent for a decade.[11]

5.      Deep in recession, Puerto Rico's public debt amounts to $70 billion—without counting the additional $50 billion in pension obligations.  In 2014 the ratings agencies downgraded some Puerto Rican bonds to "junk" levels, and in 2015 Puerto Rico began regularly defaulting on its debt obligations.  In April 2016, the Puerto Rico Legislature acknowledged through legislation that the government's fiscal situation "is more dire than at any other point in its history"; its "depleted resources and strained liquidity threaten to bind the Commonwealth to a choice between honoring its commitments to bondholders or continuing to provide the residents of Puerto Rico with essential services."[12]

6.      In an attempt to alleviate its crushing debt, Puerto Rico enacted a statute in 2014 that would allow its public utilities to restructure their obligations, which exceed $20 billion.  But the Supreme Court held that this statute was preempted by the federal bankruptcy code.  *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016).

7.      Shortly thereafter, on June 30, 2016, the U.S. Government enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**").  PROMESA established a new Financial Oversight and Management Board for Puerto Rico, which now oversees a bankruptcy-like process for renegotiating and restructuring Puerto Rico's debts, while also overseeing the Territory's fiscal budget and imposing significant austerity cuts to public spending.

8.      In response to the worsening economy, Puerto Rico's workforce has steadily exited the island, pursuing better financial opportunities across the fifty States.  Over 10% of Puerto

---

[11]   Bureau of Labor Statistics, Databases, Tables & Calculators by Subject, Puerto Rico (Apr. 2, 2018), https://tinyurl.com/yc7k9fg8.
[12]   Act 21 of 2016 (Apr. 6, 2016).

Rico's population—nearly 500,000 people—emigrated during the last decade. This exodus has increased exponentially as a result of Hurricane Maria. Researchers estimate that 135,000 Puerto Ricans have left the island for good since the Hurricane, and that the number may reach 470,000 by the end of 2019.[13] Those who leave tend be those who can: the healthy, the well-off, the young. Those who remain are disproportionately sick, poor, and elderly, further diminishing the prospects for an economic rebound. A senior economist at Moody's Analytics forecasts that Hurricane Maria could cause "a permanent increase in the rate of population decline, with many of those who remain too poor to move elsewhere. . . . Puerto Rico's already murky future is now even more in doubt."[14]

9.      Today, in between 52.3 to 59.8% of Puerto Rico's population lives in poverty (compared to 15% in the States)[15]. Between 15%–20% of Puerto Rico's population depend on Medicare. Approximately 1.3 million people rely on food stamps funded by Puerto Rico's Nutrition Assistance Program. Federal statutory and regulatory provisions explicitly exclude U.S. citizens in Puerto Rico from receiving the same federal benefits given to fellow U.S. citizens of equal need who live in any of the fifty States. This facial discrimination contributes significantly to both the fiscal and health-care crises in Puerto Rico. As detailed below, federal law has completely excluded U.S. citizens residing in Puerto Rico from receiving Supplemental Security Income ("**SSI**") since the program's inception. Federal law also excludes U.S. citizens residing in Puerto Rico from receiving food assistance through the Supplemental Nutrition Assistance

---

[13]     Center for Puerto Rican Studies, *Puerto Rico Post-Maria*, at 18–22 (Mar. 2018), https://tinyurl.com/y8zkdg39.

[14]     Jill Disis, *Hurricane Maria Could Be a $95 Billion Storm for Puerto Rico*, CNN Money (Sept. 28, 2017), https://tinyurl.com/yb5r9nhj (quoting Adam Kamins).

[15]     *Poverty Rises to 52.3 Percent in Puerto Rico after Hurricane Maria*, Prensa Latina (Nov. 28, 2017), https://tinyurl.com/ycnhxhwu (quoting Jose Caraballo, director of the Information Center for Census).

Program ("**SNAP**").  And federal law provides significantly fewer benefits under the Medicare Part D program by making U.S. citizens residing in Puerto Rico ineligible for certain low-income subsidies.  The U.S. Government Accountability Office estimated in 2014 that, if U.S. citizens in Puerto Rico were treated equally with U.S. citizens living in the fifty States of the United States, the U.S. Government would spend up to $1.8 billion each year on SSI for Puerto Ricans, up to $700 million more each year on food assistance, and up to $1.5 billion more each year on Medicare.[16]  Hundreds of thousands of Puerto Ricans would benefit were it not for the facial discrimination against Puerto Ricans embedded in federal law.

10.     This lawsuit seeks to stop and rectify that discrimination.  The plaintiffs are U.S. citizens residing in Puerto Rico who receive significantly fewer benefits under federal law than their similarly-situated counterparts residing in one of the fifty States.  The plaintiffs seek both a declaration that the federal laws causing this disparate treatment violate their right to equal protection guaranteed by the Fifth Amendment and an injunction to prevent those laws from being enforced.

### Jurisdiction and Venue

11.     This Court has jurisdiction under 28 U.S.C. § 1331.

12.     Sovereign immunity is waived by 5 U.S.C. § 702.

13.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) and (e)(1).

### Parties

14.     Plaintiff, Sixta Gladys Peña Martínez, is a 71-year-old U.S. citizen. She first lived in Puerto Rico from 1978 to 2008.  In 2008, she moved to New York, NY, where she lived until

---

[16]     U.S. Government Accountability Office, *Puerto Rico: Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources*, at 1–2 (Mar. 2014), https://tinyurl.com/yaq5l494 ("*How Statehood Would Potentially Affect Puerto Rico*").

2016.  In 2016, she returned to Puerto Rico.  Currently, she resides in San Juan, Puerto Rico, and is unemployed.

      a.     While residing in New York, Ms. Peña received monthly benefits of up to $733.00 under the SSI program due to her age and medical conditions, which include severe arthritis and high blood pressure.  When Ms. Peña relocated to Puerto Rico in 2016, she was deprived of her SSI benefits.  Instead, Ms. Peña now receives a mere $64.00 per month under Puerto Rico's Aid to the Aged, Blind or Disabled program ("**AABD**").  If she resided in the one of the fifty States she would receive SSI benefits, which are currently unavailable to her because she lives in Puerto Rico.

      b.     While residing in New York, Ms. Peña received additional monthly benefits of approximately $198.00 per month under SNAP for nutrition assistance.  Once she relocated to Puerto Rico, she began receiving only $154.00 per month under the Puerto Rico Nutrition Assistance Program (known as "**NAP**," or, in Spanish, "**PAN**")[17].  If Ms. Peña lived in one of the fifty States, she would receive significantly higher nutritional assistance benefits under SNAP than she does under NAP.

---

[17]     Pursuant to the "Additional Supplemental Appropriations for Disaster Relief Requirements Act", Pub. L. 115-72, of October 26, 2017, Congress made available to the Commonwealth of Puerto Rico additional funds, not to exceed $1,270,000,000, for disaster nutrition assistance in response to presidentially-declared major disasters and emergencies resulting from the impact of Hurricanes Irma and Maria on Puerto Rico. The funds appropriated under this Act are temporary and will remain available until September 30, 2019. The NAP beneficiaries in Puerto Rico will receive a temporary 25% increase in their benefits as a result of this Act. This temporary increase, however, does not eliminate the discrimination that this Complaint seeks to redress. The Plaintiffs' NAP benefits alleged in this Complaint exclude any temporary benefits made available pursuant to the Additional Supplemental Appropriations for Disaster Relief Requirements Act, *supra*.

15.     Plaintiff Nélida Santiago Álvarez is a 63-year-old U.S. citizen.  She was born in Puerto Rico, where she has lived her entire life except for a two-and-a-half-year period when she lived in Chicago, Illinois.  Currently, she resides in Toa Alta, Puerto Rico and is unemployed.

        a.      Ms. Santiago Álvarez suffers from multiple incapacitating health conditions, such as asthma, high blood pressure, and cardiac conditions.  She also has an implantable cardioverter-defibrillator.  If she resided in the one of the fifty States she would receive SSI benefits, which are currently unavailable to her because she lives in Puerto Rico.

        b.      Ms. Santiago Álvarez and her husband Juan Ramón Vélez Marrero acquired custody over two young grandchildren after their mother passed away in January 2018.  The four of them receive monthly nutrition assistance of $416.00 under NAP.  If they lived in one of the fifty States, the family would receive significantly higher benefits under SNAP than they do under NAP.

16.     Plaintiff Juan Ramón Vélez Marrero is a 73-year-old U.S. citizen.  He was born in Puerto Rico and has lived there his entire life. Currently, he resides in Toa Alta, Puerto Rico and is unemployed.

        a.      Mr. Vélez Marrero suffers from multiple incapacitating conditions, such as asthma, high blood pressure, and cardiac conditions.  Mr. Vélez Marrero also suffers from blindness in one eye.  If he resided in one of the fifty States, he would receive SSI benefits, which are currently unavailable to him because of his residence in Puerto Rico.

        b.      Mr. Vélez Marrero, along with his wife, Ms. Santiago Álvarez, acquired custody over two young grandchildren after their mother passed away in January 2018.  The four of them receive monthly nutrition assistance of $416.00 under NAP.  If they lived

in one of the fifty States, the family would receive significantly higher benefits under SNAP than they do under NAP.

17.     Plaintiff María Luisa Aguilar Galíndez is an 82-year-old U.S. citizen. Her monthly income consists of a Puerto Rico Government retiree pension of $526.58 and net Social Security widow disability benefits of $919.00. Ms. Aguilar Galíndez suffers from high blood pressure, a brain insufficiency, and heart ailments that culminated in a heart attack that kept her in intensive care for eight days. She also is blind in her left eye.  Currently, she resides in San Juan, Puerto Rico.

      a.     Ms. Aguilar Galíndez is a recipient of Medicare benefits under Parts A, B, and C. Her Medicare Advantage coverage is provided through Triple-S Advantage, Inc.  If Ms. Aguilar were a resident of one of the fifty States, she would be entitled to low-income subsidies under Medicare Part D, due to her monthly income and her dual eligibility for Medicare and Medicaid.  Because she is a resident of Puerto Rico, however, she is ineligible for these subsidies.

18.     Plaintiff Gamaly Vélez Santiago is a 33-year-old U.S. citizen.  She was born, and has resided all her life, in Puerto Rico.  Currently, she resides in Toa Alta, Puerto Rico.

      a.     Ms. Velez Santiago lives with her husband; a 12-year-old son, who has been diagnosed as having a disabling attention deficit condition; a 10-year-old daughter; and a 13-year-old niece who has been under the care of the Puerto Rico Department of Families since the niece's mother died. The family's monthly income consists of $500.00 for nutrition assistance under NAP that is awarded jointly to Ms. Velez Santiago and the three children, an additional $130.00 given to her husband through the same program, and $400.00 from the Puerto Rico Department of Families. If they lived in one of the fifty

States, the family would receive significantly higher benefits under SNAP than they do under NAP.

19.     Plaintiff Victor Ramón Ilarraza Acevedo is a 47-year-old U.S. citizen.  He was born in Puerto Rico and has never lived in one of the fifty States.   Currently, Mr. Ilarraza Acevedo resides in Toa Alta, Puerto Rico and earns a monthly net income of $800.00 from his employment as an assistant psychiatric therapist.

        a.      Mr. Ilarraza Acevedo suffers from several disabling health conditions.  He has four herniated discs and suffers from tailbone pain.  He has also been diagnosed with a bipolar condition.  Mr. Ilarraza Acevedo is ineligible for Puerto Rico's AABD program because of that program's extremely low income threshold for eligibility, but he would qualify for SSI benefits if Puerto Ricans were not excluded from the program.

        b.      His family of four receives $499.00 a month for nutrition assistance from NAP.  If they lived in one of the fifty States, the family would receive significantly higher benefits under SNAP than they do under NAP.

20.     Plaintiff Maritza Rosado Concepción is a 49-year-old U.S. citizen.  She was born in Hartford, Connecticut, and lived there and in New York, N.Y., until she was nine years old, when her family moved to Puerto Rico.  Currently, she resides in Toa Alta, Puerto Rico.

        a.      Mrs. Rosado's family consists of four people: herself, her husband, and two children, a 22-year-old and a 17-year-old.  The family's monthly income consists of her husband's net salary of $800.00 plus $499.00 from NAP for nutrition assistance.  If they lived in one of the fifty States, the family would receive significantly higher benefits under SNAP than they do under NAP.

21.     Plaintiff Rosa Maria Ilarraza Rosado is a 22-year-old U.S. citizen.  Ms. Ilarraza Rosado is the daughter of Plaintiffs Maritza Rosado Concepción and Victor Ramón Ilarraza Acevedo.  She was born in Puerto Rico and has lived there her entire life. Currently, she resides in Toa Alta, Puerto Rico and is unemployed.

      a.     Ms. Ilarraza Rosado has been diagnosed with low to moderate mental retardation and lives with her parents and two siblings.  Her family receives $499.00 a month for nutrition assistance from NAP.  If they lived in one of the fifty States, the family would receive significantly higher benefits under SNAP than they do under NAP.

      b.     Ms. Ilarraza Rosado was a special education student in Puerto Rico because of her condition.  She is now out of school, is unable to read or write, and has severe retention problems.  She has been denied Vocational Rehabilitation Services because she has not graduated from any school.  She is not receiving disability benefits under any program in Puerto Rico.  Plaintiff Ilarraza Rosado would be eligible for SSI benefits if they applied in Puerto Rico.

22.     Plaintiff Ramón Luis Rivera Rivera is a 57-year-old U.S. citizen.  He was born in Puerto Rico and has never lived in one of the fifty States.  Currently, he resides in Toa Alta, Puerto Rico and is unemployed.

      a.     Mr. Rivera suffers from multiple incapacitating health conditions, such as herniated discs.  He receives monthly benefits of $64.00 under Puerto Rico's AABD program.  If he resided in one of the fifty States, he would be eligible for significantly higher SSI benefits.

b.      Mr. Rivera receives $125.00 per month under NAP for nutrition assistance. He would receive significantly higher benefits under SNAP than he does under NAP if he lived in one of the fifty States.

23.      Plaintiff Yomara Valderrama Santiago is a 39-year-old U.S. citizen.  She was born in Puerto Rico, but moved to Pennsylvania for a couple of years.  She relocated to Puerto Rico in 2018.  While residing in Pennsylvania, Ms. Valderrama Santiago suffered a car accident that caused her significant trauma, including injuries to various spinal discs.  She was granted eligibility for Social Security disability benefits and will not be able to work because of her health conditions. Currently, she resides in Toa Alta, Puerto Rico.

a.      Ms. Valderrama Santiago suffers from multiple incapacitating conditions, such as herniated discs.  If she resided in one of the fifty States, she would be eligible for SSI benefits, which are currently unavailable to her because of her residence in Puerto Rico.

b.      Ms. Valderrama Santiago lives with her two underage sons.  While living in Pennsylvania, she received $511 per month under SNAP for her and her children.  When she relocated to Puerto Rico with her family, she applied for NAP benefits.  However, she has not yet been awarded any benefits under NAP.  Whatever amount Ms. Valderrama Santiago receives under NAP after moving to Puerto Rico, it will be lower than what she did and would receive under SNAP as a resident of Pennsylvania.

24.      Defendant Alex Azar is sued in his official capacity as Secretary of Health and Human Services.  In this capacity, Secretary Azar oversees the U.S. Department of Health and Human Services.

25.     Defendant U.S. Department of Health and Human Services is a federal agency and is responsible for implementing and administering the Medicare program at the federal level.  The Centers for Medicare and Medicaid Services ("**CMS**"), a component of the U.S. Department of Health and Human Services, administers the Medicare program on a day-to-day basis.

26.     Defendant Sonny Perdue is sued in his official capacity as Secretary of Agriculture. In this capacity, Secretary Perdue oversees the U.S. Department of Agriculture.

27.     Defendant U.S. Department of Agriculture is a federal agency and is responsible for implementing and administering SNAP at the federal level.  The Food and Nutrition Service, a component of the U.S. Department of Agriculture, administers SNAP on a day-to-day basis.

28.     Defendant Commissioner of the Social Security Administration is the officer that oversees the Social Security Administration.

29.     Defendant Nancy A. Berryhill is sued in her official capacity as Deputy Commissioner for Operations of Social Security.  In that capacity, Deputy Commissioner Berryhill is currently leading the Social Security Administration.[18]

30.     Defendant Social Security Administration is a federal agency and is responsible for implementing and administering SSI.

### Federal Benefits Programs and Taxes in Puerto Rico

31.     The U.S. Government has enacted various programs and adopted various implementing regulations addressing the social welfare needs of the country's elderly, low income, and hungry citizens, including SSI, SNAP, and Medicare.  Each of those programs plays a critical

---

[18]    Joe Davidson, *Social Security Is Now Headless Because of Trump's Inaction.  Will Other Agencies Be Decapitated?*, Washington Post (Mar. 12, 2018), https://tinyurl.com/ybsg63e9.

role in ensuring that U.S. citizens have access to needed health care services and can live free from the grip of hunger and crushing poverty.

32.      Each of these programs also facially discriminates against U.S. citizens who reside in Puerto Rico.

### SSI in Puerto Rico

33.      SSI is a federal income supplement program designed to help aged, blind, and disabled people who have little or no income.  The U.S. Social Security Administration administers SSI.  The Social Security Administration makes SSI payments directly to individual beneficiaries.

34.      Section 301 of the Social Security Amendments of 1972, Pub. L. No. 92-603 ("**1972 Act**"), created SSI by amending Title XVI of the Social Security Act to "establish[] a national program to provide supplemental security income to individuals who have attained age 65 or are blind or disabled."  SSI is available to residents of the fifty States, the District of Columbia, and the Northern Mariana Islands, but not to U.S. citizens who reside in Puerto Rico.  This program has not been available for residents of Puerto Rico since its inception.

35.      U.S. citizens residing in Puerto Rico are expressly excluded from SSI.  Section 303(b) of the 1972 Act specifies that "[t]he amendments made by section[] 301 . . . shall not be applicable in the case of Puerto Rico, Guam, and the Virgin Islands."  The statute also expressly excludes individuals who are "outside the United States," *id.* § 301 (codified at 42 U.S.C. § 1382(f)), with "United States" defined as "the 50 States and the District of Columbia," *id.* (codified at § 1382c(e)).  In 1976, the U.S. Government extended SSI to the Northern Mariana Islands, but not to any other Territory.  *See* Pub. L. No. 94-241, § 502(a)(1).

36.      To implement this statutory scheme, the Social Security Administration has promulgated numerous regulations that exclude U.S. citizens residing in Puerto Rico from receiving SSI benefits.

37.     Representative examples include: 20 C.F.R. § 416.120(c)(10) (defining "United States" to mean "the 50 States, the District of Columbia, or effective January 9, 1978, the Northern Mariana Islands"); 20 C.F.R. § 416.215 (defining "United States" to mean "the 50 States, the District of Columbia, and the Northern Mariana Islands"); 20 C.F.R. § 416.216(a) (defining "United States" to mean "the 50 States, the District of Columbia and the Northern Mariana Islands"); 20 C.F.R. § 416.702 (defining "United States or U.S." to mean "the 50 States, the District of Columbia, and the Northern Mariana Islands"); 20 C.F.R. § 416.1327(a)(1) (defining "United States" to mean "the 50 States, the District of Columbia, and the Northern Mariana Islands"); 20 C.F.R. § 416.1603(c) (defining "United States" to mean "the 50 States, the District of Columbia, and the Northern Mariana Islands"); 20 C.F.R. § 416.1902 (defining "State" to mean "a State of the United States, the District of Columbia, or the Northern Mariana Islands"); 20 C.F.R. § 416.2203 (defining "State" to mean "any of the 50 States of the United States, the District of Columbia, or the Northern Mariana Islands").

38.     Instead of SSI, Puerto Rico administers an Aid to the Aged, Blind, or Disabled ("**AABD**") program, which provides cash assistance to qualifying individuals who are aged, blind, or disabled.

39.     Title XVI of the Social Security Act, before it was amended by the 1972 Act, authorized States and certain Territories, including Puerto Rico, to establish an AABD program that would receive federal funding, which Puerto Rico did.  Because the amendments made by the 1972 Act to Title XVI are not "applicable" in the case of Puerto Rico, the prior version of Title XVI continues to govern Puerto Rico's AABD program.  *See* 42 U.S.C. § 1381 note.[19]  The prior

---

[19]     *See also* William R. Morton, Congressional Research Service, *Cash Assistance for the Aged, Blind, and Disabled in Puerto Rico*, at 4–5 (Oct. 26, 2016), https://tinyurl.com/y93wf9te.

version of 42 U.S.C. § 1383 authorizes the U.S. Government to pay up to 50% of Puerto Rico's expenditures on the aged, blind, or disabled.  *See* 42 U.S.C. § 1383 note.  That percentage is increased to 75% by 42 U.S.C. § 1318.  Thus, for every dollar in benefits paid under Puerto Rico's AABD program, the U.S. Government pays 75 cents.

40.     AABD, however, is not a substitute for SSI, as it provides significantly lower benefits.

41.     In fiscal year 2015, the maximum monthly SSI benefit was $733, whereas the maximum monthly AABD benefit was $64.  Indeed, a 2014 study by the U.S. Government Accountability Office study found that the average monthly federal benefit awarded under AABD was $58 per person, whereas Puerto Ricans would have received an average of $418–$422 per person under SSI if they were not excluded from that program.[20]

42.     There is also a cap on annual federal spending on Puerto Rico's AABD program. Under 42 U.S.C. § 1308, the U.S. Government's payment to Puerto Rico "shall not exceed the ceiling amount for the territory for the fiscal year," with the "ceiling amount" set at "$107,255,000 with respect to Puerto Rico."  This ceiling amount has remained the same for the past 20 years.

43.     This cap applies not only to federal payments to Puerto Rico for its AABD program, but also to federal payments to Puerto Rico under Title IV-A of the Social Security Act (the Temporary Assistance for Needy Families ("**TANF**") program), under Title IV-E of the Social Security Act (foster care, adoption assistance, and independent living), and under § 1108(b) of the Social Security Act (additional matching grants).  Puerto Rico's annual TANF block grant is

---

[20]   U.S. Government Accountability Office, *How Statehood Would Potentially Affect Puerto Rico*, *supra* note 16, at 84.

$71,562,501, thereby leaving only $35,692,499 under the cap for its AABD program, foster care, adoption assistance, and § 1108(b) matching grants.[21]

44.     SSI, by contrast, is uncapped.

45.     SSI not only provides benefits that are larger and not subject to a statutory ceiling, but it also has lower eligibility requirements as compared to AABD, so more people receive benefits.  Under both SSI and AABD, a person must be either aged, blind, or disabled, and must separately satisfy certain financial requirements.  The programs treat the "disabled" differently: a person of any age can count as "disabled" and qualify for SSI, whereas AABD excludes all disabled children from coverage.  *Compare* 42 U.S.C. § 1382c(a)(3)(C) (covering disabled children), *with* 8 L.P.R.A. § 15a (covering only disabled adults).  AABD's financial requirements are also much more stringent than SSI's.  In fiscal year 2015, an individual could qualify for SSI if his or her monthly countable income was below the maximum monthly SSI benefit of $733, whereas to qualify for AABD, the individual's monthly countable income had to be below the maximum monthly AABD benefit of $64.  As a consequence of these eligibility differences, many Puerto Ricans who would receive SSI benefits if they lived in one of the fifty States, the District of Columbia, or the Northern Mariana Islands, receive nothing under AABD.  One report estimated that 305,000 to 354,000 Puerto Ricans would have received SSI benefits in fiscal year 2011 if they were not excluded from the program, compared to the only 34,401 who actually participated in AABD that year.[22]

---

[21]     *See* William R. Morton, Congressional Research Service, *Cash Assistance for the Aged, Blind, and Disabled in Puerto Rico*, at 7–8 (Oct. 26, 2016), https://tinyurl.com/y93wf9te.

[22]     U.S. Government Accountability Office, *How Statehood Would Potentially Affect Puerto Rico*, *supra* note 16, at 82.

46.     Due to SSI's larger benefits, lack of a cap, and lower eligibility requirements, the U.S. Government Accountability Office estimates that federal spending on SSI in Puerto Rico in fiscal year 2011 would have ranged from $1.5 billion to $1.8 billion if Puerto Rico were treated as a State, compared to actual AABD spending of only $24 million that year.

47.     Plaintiffs Sixta Gladys Peña Martínez, Nélida Santiago Álvarez, Juan Ramón Vélez Marrero, Victor Ramón Ilarraza Acevedo, Rosa María Ilarraza Rosado, Ramón Luis Rivera Rivera, and Yomara Valderrama Santiago would all qualify for SSI benefits if they resided in one of the fifty States, the District of Columbia, or the Northern Mariana Islands.  Because they reside in Puerto Rico, however, they are barred from receiving SSI benefits.  And while some of these plaintiffs receive some benefits under AABD, their benefits would be higher under SSI.

## SNAP in Puerto Rico

48.     SNAP is a federal program that provides nutrition assistance to low-income households nationwide.  SNAP is available in all fifty States, the District of Columbia, Guam, and the U.S. Virgin Islands.  The Food and Nutrition Service of the U.S. Department of Agriculture administers SNAP for the U.S. Government.

49.     SNAP beneficiaries receive SNAP benefits though an Electronic Benefit Transfer ("**EBT**") card, which functions like a bank debit card.  EBT is an electronic system that allows a SNAP beneficiary to authorize transfer of their government benefits from a federal account to a retailer account to pay for products (such as food).  In other words, the U.S. Government makes SNAP benefits directly available to SNAP beneficiaries via the EBT card.

50.     EBT cards are issued by individual States and Territories.  EBT is used not only for SNAP benefits but also for other government benefits (such as TANF); consequently, EBT is available in every State and most Territories, including Puerto Rico.

51.     Federal law excludes U.S. citizens in Puerto Rico from receiving SNAP benefits—although that did not used to be the case.  Until October 2008, SNAP was known as the Food Stamp Program, which was implemented in Puerto Rico as of November 1, 1974.  *See* Pub L. No. 91-671 (1971); Pub. L. No. 93-86 (1973) (extending Food Stamp Program to the Territories); *see also* Food Stamp Act of 1977, Pub L. No. 95-113 (granting Puerto Rico full coverage under the Food Stamp Program).

52.     In 1982, however, the U.S. Government replaced FSP in Puerto Rico with a block grant for nutrition assistance.  *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35 (later extended through Pub. L. No. 98-204).  According to the U.S. Government Accountability Office, Puerto Rico was excluded from FSP "[i]n response to concerns about the size, expense, and management" of FSP there.[23]  By contrast, the federal Government has not excluded any of the fifty States from SNAP.

53.     The block grant results in lower nutrition assistance benefits for Puerto Ricans.  The U.S. Department of Agriculture has stated that "[a] block grant limits eligibility criteria and benefit levels to stay within the block grant limits and is fundamentally different from an entitlement program that serves all who are eligible."[24]  In the wake of Hurricane Maria, the U.S. Government provided an additional $1.27 billion in funding atop the block grant through 2019 for Puerto Rico's nutrition assistance program.  *See* Pub. L. No. 115-72 (Oct. 26, 2017).  This additional funding is temporary, however, and does not alleviate the fundamental differences between having a limited block grant for U.S. citizens living in Puerto Rico as compared to the SNAP entitlement program

---

[23]     U.S. Government Accountability Office, *Food Assistance: Nutritional Conditions and Program Alternatives in Puerto Rico*, at 9 (July 1992), https://tinyurl.com/ybpg9y6b.

[24]     U.S. Department of Agriculture, Food and Nutrition Service, *Examination of Cash Nutrition Assistance Program Benefits in Puerto Rico*, at 9 (Aug. 2015), https://tinyurl.com/ybrplfmm.

for U.S. citizens living in the fifty States, the District of Columbia, Guam, and the U.S. Virgin Islands.

54.     To implement this statutory scheme, the U.S. Department of Agriculture has promulgated numerous regulations that exclude U.S. citizens residing in Puerto Rico from receiving SNAP benefits.

55.     Representative examples include: 7 C.F.R. § 271.2 (defining "State" to mean "any one of the fifty States, the District of Columbia, Guam, the Virgin Islands of the United States, and the reservation of an Indian Tribe whose ITO meets the requirements of the Food and Nutrition Act of 2008 for participation as a State agency"); 7 C.F.R. § 273.9(a) (providing income eligibility standards only for "Alaska," "Hawaii," "the 48 contiguous States and the District of Columbia, Guam and the Virgin Islands"); 7 C.F.R. § 273.9(d) (allowing income deductions only "in the 48 States and the District of Columbia, Alaska, Hawaii, and the Virgin Islands," and "Guam").

56.     Instead of SNAP, Puerto Rico uses the federal block grant to fund its own Nutrition Assistance Program ("**NAP**").  NAP is administered by Puerto Rico's Administration for Socioeconomic Development of the Family ("**ADSEF**"), which is housed within the Department of Families.  ADSEF sets eligibility and benefits, certifies and monitors retailers, distributes the benefit, detects and investigates fraud, and provides nutrition education to NAP participants.

57.     SNAP benefits are larger than NAP benefits, and the criteria to qualify for SNAP are lower than for NAP, so more people qualify for SNAP benefits than for NAP benefits.  A 2010 report by the U.S. Department of Agriculture concluded that implementing SNAP in Puerto Rico would increase the number of Puerto Rican households receiving nutrition assistance by 15.3% (from 554,000 households to 639,000 households) and would increase the average monthly benefit

by 9.6% (from $240 per household per month to $263 per household per month).[25]  Likewise, a 2014 study by the U.S. Government Accountability Office found that Puerto Ricans could have received up to $700 million more in benefits in fiscal year 2011 under SNAP than they did under NAP.[26]

58.      Plaintiffs Sixta Gladys Peña Martínez, Nélida Santiago Álvarez, Juan Ramón Vélez Marrero, Gamaly Vélez Santiago, Victor Ramón Ilarraza Acevedo, Maritza Rosado Concepción, Rosa Maria Ilarraza Rosado, Ramón Luis Rivera Rivera, and Yomara Valderrama Santiago would all qualify for SNAP benefits if they resided in a State, the District of Columbia, Guam, or the U.S. Virgin Islands.  Because they reside in Puerto Rico, however, they are barred from receiving SNAP benefits.  And while some of these plaintiffs receive some nutrition assistance benefits under NAP, their benefits would be higher under SNAP.

### Medicare in Puerto Rico

59.      Medicare is a federal medical-insurance program for the elderly and the disabled.

60.      Enacted in 1965, Medicare originally had two components: Part A, which covers hospital stays and other inpatient care, and Part B, which covers visits to the doctor and other outpatient care.

61.      In 1997, the U.S. Government created Part C, which enables Medicare recipients to get the benefits of Parts A and B through private insurance plans, known as Medicare Advantage plans.

---

[25]  U.S. Department of Agriculture, Food and Nutrition Service, *Implementing Supplemental Nutrition Assistance Program in Puerto Rico: A Feasibility Study*, at 63 (June 2010), https://tinyurl.com/ybs9terp.
[26]  U.S. Government Accountability Office, *How Statehood Would Potentially Affect Puerto Rico*, *supra* note 16, at 78.

62.     In 2003, the U.S. Government added Part D, which authorizes private insurers to offer federally-subsidized insurance plans for prescriptions drugs to Medicare beneficiaries.

63.     The Medicare statute expressly treats U.S. citizens who live in Puerto Rico differently and less advantageously than citizens in States in a variety of ways.

64.     In particular, Medicare beneficiaries in Puerto Rico are ineligible to receive a subsidy for Part D benefits known as the "low-income subsidy" ("**LIS**"), which is granted to low-income individuals in the fifty States and the District of Columbia.

65.     To qualify for the subsidy, a beneficiary must satisfy one of the following criteria: (1) be a full benefit dual-eligible beneficiary (*i.e.*, eligible for both Medicare and Medicaid); (2) be an SSI beneficiary; (3) be enrolled in a Medicare Savings Program; or (4) have family income less than 135% of the federal poverty level and have resources that do not exceed certain limits. *See* 42 U.S.C. § 1395w-114(a)(3).

66.     U.S. citizens who live in Puerto Rico are explicitly precluded from qualifying even if they satisfy one of the above criteria.  Federal law provides: "In the case of a [P]art D eligible individual who is not a resident of the 50 States or the District of Columbia, the individual is not eligible to be a subsidy eligible individual under this section . . . ."  42 U.S.C. § 1395w-114(a)(3)(F).

67.     To implement this statutory scheme, CMS, has promulgated numerous regulations that exclude U.S. citizens residing in Puerto Rico from receiving the LIS.

68.     Representative examples include: 42 C.F.R. § 423.772 (defining "State" to mean "each of the 50 States and the District of Columbia"); 42 C.F.R. § 423.907(a)(1) ("Low-income Part D eligible individuals who reside in the territories are not eligible to receive premium and cost-sharing subsidies under subpart P of this part.").

69.     As a supposed replacement for the LIS, Puerto Rico receives an extra allotment to provide Medicaid coverage of prescription drugs for low-income Medicaid beneficiaries.  *See* 42 U.S.C. § 1396u-5(e).

70.     But this additional Medicaid allotment  to Puerto Rico does not entitle low-income Puerto Rico residents to the financial equivalent of the LIS they would receive under Medicare if they received equal treatment under the Medicare program.  As the Department of Health and Human Services stated in a 2016 report: "CMS acknowledges that this benefit is substantially smaller than the LIS benefit available to low-income beneficiaries in the states.  Estimating the number of beneficiaries potentially eligible for the LIS has been challenging, but based on 2011 U.S. Bureau and Medicare beneficiary data, there could be as many as 400,000 or more potentially eligible beneficiaries."[27]

71.     Plaintiff María Luisa Aguilar Galíndez is a recipient of Medicare benefits under Parts A, B, and C.  If Ms. Aguilar were a resident of one of the fifty States or the District of Columbia, she would be entitled to the LIS due to her monthly income and her dual eligibility in Medicare and Medicaid.  Because she is a resident of Puerto Rico, however, she is denied low-income subsidies under federal law.

### Aggregate Effect of Excluding Puerto Ricans from Federal Funding

72.     In 2014, before Hurricane Maria and the Puerto Rican debt crises deepened the severe strain on governmental services in Puerto Rico, the U.S. Government Accountability Office published a report on the federal funding disparities affecting Puerto Rico.  By the Office's

---

[27]  Emily Barson, Director, Intergovernmental and External Affairs, Department of Health and Human Services, *White House Task Force on Puerto Rico; End of Administration Report*, at 5–6 (Nov. 18, 2016),  https://tinyurl.com/yam3w8g8;  *see also*  Puerto Rico Healthcare Community Leaders, Statement to the U.S. Senate Committee on Finance, *Financial and Economic Challenges in Puerto Rico*, at 4 (Sept. 29, 2015), https://tinyurl.com/y8bmw4q8.

estimate, if Puerto Rico were treated equivalently to a State, its residents would benefit from up to $4 billion in additional annual federal funds.  Broken down by program, U.S. citizens who live in Puerto Rico would have received up to $1.5 billion more for Medicare, $1.8 billion for SSI, and $0.7 billion more for SNAP.

73.     If Puerto Rico residents had been eligible for these levels of federal funding over the last decade, Puerto Rico's current predicament may well have been substantially mitigated.   In the wake of Hurricane Maria, which has further depleted Puerto Rico's resources and strained its already challenged governmental services, treating needy Puerto Rico residents equivalently to other U.S. citizens in federal benefits programs would provide a significant influx of funds to support their health and welfare.

### Right to Equal Protection in Puerto Rico

74.     The U.S. Constitution bestows on all U.S. citizens, including those who live in Puerto Rico, the fundamental right to equal protection of the laws.

75.     In a series of decisions issued at the dawn of the twentieth century known as the *Insular Cases*, the U.S. Supreme Court adopted "the doctrine of territorial incorporation, under which the Constitution applies in full in incorporated Territories surely destined for statehood but only in part in unincorporated Territories."  *Boumediene v. Bush*, 553 U.S. 723, 757 (2008).  In unincorporated Territories—*i.e.*, Territories that will not necessarily become States, such as Puerto Rico—"only 'fundamental' constitutional rights" apply of their own force.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1990).

76.     The U.S. Supreme Court has held repeatedly that the constitutional right to equal protection is "fundamental" and therefore applicable in Puerto Rico.

77.     The earliest indication that the right to equal protection applies in Puerto Rico came from one of the original *Insular Cases*: *Downes v. Bidwell*, 182 U.S. 244 (1901).  There, Justice

Brown, in his lead opinion, suggested that the right "to an equal protection of the laws" may be sufficiently fundamental as to apply in Puerto Rico, although the issue was not before him, so he did not rule on the matter. *Id.* at 282.

78.     The U.S. Supreme Court converted Justice Brown's suggestion to a holding in *Examining Board v. Flores de Otero*, where the Court ruled:

> It is clear now, however, that the protections accorded by either the Due Process Clause of the Fifth Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment apply to residents of Puerto Rico. The Court recognized the applicability of these guarantees as long ago as its decision[] in *Downes v. Bidwell*.

426 U.S. 572, 600 (1976) (striking down a statutory restriction for violating the right to equal protection).

79.     Since its decision in *Examining Board*, the Supreme Court has repeatedly reiterated that the constitutional guarantee of equal protection, which applies against the federal Government through the Due Process Clause of the Fifth Amendment, applies with full force in Puerto Rico. *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 331 n.1 (1986) ("We have held that Puerto Rico is subject to . . . the equal protection guarantee of either the Fifth or the Fourteenth Amendment"); *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 7 (1982) ("It is not disputed that the fundamental protections of the United States Constitution extend to the inhabitants of Puerto Rico. In particular, we have held that Puerto Rico is subject to the constitutional guarantees of due process and equal protection of the laws.") (citations omitted); *Torres v. Puerto Rico*, 442 U.S. 465, 469 (1979) ("Puerto Rico is subject to . . . the equal protection guarantee of either the Fifth or the Fourteenth Amendment.").

80.     The First Circuit, too, has recognized time and again that the right to equal protection is fundamental and fully applicable in Puerto Rico. *E.g.*, *In re Conde Vidal*, 818 F.3d

765, 766 (1st Cir. 2016) ("The constitutional rights at issue here are the rights to due process and equal protection, as protected by both the Fourteenth and Fifth Amendments to the United States Constitution. Those rights have already been incorporated as to Puerto Rico.") (citations omitted); *DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 36 (1st Cir. 2001) ("[I]t is clearly established that the equal protection guarantee of either the Fifth or Fourteenth Amendment applies to Puerto Rico."); *Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492, 494 (1st Cir. 1977) ("It is now well settled that either the equal protection component of the Fifth Amendment or the equal protection clause of the Fourteenth Amendment applies to residents of Puerto Rico.").

81.     It is also clear that U.S. citizens in Puerto Rico have a Fifth Amendment right to equal protection against the federal Government. For example, in *Carrasco v. Secretary of Health, Education & Welfare*, the First Circuit held, in response to a challenge by a Puerto Rico resident seeking disability coverage under the Social Security Act, that a provision in the Act violated the equal-protection component of the Due Process Clause of the Fifth Amendment because the provision contained an unjustified gender-based distinction. 628 F.2d 624, 630 (1st Cir. 1980). Likewise, in *Ramos v. U.S. Civil Service Commission*, a three-judge district court held, in response to a challenge by Puerto Rican residents, that a U.S. Civil Service statute and regulation violated the right to equal protection embedded in the Fifth Amendment. 376 F. Supp. 361 (D.P.R. 1974). As Judge Torruella has put it: "The Fifth Amendment is fully applicable to the actions of the U.S. Government in Puerto Rico." *Igartúa-de la Rosa v. United States*, 417 F.3d 145, 170 (1st Cir. 2005) (en banc) (Torruella, J., dissenting).

82.     It is true that Puerto Rico is a Territory and that the U.S. Constitution's Territory Clause, Art. IV, § 3, cl. 2, bestows broad power on Congress to legislate with respect to Territories. The U.S. Supreme Court recently reaffirmed these points in the course of holding that Puerto Rico

may not assert sovereignty separate from that of the United States for purposes of double jeopardy. *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1868–73 (2016).  Because Puerto Rico is a Territory, "Congress can, pursuant to the plenary powers conferred by the Territorial Clause, legislate as to Puerto Rico in a manner different from the rest of the United States."  *United States v. Rivera Torres*, 826 F.2d 151, 154 (1st Cir. 1987); *see also Sanchez Valle*, 136 at 1876 ("We agree that Congress has broad latitude to develop innovative approaches to territorial governance, see U.S. Const., Art. IV, § 3, cl. 2; that Congress may thus enable a territory's people to make large-scale choices about their own political institutions . . . .").

83.    This plenary power, however, does not authorize Congress to deny to residents those rights embodied in the Constitution that are fundamental.  *United States v. Lebrón-Caceres*, 157 F. Supp. 3d 80, 89 (D.P.R. 2016).

84.    The facial discrimination in the federal benefits statutes and regulations described above amounts to an equal-protection violation.  Because the right to equal protection of the laws is fundamental, it follows that Congress cannot engage in such discrimination, notwithstanding its plenary power under the Territory Clause.

85.    Nearly forty years ago, the U.S. Supreme Court held in *Califano v. Torres* that the U.S. Government's exclusion of Puerto Rican residents from receiving SSI benefits did not violate the constitutional right to travel.  435 U.S. 1 (1978).  The Court offered three reasons why it was permissible to exclude U.S. citizens who live in Puerto Rico: (1) "because of the unique tax status of Puerto Rico, its residents do not contribute to the public treasury"; (2) "the cost of including Puerto Rico would be extremely great—an estimated $300 million per year"; and (3) "inclusion in the SSI program might seriously disrupt the Puerto Rican economy." *Id* at 5 n.7.  Three years later, the Court cited the same three reasons in upholding another federal statutory program (the Aid to

Families with Dependent Children ("**AFDC**") program) against a claim that the lower level of AFDC reimbursement to Puerto Rico violated the Fifth Amendment's guarantee of equal protection of the laws. *Harris v. Rosario*, 446 U.S. 651, 651 (1980).

86.     Intervening events have proven the assumptions underlying *Califano v. Torres* and *Harris v. Rosario* incorrect and made clear that these decisions require judicial re-examination in light of contemporary realities. It is simply not the case today that U.S. citizens who live in Puerto Rico do not pay federal taxes or contribute to the public treasury. In fact, Puerto Rican residents pay federal payroll taxes (such as Social Security and Medicare taxes), most import/export taxes, federal commodity taxes, self-employment taxes, and federal taxes on income generated outside Puerto Rico. Residents of Puerto Rico employed by the U.S. Government also have to report the income received from service to the U.S. Government in their federal tax returns. Employers in Puerto Rico must pay the taxes imposed by the Federal Insurance Contributions Act ("**FICA**"), which funds Social Security and Medicare, and the Federal Unemployment Tax Act. They must also withhold the employee portion of FICA taxes from their employees´ wages and contribute the employer portion.

87.     All told, from 1999 to 2014, Puerto Rico paid a total of $67 billion in federal taxes. That represents an average of $4.21 billion paid on an annual basis during that timeframe.

88.     Nor does the expense of extending a benefit permit the federal Government to engage in otherwise unconstitutional discrimination. As the U.S. Supreme Court recognized in *Sessions v. Morales-Santana*, "in a series of cases involving federal financial assistance benefits, the Court struck discriminatory exceptions denying benefits to discrete groups, which meant benefits previously denied were extended." 137 S. Ct. 1678, 1699 (2017) (citing *Califano v. Goldfarb*, 430 U.S. 199, 202–04, 213–17 (1977) (plurality opinion) (survivors' benefits); *Jimenez*

*v. Weinberger*, 417 U.S. 628, 630–31 & n.2 (1974) (disability benefits); *Department of Agriculture v. Moreno*, 413 U.S. 528, 529–30, 538 (1973) (food stamps); *Frontiero v. Richardson*, 411 U.S. 677, 678–69 & n.2, 691 & n.25 (1973) (plurality opinion) (military spousal benefits)); *see also Califano v. Westcott*, 443 U.S. 76 (1979) (aid to families of dependent children deprived of parental support); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) (survivors' benefits).  Thus, the Court "regularly has affirmed District Court judgments ordering that welfare benefits be paid to members of an unconstitutionally excluded class."  *Westcott*, 443 U.S. at 89–90 (collecting cases).

89.    Reliance upon a lack of tax payments by those who would otherwise qualify for the relevant federal benefits is an especially ill-fitting justification for denying benefits to those qualifying for federal assistance.  Whether located in the fifty States or in Puerto Rico or another Territory, such citizens will, virtually by definition, *not* be positioned to pay taxes, much less taxes commensurate with the benefits they receive.  Their lack of financial means is precisely what makes them so deserving of governmental assistance.  Moreover, nothing in the federal benefits programs at issue here distinguishes among the benefits available to the citizens of the various States on the basis that residents of those States contribute vastly different per-capita amounts of tax payments to the federal Treasury.  Thus, U.S. citizens who live in Puerto Rico should not be denied an equal share of federal benefits based on the share of federal taxes that U.S. citizens who live in Puerto Rico pay.

90.    Finally, any supposed threat of disruption to Puerto Rico's economy from the extension of federal benefits is no real threat at all.  As explained at length in the introduction above, Puerto Rico's economy is already in dire straits, a status caused in no small part by the billions of dollars of debt the Puerto Rican government accrued in paying for essential benefits for U.S. citizens who live in Puerto Rico.  Far from disrupting Puerto Rico's economy, extending

federal benefits for SSI, SNAP, and Medicare would greatly improve the financial health of Puerto Rico residents by ensuring that all U.S. citizens who live in Puerto Rico have financial, medical, and nutritional security equal to that of U.S. citizens living in the fifty United States or the District of Columbia (and in some cases, as noted above, as U.S. citizens living in certain Territories).

## Count I – Equal Protection
### (Exclusion from SSI Benefits)

91.     Plaintiffs repeat, re-allege, and incorporate the allegations in the preceding paragraphs.

92.     The SSI program provides federal benefits to low-income aged, blind, and disabled U.S. citizens.

93.     U.S. citizens who are otherwise eligible for benefits under the SSI program are expressly excluded by federal statute from receiving SSI benefits if they live in Puerto Rico.

94.     The U.S. Constitution bestows on all U.S. citizens, including those who live in Puerto Rico, the right to equal protection of the laws, enforceable against the United States through the Due Process Clause of the Fifth Amendment.

95.     The SSI statute facially violates the equal protection guarantee of the Fifth Amendment by denying SSI benefits to U.S. citizens residing in Puerto Rico who would otherwise be eligible for SSI benefits if they lived in a State, the District of Columbia, or the Northern Mariana Islands—including Plaintiffs Sixta Gladys Peña Martínez, Nélida Santiago Álvarez, Juan Ramón Vélez Marrero, Victor Ramón Ilarraza Acevedo, Rosa María Ilarraza Rosado, Ramón Luis Rivera Rivera, and Yomara Valderrama Santiago.

96.     Instead of SSI, the federal Government provides funds for Puerto Rico's AABD program, which also provides benefits to the aged, blind, and disabled.  But federal benefits are lower under the AABD program than under the SSI program, and fewer U.S. citizens who live in

Puerto Rico qualify for AABD than would qualify for SSI if it were applicable.  Plaintiff Sixta Gladys Peña Martínez, for example, receives only $64 in monthly benefits under the AABD program when, while living in New York, she used to receive $733 per month under SSI.  And Plaintiff Nélida Santiago Álvarez is ineligible for any benefits under the AABD program, yet she would receive monthly benefits under the SSI program if she lived in one of the fifty States, the District of Columbia, or the Northern Mariana Islands.  Federal funding of the AABD program thus does not eliminate the harm from facial discrimination against U.S. citizens who live in Puerto Rico in the distribution of SSI benefits.

97.     Accordingly, Plaintiffs are entitled to a declaration that the discriminatory provisions of the SSI statute, and any relevant implementing regulations, are unconstitutional and to an injunction prohibiting enforcement of these provisions and requiring equal treatment under SSI without regard to status as a resident of Puerto Rico.

98.     Plaintiffs do not seek the appropriation of any additional SSI funds to Puerto Rico. Instead, Plaintiffs simply seek to have the existing funds appropriated for SSI be distributed in a manner that does not discriminate against U.S. citizens who live in Puerto Rico.

### Count II – Equal Protection
### (Exclusion from SNAP Benefits)

99.     Plaintiffs repeat, re-allege, and incorporate the allegations in the preceding paragraphs.

100.     The SNAP program provides federal benefits to low-income households to help them buy food.

101.     The SNAP statute provides funds for SNAP benefits in the fifty States, the District of Columbia, Guam, and the U.S. Virgin Islands, but not in Puerto Rico.

102.    The U.S. Constitution bestows on all U.S. citizens, including those who live in Puerto Rico, the right to equal protection of the laws, enforceable against the United States through the Due Process Clause of the Fifth Amendment.

103.    The SNAP statute violates the equal protection guarantee of the Fifth Amendment by denying SNAP benefits to U.S. citizens residing in Puerto Rico who would otherwise be eligible for SNAP benefits if they lived in a State, the District of Columbia, Guam, or the U.S. Virgin Islands—including Plaintiffs Sixta Gladys Peña Martínez, Nélida Santiago Álvarez, Juan Ramón Vélez Marrero, Gamaly Vélez Santiago, Victor Ramón Ilarraza Acevedo, Maritza Rosado Concepción, Rosa Maria Ilarraza Rosado, Ramón Luis Rivera Rivera, and Yomara Valderrama Santiago.

104.    Instead of SNAP, the federal Government provides funds for Puerto Rico's NAP program, which also provides benefits to low-income households to help buy food.  But federal benefits are lower under the NAP program than under the SNAP program, and fewer U.S. citizens who live in Puerto Rico qualify for NAP than for SNAP.  Plaintiff Sixta Gladys Peña Martínez, for example, receives only $154 in monthly benefits under the NAP program when, while living in New York, she used to receive $198 per month under the SNAP program.  And Plaintiff Ramón Luis Rivera Rivera receives $125 under the NAP program. He would receive significantly higher benefits under SNAP than he does under NAP if he lived in one of the fifty States, the District of Columbia, Guam, or the U.S. Virgin Islands.  Federal funding of the NAP program thus does not eliminate the harm from facial discrimination against U.S. citizens who live in Puerto Rico in the distribution of SNAP benefits.

105.    Accordingly, Plaintiffs are entitled to a declaration that the discriminatory provisions of the SNAP statute, and any relevant implementing regulations, are unconstitutional

and to an injunction prohibiting enforcement of these provisions and requiring equal treatment under SNAP without regard to status as a resident of Puerto Rico.

106.    Plaintiffs do not seek the appropriation of any additional SNAP funds to Puerto Rico.  Instead, Plaintiffs simply seek to have the existing funds appropriated for SNAP be distributed in a manner that does not discriminate against U.S. citizens who live in Puerto Rico.

**Count III – Equal Protection**
**(Exclusion from Medicare Part D Low-Income Subsidies)**

107.    Plaintiffs repeat, re-allege, and incorporate the allegations in the preceding paragraphs.

108.    The Medicare program provides federal medical insurance and benefits for the elderly and the disabled.

109.    Medicare Part D authorizes private insurers to offer federally-subsidized insurance plans for prescription drugs to Medicare beneficiaries.

110.    The Medicare statute authorizes a subsidy to low-income individuals for Part D insurance.

111.    U.S. citizens who are otherwise eligible for the Part D low-income subsidy are expressly excluded by federal statute from receiving the subsidy if they live in Puerto Rico.

112.    The U.S. Constitution bestows on all United States citizens, including those who live in Puerto Rico, the right to equal protection of the laws, enforceable against the United States through the Due Process Clause of the Fifth Amendment.

113.    The Medicare statute violates the equal protection guarantee of the Fifth Amendment by denying the Part D low-income subsidy to U.S. citizens residing in Puerto Rico who would otherwise be eligible for that subsidy if they lived in a State or the District of Columbia.

114.    Plaintiff María Luisa Aguilar Galindez, for example, in ineligible for the Part D low-income subsidy because she lives in Puerto Rico, yet she would be entitled to receive the subsidy if she lived in one of the fifty States.

115.    Accordingly, Ms. Aguilar is entitled to a declaration that the discriminatory provisions of the Medicare statute governing eligibility for the Part D low-income subsidy, and any relevant implementing regulations, are unconstitutional and to an injunction prohibiting enforcement of these provisions and requiring equal treatment under Medicare without regard to status as a resident of Puerto Rico.

116.    Plaintiffs do not seek the appropriation of any additional Medicare funds to Puerto Rico.  Instead, Plaintiffs simply seek to have the existing funds appropriated for Medicare be distributed in a manner that does not discriminate against U.S. citizens in Puerto Rico.

### Prayer for Relief

117.    Wherefore, Plaintiffs request judgment be entered in their favor as follows:

A.    A declaration that the above-cited provisions of the SSI, SNAP, and Medicare statutes (and any relevant implementing regulations) that discriminate on the basis of status as resident of Puerto Rico are unconstitutional.

B.    An order enjoining Defendants from enforcing such discriminatory provisions of the SSI, SNAP, and Medicare statutes (and any relevant implementing regulations).

C.    An award of costs and attorneys' fees.

D.    Such additional or different relief as the Court deems just and proper.

Dated:  April 13, 2018

Respectfully submitted,

REICHARD & ESCALERA, LLC

QUINN EMANUEL URQUHART &
SULLIVAN LLP

s/Rafael Escalera-Rodríguez
**Rafael Escalera Rodríguez**
USDC-PR No. 122609
escalera@reichardescalera.com

s/Alana Vizcarrondo-Santana
**Alana Vizcarrondo-Santana**
USDC-PR No. 301614
vizcarrondo@reichardescalera.com

255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Telephone: (787) 777-8888

s/Efrén Rivera-Ramos
**Efrén Rivera Ramos**
USDC-PR No. 121914
efrenriveraramos@gmail.com

85 Cervantes St., Apt. 8
San Juan, PR 00907
Telephone: (787) 428-6088

s/Kathleen M. Sullivan
**Kathleen M. Sullivan**
(*pro hac vice* forthcoming)
kathleensullivan@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

s/Derek L. Shaffer
**Derek L. Shaffer**
(*pro hac vice* forthcoming)
derekshaffer@quinnemanuel.com

1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 538-8000

*Attorneys for Plaintiffs*