UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

_____
                                )
SIXTA GLADYS PEÑA MARTÍNEZ,      )
NÉLIDA SANTIAGO ÁLVAREZ,         )
JUAN RAMÓN VÉLEZ MARRERO,        )
MARÍA LUISA AGUILAR GALÍNDEZ,    )
GAMALY VÉLEZ SANTIAGO,           )
VICTOR RAMÓN ILARRAZA ACEVEDO,   )
MARITZA ROSADO CONCEPCIÓN,       )
ROSA MARIA ILARRAZA ROSADO,      )
RAMÓN LUIS RIVERA RIVERA, and    )
YOMARA VALDERRAMA SANTIAGO,      )
                                )
                 Plaintiffs,    )
                                )
          v.                    )       CIVIL ACTION
                                )       NO. 3:18-01206-WGY
ALEX AZAR, IN HIS OFFICIAL       )
CAPACITY AS SECRETARY OF         )
HEALTH AND HUMAN SERVICES;       )
U.S. DEPARTMENT OF HEALTH        )
AND HUMAN SERVICES;              )
SONNY PERDUE, IN HIS OFFICIAL    )
CAPACITY AS SECRETARY OF         )
AGRICULTURE;                     )
U.S. DEPARTMENT OF AGRICULTURE;  )
THE COMMISSIONER OF SOCIAL       )
SECURITY;                        )
NANCY A. BERRYHILL, IN HER       )
OFFICIAL CAPACITY AS DEPUTY      )
COMMISSIONER FOR OPERATIONS OF   )
SOCIAL SECURITY; and             )
THE SOCIAL SECURITY              )
ADMINISTRATION,                  )
                                )
                 Defendants.    )
_____)

YOUNG, D.J.[1]                                    April 15, 2019

## MEMORANDUM OF DECISION

---

[1] Of the District of Massachusetts, sitting by designation.

## I.    INTRODUCTION

This year, Patriots' Day in Massachusetts[2] and the deadline for filing federal taxes share a date: today, April 15.  It is fitting, then, that the Court today explains its decision to allow the plaintiffs, Puerto Rico residents, to challenge their ineligibility for certain federal benefits programs.  This motion calls on the Court to consider whether the complaint adequately alleges that Congress has failed to comply with its obligation to provide each and every American equal protection of the laws.  The Government chiefly defends Congress's decisions to exclude Puerto Rico residents from some federal benefits programs on the ground that Puerto Rico residents do not pay income taxes.

Yet not only do Puerto Ricans contribute to the general treasury, but also Puerto Rican patriots have paid the ultimate price for their country -- the United States of America -- since its founding.  Puerto Ricans aided the Continental Army during the Revolutionary War and, since Puerto Rico's cession from

---

[2] For readers unfamiliar with the holiday, Patriots' Day commemorates the Battles of Lexington and Concord in 1775.  See Mass. Gen. Laws ch. 6, § 12J (mandating the Governor of the Commonwealth of Massachusetts "to issue a proclamation calling for a proper observance of April nineteenth as Patriots' Day, in commemoration of the opening events of the War of the Revolution and the struggle through which the nation passed in its early days"); id. at ch. 4, § 7, cl. 18 (recognizing the third Monday in April as a legal holiday in the Commonwealth of Massachusetts).

Spain, fought in the United States military "in every major United States military engagement from World War I onward, with the soldiers of Puerto Rico's 65th Infantry Regiment distinguishing themselves in combat during the Korean War." Shannon Collins, Puerto Ricans Represented Throughout U.S. Military History, United States Department of Defense (Oct. 14, 2016), https://dod.defense.gov/News/Article/Article/974518/puerto-ricans-represented-throughout-us-military-history/.  Puerto Rican service in the United States military has continued to this day.  See id.  All told, more than 116,000 Puerto Ricans have served and more than 1,225 have given their lives in service of the United States.  See id.

Of course, these facts themselves do not dispose of the legal issues that this case presents.  As a lower court in a multi-level court system, this Court obeys higher courts' commands.  The Court nonetheless approaches this case with two fundamental legal principles in mind: (1) the Fifth Amendment guarantees the equal protection of the laws, see Bolling v. Sharpe, 347 U.S. 497, 499 (1954), and (2) Puerto Ricans are American citizens, and have been so for over 100 years, see Jones Act, Pub. L. No. 64-368, § 5, 39 Stat. 951, 953 (1917), current version codified at 48 U.S.C. § 733a.

Turning to the particulars of this case, the plaintiffs Sixta Gladys Peña Martínez ("Peña"),[3] Nélida Santiago Álvarez ("Santiago"), Juan Ramón Vélez Marrero ("Vélez"), María Luisa Aguilar Galíndez ("Aguilar"), Gamaly Vélez Santiago, Victor Ramón Ilarraza Acevedo, Maritza Rosado Concepción, Rosa Maria Ilarraza Rosado, Ramón Luis Rivera Rivera, and Yomara Valderrama Santiago (collectively, the "Plaintiffs") challenge their ineligibility for Supplemental Security Income ("SSI"), Supplemental Nutrition Assistance Program ("SNAP"), and Medicare Part D Low Income Subsidies ("LIS") under the Fifth Amendment Due Process Clause's equal protection component.  Compl. ¶¶ 91-116, ECF No. 1.  The defendants Alex Azar, Secretary of Health and Human Services; Sonny Perdue, Secretary of Agriculture; Nancy A. Berryhill, Deputy Commissioner for Operations of Social Security; and the Social Security Administration (collectively, the "Government") moved to dismiss the Plaintiffs' complaint for lack of subject matter jurisdiction and failure to state a claim.  Defs.' Mot. Dismiss ("Mot. Dismiss") 8-25, ECF No. 10.

On March 27, 2019, the Court DENIED the Government's motion to dismiss.  Electronic Clerk's Notes, ECF No. 55.  The Court

---

[3] "According to Spanish naming conventions, if a person has two surnames, the first (which is the father's last name) is primary and the second (which is the mother's maiden name) is subordinate." United States v. Martínez-Benítez, 914 F.3d 1, 2 n.1 (1st Cir. 2019).  Hence, this memorandum of decision refers to individual plaintiffs by their first family name.

has federal question jurisdiction over the Plaintiffs' claims
given their inability first to receive review in an
administrative forum.  The Plaintiffs also adequately allege
they have standing to sue; to the extent that discovery may
reveal otherwise, the Government may object to standing again.
Finally, the complaint constructs a plausible case that
Congress's choice to exclude Puerto Rico residents from SSI,
SNAP, and LIS lacks a rational basis.

   **A.   Procedural History**

   The Plaintiffs filed their complaint on April 13, 2018.
Compl. 1.  The Government moved to dismiss on June 25, 2018.
Mot. Dismiss 1.  The parties have fully briefed the motion,
Pls.' Mem. Opp'n Defs.' Mot. Dismiss ("Opp'n"), ECF No. 18;
Reply Mem. Supp. Defs.' Mot. Dismiss ("Reply"), ECF No. 21,
which was heard on March 27, 2019, Order, ECF No. 51.  The Court
acknowledges with thanks the amici curiae that participated in
briefing this motion.  See Amicus Br. Espacios Abiertos Supp.
Pls.' Claims, ECF No. 32; Br. Amicus Curiae Allard K. Lowenstein
International Human Rights Clinic, ECF No. 40; Congresswoman
Nydia M. Velázquez's Amicus Curiae Br. Supp. Pls.' Opp'n Defs.'
Mot. Dismiss ("Congresswoman Velázquez Amicus Br."), ECF No. 43;
Puerto Rico Manufacturers Association Amicus Curiae Br. Supp.
Pls.' Claims And Opp'n Defs.' Mot. Dismiss, ECF No. 50.  The
Government filed oppositions to Espacios Abiertos and the Allard

K. Lowenstein International Human Rights Clinic's amicus curiae briefs.  See Defs.' Resp. Amicus Br. Espacios Abiertos Supp. Pls.' Claims, ECF No. 48; Defs.' Resp. Amicus Br. Allard K. Lowenstein International Human Rights Clinic, ECF No. 49.

### B.   Facts Alleged

All the Plaintiffs reside in Puerto Rico and insist that, but for their residency, they would be eligible for one or all of the three challenged programs.  Compl. ¶¶ 14-23.  As such, this fact section first describes (as alleged in the complaint) the programs and federal policy toward Puerto Rico, then recounts facts about the Plaintiffs that are relevant to their putative eligibility for benefits.  This section limits its discussion of the Plaintiffs' circumstances to the allegations necessary to satisfy the Court (at this stage of the proceedings) that at least one plaintiff has Article III standing to contest Puerto Rico residents' exclusion from each program at issue.

### 1.   Challenged Programs

Congress funds all three programs -- SSI, SNAP, and LIS -- from general treasury funds, unlike many federal social insurance programs that Congress funds from a dedicated payroll tax.  See Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. B, tit. IV (Feb. 15, 2019) (funding SNAP for fiscal year 2019); Department of Defense and Labor, Health and Human

Services, and Education Appropriations Act, 2019 and Continuing
Appropriations Act, 2019, Pub. L. No. 115-245, div. B, tit. IV
(Sept. 28, 2018) (funding SSI for fiscal year 2019); 42 U.S.C.
§ 1395w-116 (creating in the Supplementary Medical Insurance
Trust Fund the Medicare Prescription Drug Account and stating
that it will be funded by general revenues); cf. Federal
Insurance Contributions Act, 26 U.S.C. § 3101 et seq.; Self-
Employment Contributions Act, 26 U.S.C. § 1401 et seq.  SSI,
SNAP, and LIS all exclude Puerto Rico residents from eligibility
for benefits.  Compl. ¶¶ 32, 35 (citing 42 U.S.C. §§ 1382(f);
1382c(e)); 51-52; 64-66 (citing 42 U.S.C. § 1395w-114(a)(3)(F)).

### a.   Supplemental Security Income

SSI provides additional cash income to people that are
older than 65, blind, or disabled.  Compl. ¶ 34; 42 U.S.C.
§§ 1382(a), 1382c.  Residents of the states, the District of
Columbia, and the Northern Mariana Islands may qualify for SSI
benefits.  Compl. ¶ 35; 42 U.S.C. § 1382c.  Puerto Rico operates
a substitute program, the Aid to the Aged, Blind, or Disabled
("AABD") program, in place of the SSI program.  Compl. ¶ 38.
The Government subsidizes 75% of AABD's expenses, and AABD
offers lower benefits than SSI.  Compl. ¶ 39; 42 U.S.C. § 1318;
P.R. Laws Ann. tit. 8, §§ 13, 15, 15a.

### b. Supplemental Nutrition Assistance Program

SNAP provides cash assistance to low-income individuals to buy food.  Compl. ¶ 48; 7 U.S.C. § 2011.  Residents of the states, the District of Columbia, Guam, and the United States Virgin Islands may qualify for SNAP benefits.  Compl. ¶ 48; 7 U.S.C. § 2014(b).  Puerto Rico receives a federal block grant to fund its similar Nutrition Assistance Program ("NAP").  Compl. ¶ 56.  More individuals qualify for SNAP than for NAP, and SNAP benefits tend to be larger.  Id. ¶ 57.[4]

### c. Medicare Part D Low Income Subsidies

Medicare Part D subsidizes private insurers' prescription drug plans for Medicare beneficiaries.  Compl. ¶ 62; 42 U.S.C. § 1395w-101(a)(1).  LIS, in turn, subsidizes low-income Medicare beneficiaries so that they can purchase a Medicare Part D insurance plan.  Compl. ¶ 64; 42 U.S.C. § 1395w-114.  Those beneficiaries must reside in a state or the District of Columbia

---

[4] Congress authorized supplemental federal funding for NAP to address food shortages in Puerto Rico in the aftermath of Hurricanes Irma and Maria, see Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, Pub. L. No. 115-72, 131 Stat. 1224 (Oct. 17, 2017), but has not since reauthorized a temporary increase in the NAP block grant, see Supplemental Appropriations Act of 2019, H.R. 268, 116th Congress (2019); see also Danica Coto, Puerto Ricans Struggle to Buy Food Amid Funding Shortfall, Wash. Post (Mar. 29, 2019), https://www.washingtonpost.com/politics/congress/puerto-rico-seeks-more-federal-funds-as-congress-stalls/2019/03/29/d007149c-523a-11e9-bdb7-44f948cc0605_story.html?utm_term=.d37b960c4fbf (reporting that the Puerto Rican government is cutting benefits as federal funding has run out).

and (1) have eligibility for Medicaid and Medicare; (2) receive SSI; (3) participate in a Medicare Savings Program; or (4) "have family income less than 135% of the federal poverty level and have resources that do not exceed certain limits." Compl. ¶ 65; 42 U.S.C. § 1395w-114(a)(1), (a)(3)(A), (a)(3)(F). Congress sends some extra money to the Puerto Rican Medicaid program to support prescription drug insurance but has not funded the program such that it can provide the same benefit as LIS. Compl. ¶¶ 69-70 (citing U.S.C. § 1396u-5(e)).

### 2.   Relevant Federal Policies Towards Puerto Rico

The complaint alleges that Government used tax policy to encourage private companies to invest in Puerto Rico prior to 1996. Compl. ¶ 4. The complaint alleges that ending this policy contributed to Puerto Rico slipping into a recession, which is now going on 13 years. Id. Puerto Rico's economic collapse culminated in its government and public utility companies becoming unable to pay their bills by 2016 and deepened when Hurricane Maria struck the island in 2017. Id. ¶¶ 2, 7. Further, the complaint cites estimates that "between 52.3 to 59.8%" of Puerto Rico residents are impoverished and that hundreds of thousands of residents have left the island.

Id. ¶ 9 & n.15.[5]  Although Puerto Rico residents need not pay income tax, they pay into the public fisc because, the complaint says, they pay some import/export taxes and federal commodity taxes.  Compl. ¶ 86.

### 3.  Plaintiffs

All the Plaintiffs reside in Puerto Rico.  Compl. ¶¶ 14-23. They all allege that, were they to reside in a state, they would receive benefits under one or more of the challenged programs. Id.  In lieu of discussing each Plaintiff's background, this memorandum of decision examines four Plaintiffs' circumstances, which -- as explained below -- suffice at this time to ground this Court's authority to adjudicate this suit's subject matter.

### a.  Peña

At the time she filed suit, Peña was 71 years old and a United States citizen.  Id. ¶ 14.  Although she (apparently) was not born in Puerto Rico, she resided there from 1978 to 2008, before relocating to New York City.  Id.  During her time in New

---

[5] The Plaintiffs cite an article from Prensa Latina, which appears to be the Cuban state news agency, for this estimate. See Compl. ¶ 9 & n.15 (referring to Poverty Rises to 52.3 Percent in Puerto Rico after Hurricane Maria, Prensa Latina (Nov. 28, 2017), https://tinyurl.com/ycnhxhwu).  Although the Plaintiffs' link does not work and the Court has credibility concerns about Cuban state news, the Court credits this allegation only for the purpose of resolving this motion to dismiss, although it keeps an open mind as to whether the Plaintiffs can establish the accuracy of this estimate at a later stage of this proceeding.  See Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 339-40 (D. Mass. 2011).

York City, Peña received about $733.00 in SSI and $198.00 in SNAP benefits monthly.  Id. ¶ 14a-b.

Peña moved back to Puerto Rico in 2016 and currently resides in San Juan.  Id. ¶ 14.  She is unemployed and receives $64.00 in AABD benefits monthly.  Id. ¶¶ 14, 14a.  Initially upon her return, Peña's NAP benefits amounted to $154.00 per month, although at the time of briefing on the motion to dismiss they had increased to $192.50 on account of the post-hurricane temporary increase in the federal NAP block grant.  Id. ¶ 14b & n.17; Opp'n 13.

### b.  Santiago and Vélez

Santiago and Vélez are a married couple, ages 63 and 73 respectively, residing in Toa Alta, Puerto Rico.  Id. ¶¶ 15-16. Their household consists of them plus two grandchildren, over whom they have custody.  Id. ¶¶ 15b, 16b.  The complaint alleges that both Santiago and Vélez "suffer[] from multiple incapacitating health conditions, such as asthma, high blood pressure, and cardiac conditions."  Id. ¶¶ 15a, 16a.  Further, the complaint states that Santiago uses an implantable cardioverter-defibrillator and that Vélez cannot see out of one eye.  Id.

While the complaint does not allege that either Santiago or Vélez receives AABD benefits, it claims that their aforementioned disabilities and Vélez's partial blindness would

qualify them for SSI benefits but for their residence in Puerto Rico instead of a state.  Id.  Their household benefits from $416.00 in NAP payments, which, the complaint asserts, is lower than the payments that it would be eligible to receive under SNAP.  Id. ¶¶ 15b, 16b.

### c.  Aguilar

Aguilar, age 82, lives in San Juan, Puerto Rico.  Id. ¶ 17. The complaint alleges that she cannot see out of her left eye and has many cardiological and neurological ailments.  Id.  Her sole sources of monthly income are a pension of $526.58 and Social Security disability benefits of $919.00.  Id.  She receives healthcare using Medicare Parts A, B, and C benefits. Id. ¶ 17a.  The complaint avers that she also qualifies for Medicaid.  Id.  Aguilar thus contends that she would be entitled to Medicare Part D LIS if she lived in a state.  Id.

## II.  SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction to adjudicate this case.  First, despite the Government's exhortations, Mot. Dismiss 8-11, the Plaintiffs do not need to comply with a statutory requirement to channel their SSI and LIS challenges through an administrative process because they lacked an administrative avenue to pursue them.  See Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 19-20 (2000); Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 680-81

(1986).  Second, though the Government presses that no Plaintiff has standing to challenge SNAP, Mot. Dismiss 15-17; Reply 6-7 & n.9, the complaint adequately alleges the elements of Article III standing to attack that program.  See Compl. ¶¶ 99-106; Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190 (2000).  Therefore, the Court DENIED the Government's motion to dismiss for lack of subject matter jurisdiction.

### A.   Standard of Review

Challenges to the Plaintiffs' proper channeling of and standing to bring their claims implicate the Court's subject matter jurisdiction.  See Corliss v. Barnhart, 225 F. Supp. 2d 104, 108-09 (D. Mass. 2002) (Collings, M.J.) (channeling); United Seniors Ass'n, Inc. v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007) (standing).  Because the Plaintiffs invoke the Court's subject matter jurisdiction, they bear the burden of showing subject matter jurisdiction exists.  See Wolf v. Altitude Costa LLC, 347 F. Supp. 3d 106, 108 (D.P.R. 2018) (quoting Fábrica de Muebles J.J. Álvarez, Incorporado v. Inversiones Mendoza, Inc., 682 F.3d 26, 32 (1st Cir. 2012)).  Where the defendants challenge the sufficiency of the plaintiffs' assertions to establish subject matter jurisdiction, the Court credits the plaintiffs' "well-pleaded factual allegations (usually taken from the complaint, but sometimes

augmented by an explanatory affidavit or other repository of uncontested facts) [and] draw[s] all reasonable inferences from them in [their] favor." See Valentín v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).

B.   **Analysis**

The Court concludes that it has federal question jurisdiction over this action because the Plaintiffs need not pursue Social Security and Medicare claims through an administrative process when the Social Security Administration does not permit them to apply for benefits.   See Illinois Council, 529 U.S. at 19.   Further, the Plaintiffs have standing to raise their claims because they have adequately alleged that they would be entitled to receive greater benefits under SNAP than they currently do under NAP.   See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

1.   **Enforcing a Channeling Requirement Would Result in No Review at All**

The Plaintiffs cannot pursue their arguments in an administrative process that would lead to judicial review.   The Government insists that the Social Security and Medicare Acts require the Plaintiffs to channel their claims through an administrative review process prior to seeking judicial review. Mot. Dismiss 8-11.   In response, the Plaintiffs contend that their claims fall into an exception to that requirement for

claims that would receive no review at all in the administrative process. Opp'n 6-8. As a fallback position, the Plaintiffs posit that they have met the channeling requirement because they attempted to apply for benefits and that the Court should waive the exhaustion requirement. Id. at 8-9.

The Social Security and Medicare Acts contain so-called "channeling requirements," which mandate that plaintiffs bring claims "arising under" those acts through an administrative review process prior to judicial review. See 42 U.S.C. §§ 405(g),(h), 1383(c)(3), 1395ii.[6] Because the Supreme Court presumes that Congress did not intend to foreclose judicial review of claims arising under those acts, it reasons that these channeling requirements do not apply where their application "would mean no review at all." Illinois Council, 529 U.S. at 19; Michigan Acad. of Family Physicians, 476 U.S. at 680-81.

The "no review at all" exception does not apply when an agency simply declines to consider an argument or provide the requested relief because a federal court may still supplement the administrative record and enter appropriate relief. See Justiniano v. Social Sec. Admin., 876 F.3d 14, 23 (1st Cir. 2017) (holding that "no review at all" exception did not apply

---

[6] The Plaintiffs implicitly concede that their arguments arise under the Social Security and Medicare Acts. See Opp'n 5-9.

where the agency would not consider claimant's particular
contention during administrative process (quoting Illinois
Council, 529 U.S. at 23-24)); see also Elgin v. Department of
the Treasury, 567 U.S. 1, 9-10 (2012) (holding plaintiffs must
proceed through administrative appeals process before bringing
constitutional claims in court of appeals after the final agency
decision).  Accordingly, to show that this exception applies,
the Plaintiffs must demonstrate that they cannot use the
administrative process to generate a final decision appealable
to the courts.  Puerto Rican Ass'n of Physical Med. & Rehab.,
Inc. v. United States, 521 F.3d 46, 49 (1st Cir. 2008).

The Plaintiffs assert that their claims fall within the "no
review at all" exception because the Social Security
Administration, which administers the applications for both SSI
and LIS, prevented them from applying.  Opp'n 7.  In support of
this position, they submit a declaration sworn under penalty of
perjury from one of their attorneys, Alana Vizcarrondo
("Attorney Vizcarrondo"), which details her attempts to apply
for benefits on behalf of her clients.  Opp'n, Ex. 1, Decl.
Alana Vizcarrondo ("Vizcarrondo Decl.") 4, ECF No. 18-1.

The parties agree that an applicant may file a request for
benefits in three ways: by (1) completing an online form, (2)
meeting with a Social Security representative in-person, or

(3) requesting a form from the Social Security Administration and mailing back a completed version.  See Opp'n 6-7; Reply 6.

Attorney Vizcarrondo declares that she could not submit online applications for either set of benefits because the Social Security Administration website states that Puerto Rico residents may not apply for those benefits.  Vizcarrondo Decl. ¶¶ 7, 13-15.  As for the latter two options, Attorney Vizcarrondo recounts that, when she called the Guaynabo, Puerto Rico Social Security Administration office, Social Security Administration employees told her that her clients could not apply and that they did not know of an application form that her clients could use.  Id. ¶¶ 8, 16.  Notwithstanding Attorney Vizcarrondo's declaration, the Government insists that the Plaintiffs could have made an appointment and requested a paper application.  See Reply 6.

Although the Government represents that it has a policy of accepting all applications for SSI and LIS, Reply 2-3, the Government does not controvert Attorney Vizcarrondo's averment that employees at the Guaynabo Social Security Administration Office told her that it did not have the ability to take the Plaintiffs' applications.  Vizcarrondo Decl. ¶¶ 8, 16.  This is consistent with the undisputed Social Security Administration websites and forms, which evince an implicit policy not to review applications from Puerto Rico residents at all.  See

[17]

generally Vizcarrondo Decl., Exs. A (Supplemental Security
Income Application Instructions) & C (Medicare Part D Low Income
Subsidies Application Instructions).  Ergo, the Court rules that
the Plaintiffs' claims need not be channeled through an
administrative process before receiving judicial review.[7]  As
such, the Court has jurisdiction under section 1331 of chapter
28 of the United States Code to entertain these claims.  See
Compl. ¶ 11.[8]

> **2.  The Plaintiffs Sufficiently Allege That They
> Suffered an Injury in Fact by Dint of Their
> Ineligibility for SNAP Benefits**

Plaintiffs have standing to bring their SNAP claims.[9]  To
establish constitutional standing, Plaintiffs must establish

---

[7] The Court therefore has no occasion to address the
Plaintiffs' arguments that they presented their claims for
benefits and that the Court ought waive the requirement that
they exhaust the administrative process.  See Opp'n 8-9.

[8] Because the Supreme Court has inferred that the Fifth
Amendment equal protection guarantee provides parties with a
private cause of action for damages within federal question
jurisdiction, Davis v. Passman, 442 U.S. 228, 244 (1979), the
Court has statutory subject matter jurisdiction over the
Plaintiffs' suit for declaratory and supplemental relief, see
Compl. ¶ 117; 28 U.S.C. §§ 2201, 2202; Skelly Oil Co. v.
Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950).

[9] The Government questions, in its motion to dismiss, the
standing of several of the Plaintiffs to contest the denial of
SSI to Puerto Rico residents.  Mot. Dismiss 14-15.  Yet the
Government acknowledges that Peña has standing to sue, Reply 6
n.9, and so the Court has jurisdiction to entertain the SSI
count.  See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,
547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with

three elements: (1) an "injury in fact" that is (2) "causal[ly] connect[ed]" to the Government's policy and (3) "likely" redressable by a court order.  See Defenders of Wildlife, 504 U.S. at 560-61 (internal citations and quotations omitted).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," because the Court presumes "that general allegations embrace those specific facts that are necessary to support the claim."  See id. (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 889 (1990)).

Of the elements of constitutional standing, the Government suggests that the Plaintiffs only have failed to allege an injury in fact from their ineligibility for SNAP.  Mot. Dismiss 15-17; Reply 6-7 & n.9.  "[I]n a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'"  Friends of the Earth, 528 U.S. at 190 (emphasis added) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)).

---

standing is sufficient to satisfy Article III's case-or-controversy requirement.").  In its reply, the Government appropriately reserved its right to dispute Peña and the other Plaintiffs' standing to attack the SSI program's eligibility requirements if the case moves forward.  Reply 6 n.9.

When members of a group challenge a government-imposed "barrier" to access to a benefit, "the denial of equal treatment result[s] from the imposition of the barrier, not the ultimate inability to obtain the benefit." Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993).  Therefore, to establish an injury, a group member "need only demonstrate that it is able and ready to [apply for the benefit] and that a discriminatory policy prevents it from doing so on an equal basis." See id.

The Government contends that the Plaintiffs currently receive NAP benefits in excess of the benefits they could receive from SNAP because of a 2017 increase in federal funding for NAP.  Reply 6-7.  The Government thus insists that the Plaintiffs may not challenge SNAP because they are not suffering an injury.  Id.

The Plaintiffs respond that their allegation that they would qualify for SNAP because of their low incomes and limited resources establishes an injury in fact on a motion to dismiss. Opp'n 12.  They also dispute that the 2017 temporary increase in NAP funding caused every Plaintiff to receive as much or more in NAP benefits than they would have with SNAP.  Id. at 13. Furthermore, the Plaintiffs argue that because the 2017 increase expires in 2019, it constitutes a voluntary (and temporary) cessation of an allegedly unconstitutional policy, and so it

does not defeat standing.  Id. (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 288–89 & n.11 (1982)).

At the motion to dismiss stage, the Court credits the complaint's allegations that at least Plaintiffs Santiago and Vélez would qualify for SNAP if they lived in a state and that SNAP benefits would exceed their NAP benefits.  The complaint alleges that Plaintiffs Santiago and Vélez are married, unemployed, aged 63 and 73 respectively, and responsible for two young grandchildren.  Compl. ¶¶ 15-16.  The complaint further states that their household receives $416.00 in NAP benefits and that the household would be eligible to receive more in SNAP benefits.  Id.  The Government provides a helpful link to a United States Department of Agriculture webpage that indicates that the Santiago and Vélez household might be entitled to $642.00, not $416.00, in nutrition assistance if they could access SNAP.  See Reply 7 n.10 (citing SNAP: Am I Eligible for SNAP, United States Department of Agriculture (Nov. 16, 2018), https://www.fns.usda.gov/snap/eligibility ("How much could I receive in SNAP benefits?") (indicating that, with no net monthly income, a four-person household would receive a maximum monthly allotment of $642.00)).

The Government raises legitimate concerns about whether the Plaintiffs actually would qualify and the exact amount they

would receive under NAP and SNAP,[10] but its concerns flow from
questions of fact not easily resolved by reference to the
complaint.  See Mot. Dismiss 15-17.  After discovery, the
Government could renew its motion on the ground that the
Plaintiffs would not be entitled to SNAP benefits or that their
benefits under SNAP would not be greater than their current NAP
benefits.  See Defenders of Wildlife, 504 U.S. at 561 (noting
increasing burden for plaintiffs to show standing as their suit
progresses); see also Wittman v. Personhuballah, 136 S. Ct.
1732, 1736 (2016) ("The need to satisfy these three [standing]
requirements persists throughout the life of the lawsuit.").

In any event, Puerto Rico has depleted the funds Congress
appropriated for the one-time funding increase.  See Danica
Coto, Puerto Ricans Struggle to Buy Food Amid Funding Shortfall,
Wash. Post (Mar. 29, 2019), https://www.washingtonpost.com/polit
ics/congress/puerto-rico-seeks-more-federal-funds-as-congress-
stalls/2019/03/29/d007149c-523a-11e9-bdb7-

---

[10] Most pertinently, the Government asserts that material
differences exist in how NAP and SNAP calculate a claimant's
resources, which must be below a certain threshold for a
claimant to obtain benefits.  See Mot. Dismiss 4, 16.  The
Government, however, does not point to differences that might
make a material difference.  At the time of briefing, SNAP
permitted a household to hold more countable resources than NAP
did.  See id. at 4 (stating that SNAP allowed $3,250 in
countable resources for households with a member aged 60 or over
and NAP $3,000).  If discovery reveals that the Plaintiffs
challenging SNAP rely on exclusions unavailable in SNAP to
qualify for NAP, this Court will reconsider their standing.

44f948cc0605_story.html?utm_term=.d37b960c4fbf.  That depletion was "likely to occur" when the Plaintiffs filed their suit because Congress had only appropriated a lump-sum increase in discretionary spending on NAP, as opposed to amending the mandatory block grant for NAP.  See Friends of the Earth, 528 U.S. at 190; cf. Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411 (2013) (reasoning that the plaintiffs failed to show injury in fact because they did not "offer any evidence" that the Government planned to or had subjected them to the challenged policy); compare Pub. L. No. 115-72 (Oct. 26, 2017) (providing emergency NAP funding increase) with 7 U.S.C. § 2028(a)(2) (describing Puerto Rico's automatic, annual NAP block grant, last amended in 2014).  Should Congress change NAP funding again during the pendency of this litigation, the Court will entertain a fresh attack on the Plaintiffs' standing to challenge SNAP.

At least Santiago and Vélez thus have suffered an injury in fact with regard to SNAP benefits, and because the presence of one party with standing suffices to provide this Court with jurisdiction, the Court DENIED the Government's motion to dismiss on standing grounds.  See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

## III. FAILURE TO STATE A CLAIM

The Court also DENIED the motion to dismiss the complaint for failure to state a claim.  While it rejects the Plaintiffs and their amici's entreaties to apply heightened scrutiny, the Court reads the complaint plausibly to allege that the challenged programs' exclusion of Puerto Rico residents does not withstand rational basis review.

### A.   Standard of Review

A complaint survives a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss where it alleges "enough facts to state a claim to relief that is plausible on its face."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In analyzing the sufficiency of the complaint, the Court accepts the complaint's allegations as true and draws all reasonable inferences in the plaintiff's favor.  Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 339-40 (D. Mass. 2011) (citing Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000)).  The Court may also consider undisputed facts that are central to the plaintiffs' claims submitted in documents filed in the motion to dismiss briefing.  See Winfield v. Town of Andover, 305 F. Supp. 3d 286, 292 (D. Mass. 2018) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

The Fourteenth Amendment to the United States Constitution forbids states from denying "any person within its jurisdiction the equal protection of the laws."  The Supreme Court has recognized that discrimination may constitute "a denial of due process of law," thereby violating the Fifth Amendment, which applies to the federal government.  Bolling, 347 U.S. at 499 (1954).  "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."  Buckley v. Valeo, 424 U.S. 1, 93 (1976) (per curiam).

As analyzed in detail below, precedent requires the Court to apply rational basis review to these equal protection claims.  See infra, section III.B.1.  Rational basis review requires that the "classification in question is rationally related to a legitimate [government] interest."  Powell v. Tompkins, 926 F. Supp. 2d 367, 393 (D. Mass. 2013) (quoting Kimel v. Florida Bd. of Regents, 528 U.S. 62, 83 (2000)), aff'd, 783 F.3d 332 (1st Cir. 2015).  This standard means that the Court does not evaluate the Government's wisdom in discriminating among groups, but instead considers whether Congress rationally could believe that its enactment furthers a valid public purpose.  See United States R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 175–76 (1980) (citing Jefferson v. Hackney, 406 U.S. 535, 549 (1972); Flemming v. Nestor, 363 U.S. 603, 611 (1960)).  Nevertheless, Congress may neither "rely on a classification whose relationship to an

asserted goal is so attenuated as to render the distinction arbitrary or irrational," nor seek to further an objective that is not a "legitimate" interest, "such as 'a bare . . . desire to harm a politically unpopular group.'"  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446-47 (1985) (alteration in original) (quoting United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)).

**B.  Analysis**

The complaint survives this motion to dismiss, but only just.  Notwithstanding the Plaintiffs and their amici's pleas, see, e.g., Opp'n 16-19, Supreme Court precedent requires this Court to apply rational basis review to this alleged violation of the Fifth Amendment's Equal Protection guarantee, see Harris v. Rosario, 446 U.S. 651, 651-52 (1980) (per curiam); Califano v. Gautier Torres, 435 U.S. 1, 5 (1978) (per curiam).  The Court rejects the Government's suggestion, however, that these cases preclude a ruling that these programs, today, falter under rational basis review.  See Reply 11-15.

**1.  Supreme Court Precedent Requires the Court to Apply Rational Basis Review**

The Plaintiffs admit that the Supreme Court applied rational basis review to prior equal protection claims that Puerto Rico residents advanced but argue that recent Supreme Court cases undermine those precedents.  Opp'n 2.  The

Government responds that this Court should apply rational basis review until the Supreme Court overrules its conclusion that this standard applies for equal protection challenges to legislation premised on distinctions between residents of Puerto Rico and residents of states.  Reply 8-9 & n.12.  The Government has the better of this debate.

> **a.    The Court must first identify the precise holdings of relevant Supreme Court precedents**

Evaluating this debate requires a close study of two Supreme Court per curiam summary reversals: Califano v. Gautier Torres, 435 U.S. 1 (1978) (per curiam) and Harris v. Rosario, 446 U.S. 651 (1980) (per curiam).  "The Supreme Court's summary disposition of an appeal to it is an adjudication on the merits that must be followed by lower courts, subject, of course, to any later developments that alter or erode its authority." Auburn Police Union v. Carpenter, 8 F.3d 886, 894 (1st Cir. 1993) (citing Hicks v. Miranda, 422 U.S. 332, 343-45 (1975)). Only the Supreme Court, however, may overrule its precedents. See State Oil Co. v. Khan, 522 U.S. 3, 20 (1997).  Therefore, a Supreme Court precedent that has "direct application in a case" controls a lower court's adjudication, even where other Supreme Court decisions challenge the underlying reasoning of that directly applicable case.  Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989).  The First Circuit

recently reaffirmed that applying heightened scrutiny to Puerto
Rico residents' equal protection claims would be "inconsistent
with Supreme Court precedent."  United States v. Ríos-Rivera,
913 F.3d 38, 44 (1st Cir. 2019), petition for cert. filed, (U.S.
Apr. 8, 2019) (No. 18-8769).

Still, the facts presented and the arguments the Supreme
Court actually addressed in the relevant cases limit their
reach.  See Illinois State Bd. of Elections v. Socialist Workers
Party, 440 U.S. 173, 182-83 (1979); Mandel v. Bradley, 432 U.S.
173, 177 (1977).  In other words, this Court must determine
whether Califano and Harris control, are only analogous, or are
irrelevant to this case.  This Court first "determine[s] the
'reach and content'" of Califano and Harris.  Auburn Police
Union, 8 F.3d at 894 (quoting Hicks, 422 U.S. at 345 n.14).  The
Court understands Califano and Harris to mandate rational basis
review (thereby controlling the outcome of the first debate) but
not to decide the particular questions raised by this complaint
(thereby providing only analogous authority).

### b.   Califano v. Gautier Torres, 435 U.S. 1 (1978) (per curiam)

In Califano, the Government appealed a court ruling that
the SSI program's exclusion of Puerto Rico residents violated
the constitutional right to travel as applied to beneficiaries
who lost eligibility upon moving to the island.  435 U.S. at 2-

3.  The Supreme Court reversed that ruling on the ground that
the right to travel does not require "that a person who travels
to Puerto Rico must be given benefits superior to those enjoyed
by other residents of Puerto Rico if the newcomer enjoyed those
benefits in the State from which he came."  Id. at 4.  The
Supreme Court observed in a footnote that the complaint also
raised an equal protection claim and stated that "the District
Court apparently acknowledged that Congress has the power to
treat Puerto Rico differently, and that every federal program
does not have to be extended to it."  Id. at 3 n.4.  In a
separate footnote, and following a discussion of the right to
travel, the Supreme Court recounted the reasons that the
Government proffered in the district court for why Puerto Rico
residents' exclusion from the SSI program did not deny Puerto
Rico residents equal protection of the laws:

> First, because of the unique tax status of Puerto Rico,
> its residents do not contribute to the public treasury.
> Second, the cost of including Puerto Rico would be
> extremely great -- an estimated $300 million per year.
> Third, inclusion in the SSI program might seriously
> disrupt the Puerto Rican economy.

Id. at 5 n.7 (citing Department of Health, Education, and
Welfare, Report of the Undersecretary's Advisory Group on Puerto
Rico, Guam and the Virgin Islands 6 (Oct. 1976) ("HEW Report")).
Aside from these observations, the Supreme Court did not discuss
equal protection principles.  See generally id.

        c.  **_Harris_ v. _Rosario_, 446 U.S. 651 (1980) (per curiam)**

In _Harris_, however, the Supreme Court read _Califano_ more broadly than its text might naturally suggest.  See _Harris_, 446 U.S. at 654-55 (Marshall, J., dissenting).  There, Puerto Rican plaintiffs challenged the Aid for Families with Dependent Children's ("AFDC") exclusion of Puerto Rico residents on the ground that it "violates the Fifth Amendment's equal protection guarantee."  _Id._ at 651.  The Court stated that:

> Congress, which is empowered under the Territory Clause of the Constitution, U.S. Const., Art. IV, § 3, cl. 2, to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," may treat Puerto Rico differently from States so long as there is a rational basis for its actions.  In [_Califano_], we concluded that a similar statutory classification was rationally grounded on three factors: Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State under the statute would be high; and greater benefits could disrupt the Puerto Rican economy.  These same considerations are forwarded here in support of [this program] and we see no reason to depart from our conclusion in [_Califano_] that they suffice to form a rational basis for the challenged statutory classification.

_Id._ at 651-52.

        d.  **The "reach and content" of _Califano_ and _Harris_**

The reasoning of _Califano_ and _Harris_ invites at least five observations relevant to this motion's resolution.  First, although the _Harris_ plaintiffs challenged the statute under the Fifth Amendment, the Supreme Court did not cite either the Fifth

or Fourteenth amendments' equal protection provisions in its
analysis.  See id.  Instead, it cited Article IV, section 3,
clause 2 (the "Territory Clause") and Califano -- which, as
discussed above, may be read to decide only that the right to
travel does not require migrants to Puerto Rico to receive the
same level of benefits as they did on the mainland -- to support
its analysis.  See id.

 The Supreme Court's choice to cite the Territory Clause and
not the Due Process Clause appears odd because the case on its
face is not about the reach of Congress's authority to govern
Puerto Rico as a jurisdiction but on its discriminatory
treatment of Puerto Rico residents.  The Government here relies
on the citation to the Territory Clause to suggest that a weaker
form of rational basis review applies to legislation Congress
passed pursuant to the Territory Clause.  Mot. Dismiss 23-24.
The Government's reading of Harris conflicts with other Supreme
Court cases applying equal protection principles equally to
United States citizens residing in Puerto Rico and those
residing elsewhere.  See Rodriguez v. Popular Democratic Party,
457 U.S. 1, 7-8 (1982) (holding that Puerto Rico citizens have
the same equal protection right to an equivalent vote as other
United States citizens) (citing Examining Bd. of Eng'rs,
Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 599–601
(1976); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663

(1974)).  A better way to understand the Supreme Court's words
would be that the Territory Clause implicitly permits Congress
to subject territories to different schemes and so differing
treatment ought not be subjected to heightened judicial review.
See Aurelius Inv., LLC v. Puerto Rico, 915 F.3d 838, 851-53 (1st
Cir. 2019) (observing that the Territory Clause's grant of
plenary power does not abrogate other constitutional
restrictions on Congress's lawmaking authority, even though some
provisions must "bend to the peculiar demands of providing for
governance within the territories").

Second, the Supreme Court construed Califano in Harris to
"conclude" that SSI's bar of Puerto Rico residents had a
rational basis.  Harris, 446 U.S. at 651-52.  It then found that
the three "considerations" mentioned in Califano "suffice[d] to
form a rational basis."  Id. at 652.  Notably, the Supreme Court
lists one reason after another, connected by an "and."  Id.  The
Supreme Court's use of the conjunctive appears to indicate that
no one "consideration" independently sufficed to justify the
exclusion of Puerto Rico residents from eligibility for SSI.
See OfficeMax, Inc. v. United States, 428 F.3d 583, 589 (6th
Cir. 2005) (Sutton, J.) (noting that "the Supreme Court has said
that 'and' presumptively should be read in its 'ordinary'
conjunctive sense unless the 'context' in which the term is used
or 'other provisions of the statute' dictate a contrary

interpretation" (quoting <u>Crooks</u> v. <u>Harrelson</u>, 282 U.S. 55, 58 (1930)); <u>see generally</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 116-25 (2012).

Third, the Supreme Court never explained what it meant -- either in <u>Califano</u> or <u>Harris</u> -- when it reasoned that extending benefits programs might "disrupt" the Puerto Rican economy. <u>See</u> <u>Harris</u>, 446 U.S. at 652 (stating that "greater benefits could disrupt the Puerto Rican economy" (citing <u>Califano</u>)); <u>Califano</u>, 435 U.S. at 5 n.7 (hypothesizing that "inclusion in the SSI program might seriously disrupt the Puerto Rican economy" (citing HEW Report 6)). Congresswoman Velázquez attached to her brief the report upon which the Supreme Court relied, but that report does not put forward an economic theory supporting the conclusion that Puerto Rico's "inclusion in the SSI program might seriously disrupt the Puerto Rican economy." <u>See</u> Congresswoman Velázquez Amicus Br., Ex. 1, HEW Report 6, ECF No. 43-1. In fact, that report cites the example of the Food Stamp Program, which Congress had extended to Puerto Rico, as "show[ing] that a large influx of assistance does not necessarily disrupt the economy." <u>See</u> Congresswoman Velázquez Amicus Br. 5-7; HEW Report 6.

Fourth, the three reasons that the Supreme Court offered might change over time. The Supreme Court cited a contemporary policy evaluation document -- the HEW Report -- to locate a

rational basis for Congress's decision to exclude Puerto Rico residents from the challenged programs.  See Harris, 446 U.S. at 652; Califano, 435 U.S. at 5 n.7.  Today, Puerto Rico's tax status might have changed, the cost of expansion of AFDC or SSI might have decreased, or it might have become irrational to believe that introducing AFDC or SSI in Puerto Rico would disrupt the Puerto Rican economy.

Fifth, the Supreme Court's comment that "Puerto Rican residents do not contribute to the federal treasury" requires some explanation because Puerto Rico residents did pay some taxes in both 1978 and 1980, the years of the Califano and Harris decisions, respectively.  See Harris, 446 U.S. at 652; Califano, 435 U.S. at 5 n.7.  The Supreme Court possibly meant to point out that Puerto Ricans did not -- and currently do not -- pay income taxes.  See Reply 13.  It is likely that the Supreme Court distinguished between taxes that fund the Government's general operations and taxes -- such as the payroll taxes that Puerto Rico residents pay -- that fund specific programs.  See id. at 13 n.15 (citing 26 U.S.C. § 3101 et seq.).

At bottom, then, the Court reads Harris and Califano to stand for the following: rational basis review applies to equal protection challenges to social welfare programs made unavailable to Puerto Rico residents and the facts presented in

those two cases provided rational bases for the distinctions there.

### e.  __Harris__ and __Califano__ are still good law

The Plaintiffs and their amici invite the Court to disregard Harris and Califano on the ground that the Supreme Court has undermined their reasoning.  Nevertheless, the Supreme Court has not overruled either decision or expressly repudiated their reasoning.  As a consequence, this Court is bound to follow those cases unless and until the Supreme Court states otherwise.  See Figueroa v. Rivera, 147 F.3d 77, 81 n.3 (1st Cir. 1998).  To the extent that Harris and Califano rest on the much-criticized Insular Cases,[11] which infamously held that the Constitution does not follow the flag, the Court has no authority to set them aside on that ground.  Aurelius Inv., 915 F.3d at 854 & n.12 (observing that the Insular Cases' "unincorporated territories doctrine" is "discredited" and citing, among other scholarly works, Christina Duffy Burnett, A Convenient Constitution?: Extraterritoriality After Boumediene,

---

[11] The Insular Cases are seven cases that the Supreme Court decided shortly after Spain ceded Puerto Rico to the United States.  Balzac v. Porto Rico, 258 U.S. 298 (1922); Dorr v. United States, 195 U.S. 138 (1904); De Lima v. Bidwell, 182 U.S. 1 (1901); Dooley v. United States, 183 U.S. 151 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Dooley v. United States, 182 U.S. 222 (1901); Goetze v. United States, 182 U.S. 221 (1901); see also Rafael Hernández Colón, The Evolution of Democratic Governance Under the Territorial Clause of the U.S. Constitution, 50 Suffolk U. L. Rev. 587, 588 n.4 (2017).

109 Colum. L. Rev. 973, 982 (2009); Jamal Greene, <u>The Anticanon</u>,
125 Harv. L. Rev. 379, 437 (2011); Charles E. Littlefield, <u>The
Insular Cases</u>, 15 Harv. L. Rev. 169, 170 (1901)).  The First
Circuit recently refused to "be induced to engage in an ultra
vires act" -- <u>i.e.</u>, declaring the <u>Insular Cases</u> bad law --
"merely by siren songs."  <u>Aurelius Inv.</u>, 915 F.3d at 855; <u>see
also</u> <u>Ríos-Rivera</u>, 913 F.3d at 44 (stating that applying
heightened scrutiny to a statute treating persons in Puerto Rico
differently those present in states would be "inconsistent with
Supreme Court precedent").

　　In a recent challenge to the SSI program's exclusion of
Puerto Rico residents, Chief Judge Gelpí reasoned that he did
not need to apply <u>Harris</u> or <u>Califano</u> because <u>Boumediene</u> v. <u>Bush</u>,
553 U.S. 723 (2008), and <u>United States</u> v. <u>Windsor</u>, 570 U.S. 744
(2013), abrogated them.  <u>United States</u> v. <u>Vaello-Madero</u>, 356 F.
Supp. 3d 208, 215 n.7 (D.P.R. 2019).  This Court respectfully
disagrees.  The Supreme Court did not cite <u>Harris</u> or <u>Califano</u> in
either case, and both can be reconciled with these later cases
that Chief Judge Gelpí cites.  <u>See generally</u> <u>Windsor</u>, 570 U.S.
744; <u>Boumediene</u>, 553 U.S. 723.

　　Despite Chief Judge Gelpí's suggestion, the Supreme Court
did not hold in <u>Harris</u> or <u>Califano</u> that Congress could "switch
the Constitution on or off at will" as the Supreme Court forbade
in <u>Boumediene</u>.  <u>See</u> <u>Vaello-Madero</u>, 356 F. Supp. 3d at 213

(quoting Boumediene, 553 U.S. at 765).  Instead, Harris and Califano establish that the Government may justify discriminating against Puerto Rico residents upon a rational basis.  Harris, 446 U.S. at 651-52; Califano, 435 U.S. at 5.

Windsor, wherein the Supreme Court struck down the Defense of Marriage Act, also fits with Harris and Califano.  There, the Supreme Court held that the law did not pass rational basis review because the only support the Court found for the act was animus, whereas in Harris and Califano, the Court located other legitimate reasons.  Compare Windsor, 570 U.S. at 769-70 (ruling that the Defense of Marriage Act's "avowed purpose and practical effect of the law in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States") with Harris, 446 U.S. at 651-52 (holding that Congress could validly exclude Puerto Rico residents from a benefit program because "Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State under the statute would be high; and greater benefits could disrupt the Puerto Rican economy").  Therefore, this Court declines to follow Chief Judge Gelpí's reasoning in Vaello-Madero.

In sum, the Court rules that Harris and Califano stand for the following two propositions:  First, when Congress legislates

differently for Puerto Rico, or its residents, than it does for
the states, or their residents, those distinctions receive
rational basis review.  Second, the contemporary factual reasons
that the Supreme Court cited in those cases -- Puerto Rico's tax
status, the cost of extending benefits, and the potential to
disrupt the Puerto Rican economy -- cleared the bar of rational
basis review.

> **2.    The Complaint Plausibly Alleges That Puerto Rico
> Today Differs Materially from Puerto Rico in 1980**

The Plaintiffs' complaint states a plausible claim for
relief for three reasons.  First, the Supreme Court in Harris
and Califano did not hold that each of the three reasons it
cited sufficed independently to justify the discrimination in
those programs.  The Court takes those cases to hold that those
reasons combined justify disparate treatment of Puerto Rico
residents.  Second, the complaint plausibly alleges that the
justifications that the Government proffered in Harris and
Califano no longer support the disparate treatment of Puerto
Rico residents in these particular programs.  See, e.g.,
National Coal. for Men v. Selective Serv. Sys., 355 F. Supp. 3d
568, 575-76 (S.D. Tex. 2019) ("National Coalition") (reasoning
that Rostker v. Goldberg, 453 U.S. 57 (1981), which held that
male-only selective service registration did not violate equal
protection, did not foreclose a new equal protection challenge

predicated on a change in opportunities for women in the military).  Third, the complaint alleges that if those justifications have evaporated, the exclusion of Puerto Rico residents from these programs is not "rationally related to a legitimate [government] interest."  Compl. ¶ 86; see also Powell, 926 F. Supp. 2d at 393.

### a. Each cited reason in the Harris and Califano cases was necessary to their outcomes

The Harris and Califano decisions rested on three interdependent reasons, none of which the Supreme Court expressly indicated was independently sufficient.  Indeed, Harris strongly suggests that all three bases were necessary to support the laws in question.  See 446 U.S. at 652 (listing each "consideration[]" separated by an "and" and stating that those considerations "suffice to form a rational basis" for AFDC); see also OfficeMax, 428 F.3d at 589.

Further, the Supreme Court has held that the second reason cited in Harris and Califano, to save money, cannot support a finding of rational basis on its own.  See Harris, 446 U.S. at 651-52 (citing Califano, 435 U.S. 1).  In Department of Agriculture v. Moreno, decided before Harris, the Supreme Court ruled that Congress could not solely justify its exclusion of eligibility from the AFDC program of households containing unrelated people on cost savings.  See 413 U.S. 528, 537 (1973).

It thus inferred that the true motivation behind the differential treatment was animus against "hippies."  Id. at 534-35.

The Government points out that the Court's review of Congress's spending decisions "must be deferential."  Reply 14 (citing Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW, 485 U.S. 360, 373 (1988)). Fair enough, but such deference on "does not mean that Congress can pursue the objective of saving money by discriminating against individuals or groups" -- even where that discrimination receives only rational basis review.  See Lyng, 485 U.S. at 373. Therefore, the Government must produce some other legitimate government interest to sustain Congress's choice to restrict benefits eligibility.  See id. at 371-73 (upholding ineligibility for food stamps for strikers because it "is rationally related to the legitimate governmental objective of avoiding undue favoritism to one side or the other in private labor disputes").

Accordingly, Congress cannot categorically exclude a non-suspect class of people -- e.g. red-haired citizens -- from federal benefits programs simply to save money.  Although Congress need not identify the reason itself, a court must be able to identify a valid rationale to buttress the cost-saving decision.  See United States R.R. Ret. Bd., 449 U.S. at 179.

Although in the complex area of economic policy "the legislature must be allowed leeway to approach a perceived problem incrementally," the Court must be able to identify a "conceivable basis" for the classification grounded in the world as it is.  See Fed. Commc'ns Comm. v. Beach Commc'ns, Inc., 508 U.S. 307, 316 (1993) (citing Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483 (1955)).  Even though the Supreme Court in Beach Communications did say that such classifications are "virtually unreviewable," Reply 9 (quoting Beach Commc'ns, 508 U.S. at 316), before upholding a statute regulating cable systems, it analyzed the assumptions behind the distinction before ruling it had a rational basis, see Beach Commc'ns, 508 U.S. at 316-20).  Put another way, "virtually unreviewable" does not mean "unreviewable."  See Beach Commc'ns, 508 U.S. at 316-20.

Consequently, both the Supreme Court's grammar and pre and post-Harris case law suggest that each reason it offered in Harris was necessary to its holding.

> **b.   Changed circumstances distinguish the programs involved in Harris and Califano from the challenged programs here**

The complaint plausibly alleges that the other two reasons that the Government propounded in those cases, Puerto Rico's tax status and the potential disruption to the Puerto Rican economy,

no longer obtain.[12]  For instance, the complaint observes that
when the Supreme Court decided Harris and Califano, Puerto Rico
benefited from corporate tax incentives to encourage businesses
to relocate there.  Compl. ¶ 4.  Shortly before those decisions
came down, for example, Congress included in its 1976 tax reform
bill a credit against all federal income tax for business income
derived from Puerto Rico.  See Pub. L. No. 94-455, title X,
§ 1051(b), 90 Stat. 1643, codified at 26 U.S.C. § 936 (1976).
These tax incentives ended in 2006.  Compl. ¶ 4 (referring to
Small Business Job Protection Act of 1996, Pub. L. No. 104-188,
tit. I(f), § 1601(a), 110 Stat. 1755, 1827).

Moreover, the Tax Cut and Jobs Act of 2017, Pub. L. No.
115-97, significantly altered the federal tax regime.  Some
commentary has suggested that it raises taxes on Puerto Rico
businesses.  See, e.g., Brittany De Lea, Tax Reform in US
'Hinders' Puerto Rico Recovery: Gov. Rossello, FoxBusiness (Feb.

---

[12] The Government also provides new estimates for the cost
of extending SSI and SNAP benefits to Puerto Rico residents.
See Reply 14 n.17.  It does not assert how much it would cost to
extend LIS to Puerto Rico residents.  See generally Reply.  In
any event, the Plaintiffs concede that extending these benefits
would result in increased costs.  See Compl. ¶ 88.
Nevertheless, as explained above, Congress must advance an
independent, legitimate reason for its money-saving decisions.
See section III.B.2, supra.  Likewise, the Court does not
analyze whether changed circumstances undermine the expense
justification for SSI or SNAP, as that consideration alone could
not justify the exclusion of Puerto Rico residents from these
programs.

15, 2018), https://www.foxbusiness.com/politics/tax-reform-in-us-hinders-puerto-rico-recovery-gov-rossello (discussing a 12.5% excise tax imposed on profits created by use of intellectual property in Puerto Rico, enacted at Pub. L. No. 115-97, subtit. I.D, subpt. B, ch. I, 131 Stat. 2054, codified at 26 U.S.C. §§ 250, 951A).  In any event, Congress has passed at least two major tax reform laws since Califano.  Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085; Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054.  Consequently, the complaint alleges that the Government cannot justify its continued exclusion of Puerto Rico residents from these benefit programs with an outdated tax code.  Compl. ¶¶ 4, 86-87, 89.

The Plaintiffs and their amici posit that the Supreme Court erred in 1980 when it relied on the statement that Puerto Rico residents "do not contribute to the public treasury."  See, e.g., Opp'n 22 (quoting United States v. Vaello-Madero, 313 F. Supp. 3d 370, 374 (D.P.R. 2018) (in turn quoting Harris, 446 U.S. at 652)).  They note that Puerto Rico residents have long paid payroll taxes.  See id.  This Court interprets the Supreme Court's statement generously, so it is consistent with the facts of 1980.  See Rodriguez de Quijas, 490 U.S. at 484-85.  The Supreme Court may have been referring to the fact that payroll taxes do not go to the general public treasury, but into Social Security and Medicare trust funds, so they do not supply

Congress's general funds.  See 42 U.S.C. §§ 401, 1395i.
Besides, the Court has no need to address the accuracy of the
Supreme Court's statements about the 1980 tax code in light of
the major changes that the Plaintiffs allege have occurred
since.

The Court would benefit from discovery about the effect of
any post-1980 changes to collections of taxes that fund the
general treasury -- other than payroll taxes -- from Puerto Rico
(such as import/export taxes).  The complaint alleges enough for
the Court to infer that the federal tax burden on Puerto Rico
residents may have increased, as the complaint alleges that
federal business taxes have increased since 1996.  See Compl.
¶ 4.  The parties have not provided this data, although
Congresswoman Velázquez links to Internal Revenue Service
statistics that lump together payroll and income taxes.  See
Congresswoman Velázquez Amicus Br. 10 nn.7 & 8.  If Puerto Rican
payments to the general federal treasury relative to the size of
the territory's economy are very similar to those from the other
states and territories, it may not be rational to deny Puerto
Rico residents these benefits on the basis that Puerto Rico
contributes less to the federal fisc.

As the complaint alleges that close to 60% of Puerto Rico
residents live below the poverty line, the inapplicability of
the income tax may not cost the federal fisc much at all, given

that tax's progressivity.  See Compl. ¶ 9.  Perhaps discovery

will show that other taxes hit Puerto Rico residents

particularly hard, so as to make up for the income tax's

absence.  See Plyler v. Doe, 457 U.S. 202, 228 (1982) (reasoning

that school districts could not exclude children of undocumented

immigrants because even though undocumented immigrants might not

pay every tax that other residents pay, they pay taxes that fund

public schools (citing the lower courts' findings of fact, In re

Alien Children Ed. Litig., 501 F. Supp. 544, 571 (S.D. Tex.

1980) and Doe v. Plyler, 458 F. Supp. 569, 578 (E.D. Tex.

1978))).[13]

---

[13] The Government suggests that Plyler "turn[ed] on
application of intermediate scrutiny, not rational basis
review."  Reply 15 (citing Plyler, 457 U.S. at 218 n.16, 223-
24).  The Supreme Court, however, did not precisely articulate
in Plyler whether it was applying rational basis or intermediate
scrutiny.  Instead of asking whether the classification was
rationally related to a legitimate governmental goal, the
Supreme Court inquired whether it was rationally related to
"some substantial goal."  Plyler, 457 U.S. at 224.  Judge
William Wayne Justice, who heard one of the district court cases
that the Supreme Court reviewed in Plyler, contrasts this
standard with intermediate scrutiny, "where a judge analyzes
whether a state policy is substantially related to and important
state interest."  See William Wayne Justice, Putting the Judge
Back in Judging, 63 U. Colo. L. Rev. 441, 444 n.19 (citing Craig
v. Boren, 429 U.S. 190, 197 (1976)).
    Higher courts have yet to sort out the precise standard of
review that the Supreme Court applied in Plyler.  In Kadrmas v.
Dickinson Public Schools, the Supreme Court said that Plyler did
not fit the pattern of cases applying intermediate scrutiny and
suggested that "unique circumstances" drove its outcome.  See
487 U.S. 450, 459 (1988).  The First Circuit has suggested that
Plyler applied a "heightened level" of scrutiny.  Montalvo-

At this stage, however, the Court need not analyze how similar would be similar enough (or how to measure it) to vitiate this proposed reason.  See In re Alien Children Ed. Litig., 501 F. Supp. at 570 (noting that undocumented families pay taxes "to the same extent as others with similar income"). It is plausible that, even without income taxes, the Government might collect a similar amount from Puerto Rico residents as it does from those residing in states and other territories.  See Congresswoman Velázquez Amicus Br. 10 & n.8 (observing that "[p]rior to its economic downturn in 2006, Puerto Rico had paid more in federal taxes than Vermont, Wyoming, South Dakota, North Dakota, Montana, and Alaska each individually paid in almost every year").  The Court thus postpones to a later stage of the proceedings whether Puerto Rico's current tax regime justifies the unchanged benefits regime, keeping in mind that Puerto Rico's different tax treatment need not be wise, but only rational in order to uphold the Congressional discrimination.

---

Huertas v. Rivera-Cruz, 885 F.2d 971, 977 (1989) (citing Plyler, 457 U.S. at 239 (Powell, J., concurring)).  Putting aside the issue of how to label it, the Plyler standard of review has relevance here because the Supreme Court assumed in its analysis that "the State's ability to provide high-quality public education" constituted an important goal.  457 U.S. at 229-30. The exclusion of undocumented children could not be justified, however, because "the record in no way" supported the State's claims that that goal would be advanced.  See id. at 229.

Second, the complaint alleges -- and the Government's motion papers do not refute -- that Hurricane Maria and Puerto Rico's municipal bankruptcy have profoundly changed Puerto Rico's economy for the worse.  Compl. ¶¶ 1, 2, 8, 72-73.  Taking that as true, as the Court must at the motion to dismiss stage, the Government cannot justifiably base its current policy on 1980 concerns about disrupting the Puerto Rican economy.  See Pimentel v. City of Methuen, 323 F. Supp. 3d 255, 267, 270-71 (D. Mass. 2018) (Saylor, J.) (denying motion to dismiss because complaint's allegations, taken as true, did not lend any "apparent rational basis" to the disputed government actions).  Moreover, as Congresswoman Velázquez emphasizes, those justifications originated from the  HEW Report that the department published in 1976.  Congresswoman Velázquez Amicus Br. 5-7 & Ex. 1.  Additionally, the Plaintiffs allege that the tax code changes referenced above caused Puerto Rico to enter a recession in 2006.  Compl. ¶ 4.

The Government attempts to justify its claims that Congress could rationally believe that extending these programs to Puerto Rico might disrupt the island's economy, but its arguments are wanting for four reasons, two of which are procedural and two of which are substantive.[14]  See Reply 15.

---

[14] The Government did not seem to defend this rationale at the motion hearing.

First, the Government only advances an argument about the administrative costs that Puerto Rico's territorial government might be required to pay to operate SNAP.  See id.  It does not offer a theory for the other two challenged programs, nor is one apparent to this Court.

Second, it relies on an estimate from a 2010 report that it does not attach to its brief.  See id. & n.18 (citing Food and Nutrition Service, United States Department of Agriculture, Implementing Supplemental Nutrition Assistance Program in Puerto Rico: A Feasibility Study ii-iii, 77-83).  This report is evidence and, while it may be probative, it cannot defeat a well-pleaded complaint at the motion to dismiss stage.  Cf. Watterson, 987 F.2d at 3 (allowing courts to consider on a motion to dismiss only undisputed "official public records; . . . documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint").  Further, the Government only cites this report in its reply,[15] and so the Plaintiffs could not -- or at least did not -- accept the report as accurate.  See Reply 15 & n.18.

Third, the quoted language from the report reprinted in the Government's brief does not indicate that the benefits would "disrupt" Puerto Rico's economy but instead that they would be

---

[15] The Government also neither attached this report nor provided a link to it.

expensive to administer.  See id. at 15.  Those are two
different concepts.  Moreover, increased administrative
complexity does not necessarily provide a rational basis for
denying a group access to benefits.  Gill v. Office of Pers.
Mgmt., 699 F. Supp. 2d 374, 395 (D. Mass. 2010) (Tauro, J.),
aff'd sub nom. Massachusetts v. U.S. Dep't of Health & Human
Servs., 682 F.3d 1 (1st Cir. 2012).  The Government thus
attempts to bootstrap its program costs argument to its economic
disruption argument, which, as explained above, fails
independently to justify Puerto Rico residents' exclusion here.

Fourth, the Government cites a report from 2010.  Reply 15
& n.18.  The data used to compile the report is surely older.
See id.  As described above, the Plaintiffs have alleged that
Puerto Rico's economic situation has changed since 2010.  See
Compl. ¶¶ 1, 2, 8, 72-73.  Discovery may ferret out whether this
justification still fits the facts.  The Government complains
that "the Supreme Court has expressly disavowed" "courtroom
factfinding under rational basis review."  Reply 16 (citing
Heller v. Doe by Doe, 509 U.S. 312, 320 (1993)).  This Court
orders no such thing.  Instead, the Court rules that this
Complaint adequately alleges that Puerto Rico residents'
exclusion from SSI, SNAP, and LIS fail to meet "the standard of
rationality [as the Supreme Court has so often] defined it"
because it does not "find some footing in the realities of the

subject addressed by" those programs.  See Heller, 509 U.S. at
321.

     While due process does not require Congress to follow any
particular economic theory, for this reason to satisfy the
rational basis requirement, the Court must be able to locate
some economic theory explaining how extending these benefits
would disrupt Puerto Rico's economy.[16]  Cf. Lochner v. New York,
198 U.S. 45, 75 (1905) (Holmes, J., dissenting) ("The 14th
Amendment does not enact Mr. Herbert Spencer's Social
Statics.").  This Court has not found one on its own.
Accordingly, for this explanation to suffice, the Government
must string together some story by which the extension of SSI,
SNAP, and LIS to Puerto Rico residents might disrupt Puerto

_____

     [16] Although the Supreme Court did not sketch out the precise
contours of the economic theory undergirding Califano and
Harris, it does not take much imagination to hypothesize one.
For example, prior to 1996, Congress enacted various tax
incentives targeted at growing the private sector in Puerto
Rico.  During that time, a rational legislator might have feared
that extending welfare benefits, while at the same time not
levying income taxes, not only might have cancelled out those
tax incentives, but also might have sabotaged the Congressional
goal by deterring Puerto Rico residents from private sector
employment.  The allegations in the complaint appear to
undermine the vitality of that particular theory, however.  To
wit, since the Supreme Court handed down those cases, Congress
repealed Puerto Rico's business tax incentives and seemed to
have raised taxes on Puerto Rico manufacturers, while Puerto
Rico's economy has slumped further.  See De Lea, supra; Pub. L.
No. 115-97, subtit. I.D, subpt. B, ch. I, 131 Stat. 2054,
codified at 26 U.S.C. §§ 250, 951A.

Rico's economy, aside from its expense. See Lyng, 485 U.S. at 372-73.

The Plaintiffs, it should be noted, face a steep climb after discovery.  The Government correctly points out the generally deferential standard applicable to rational basis review.  Reply 11-12 ("Rational basis review does not 'permit courts to pass judgment on the effectiveness of the legislature's proposed classifications.'" (quoting Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 214 (1st Cir. 2002))).  The Plaintiffs' complaint passes muster at this stage not because it alleges unconstitutional animus, but because, construed generously, it negates each of the rationales for disparate treatment of Puerto Rico residents that the Government proffered in its motion to dismiss.[17]  The complaint itself does not mention animus, although the Plaintiffs argue it in their opposition.  See generally Compl.; Opp'n 24.

---

[17] As an alternative rational basis, the Government cites "the fact that providers in Puerto Rico have 'lower operating costs' compared to providers in the States."  Mot. Dismiss 22 (quoting Hospital San Rafael, Inc. v. Sullivan, 784 F. Supp. 927, 940 (D.P.R. 1991)).  In Hospital San Rafael, another session of the Court upheld lower Medicare reimbursement rates to hospitals in Puerto Rico on summary judgment given that they resulted from the "the utilization of largely Puerto Rico specific data" and "in part due to the lower operating costs on the island as compared to hospitals nationally."  784 F. Supp. at 940 & n.19.  The Court does not see how that rationale applies here, on a motion to dismiss and in a case involving payments to individuals, not hospitals.

In any event, an animus theory does not provide the
Plaintiffs with an easier or perhaps even an analytically
different route to success:  It is well-established in the First
Circuit that a plaintiff cannot allege an animus theory simply
"by asserting an inequity and tacking on the self-serving
conclusion that the defendant was motivated by a discriminatory
animus."  See Barrington Cove Ltd. P'ship v. Rhode Island Hous.
& Mortg. Fin. Corp., 246 F.3d 1, 10 (1st Cir. 2001) (quoting
Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992)).
Instead, the Plaintiffs must show that Congress targeted Puerto
Ricans for no legitimate reason at all.  In the four cornerstone
animus cases -- Windsor, Romer, Cleburne, and Moreno -- the
Court found both that the laws lacked any rational economic
justification and that they were based on disapproval of a
disfavored group.  See Windsor, 570 U.S. at 769-70 (determining
that exclusion of same-sex marriages from eligibility for
federal marriage benefits violated equal protection); Romer v.
Evans, 517 U.S. 620, 635 (1996) (invalidating state
constitutional amendment forbidding antidiscrimination laws
protecting homosexual individuals); Cleburne, 473 U.S. at 447-49
(striking down city ordinance limiting homes for mentally
disabled to certain neighborhoods); Moreno, 413 U.S. at 535-37
(ruling unconstitutional the ineligibility of "hippie"
households for food stamps).

To be clear, the Government does not have the burden of supplying facts to support their purported rational bases; moving forward, the Plaintiffs must provide evidence that renders the Government's policies without rationality in light of "any reasonably conceivable state of facts."  See Beach Commc'ns, 508 U.S. at 313.  The Court would have to find that the facts so clearly eviscerate the Government's rationales in order to rule that animus motivated the distinctions in these challenged programs.

> ### c.   Harris and Califano constitute analogous, as opposed to directly applicable, cases

The Government objects that Harris and Califano's outcomes bind this Court's disposition of the Plaintiffs' attacks on each program here.  Reply 11.  Not so.  In neither Harris nor Califano did the Supreme Court decide the constitutionality of either SNAP or LIS.  Harris, 446 U.S. at 651-52; Califano, 435 U.S. at 2.  Harris and Califano provide at most the legal rules and analogous fact patterns from which the Court ought evaluate the actual evidence brought forth on summary judgment, a case stated hearing, or trial.

The Plaintiffs' challenge to the SSI program, however, is more fraught.  As explained above, the Supreme Court in Harris construed Califano to hold that the SSI program's disparate treatment of Puerto Rico residents did not violate equal

protection.  _Harris_, 446 U.S. at 651-52.  Accordingly, the
Government stands on firmer ground in asserting that the Court's
review of SSI may constitute an impermissible undermining or
anticipatory overruling of _Califano_.  _See_ _Rodriguez de Quijas_,
490 U.S. at 484-85.

Nevertheless, _Harris_ and _Califano_ may not bind this Court
to dismiss an equal protection challenge to SSI for two reasons.
First, this Court could hold that, to the extent that _Harris_
purports to represent a new _holding_ as opposed to apply the same
_rule_ as _Califano_, reading a new holding into _Califano_
constitutes nonbinding dicta, because _Harris_ addressed only the
AFDC program.  _See_ _Harris_, 446 U.S. at 651-52.  As the
Plaintiffs posited at the motion hearing, because _Califano_
itself held only that Puerto Rico residents' ineligibility for
SSI did not violate the right to travel, the Supreme Court may
have left open the question whether SSI survives rational basis
review under the Fifth Amendment equal protection guarantee.
_See_ 435 U.S. at 2.

This Court, however, views this reading as too formalistic
-- the Supreme Court in _Harris_ did not spill much ink in
deciding that AFDC passed muster under the rational basis test
precisely because it considered that it had settled that
question in _Califano_.  _See_ _Harris_, 446 U.S. at 651-52 (citing
_Califano_, 435 U.S. at 2).  This Court is thus bound to follow

the Supreme Court's reading of <u>Califano</u> in <u>Harris</u> and cannot
revisit <u>Califano</u> here.

Instead, the Court adopts <u>National Coalition</u>'s approach:
<u>i.e.</u>, to evaluate an equal protection challenge at the time
plaintiffs file it.  355 F. Supp. 3d at 576 n.4 (ruling that "a
change in factual circumstances" caused the contemporary absence
of a "dispositive fact" in a Supreme Court case to mean that the
precedent did not bind the district court).  This, as the
Plaintiffs note in their opposition, is a long-standing
constitutional principle.[18]  Opp'n 22 (quoting <u>United States</u> v.

---

[18] The Plaintiffs contend that <u>Shelby County</u> v. <u>Holder</u>, 570
U.S. 529 (2013), and <u>Whole Woman's Health</u> v. <u>Hellerstedt</u>, 136 S.
Ct. 2292 (2016), also support this proposition.  Opp'n 22.  The
Government suggests that both cases are inapposite.  The Court
is inclined to agree with the Government as to <u>Whole Woman's
Health</u>, for reasons different from those that the Government
offers, and to agree with the Plaintiffs as to <u>Shelby County</u>.
    The Plaintiffs quote the Supreme Court's statement in <u>Whole
Woman's Health</u> that "Factual developments may show that
constitutional harm, which seemed too remote or speculative to
afford relief at the time of an earlier suit, was in fact
indisputable.  In our view, such changed circumstances will give
rise to a new constitutional claim."  Opp'n 22 (quoting <u>Whole
Woman's Health</u>, 136 S. Ct. at 2306).  This statement, however,
is about whether or not a government policy has an
unconstitutional effect.  <u>See</u> <u>Whole Woman's Health</u>, 136 S. Ct.
at 2305-06.  In the cited section of <u>Whole Woman's Health</u>, the
Supreme Court ruled that a previous facial challenge did not bar
the plaintiffs from bringing a subsequent as-applied challenge.
<u>See id.</u>  The present case neither implicates principles of claim
preclusion nor relates to a prior facial challenge, and so <u>Whole
Woman's Health</u> does not bear upon it directly.
    On the other hand, the Plaintiffs' reference to <u>Shelby
County</u> seems well-placed.  Opp'n 22 (quoting <u>Shelby Cty.</u>, 570
U.S. at 536, for the proposition that statutes "impos[ing]

current burdens . . . must be justified by current needs"). The
Government attempts to limit Shelby County to its context of
"balancing federalism and Fifteenth Amendment rights." Reply
12. Yet the Supreme Court was not clear in either Shelby County
or its predecessor Northwest Austin Municipal Utility District
Number One v. Holder, 557 U.S. 193 (2009) ("Northwest Austin"),
exactly from where it derived the requirement that a statute
that "imposes current burdens . . . must be justified by current
needs." See Shelby Cty., 570 U.S. at 536 (citing neither the
Fifteenth nor the Tenth Amendment); Northwest Austin, 557 U.S.
at 203 (same). Both cases treat this requirement separately
from the Equal Sovereignty doctrine, which requires that "a
statute's disparate geographic coverage [be] sufficiently
related to the problem that it targets." Northwest Austin, 557
U.S. at 203; see Shelby Cty., 570 U.S. at 542-43 (explaining the
need to ground the Voting Rights Act in contemporary facts and
then applying the Equal Sovereignty doctrine).

Consequently, this Court notes that one way to interpret
the Supreme Court's instruction to consider the current state of
affairs is that it is an incidence of our system of judicial
review where courts do not pass upon questions of constitutional
interpretation in the abstract, but instead train their
attention to discrete cases and controversies. See U.S. Const.,
art. III; see also Mance v. Sessions, 896 F.3d 699, 706 (5th
Cir. 2018) (per curiam) (in a Second Amendment case, observing
that "current burdens on constitutional rights 'must be
justified by current needs'" (quoting Shelby Cty., 570 U.S. at
536; Northwest Austin, 557 U.S. at 203)). This means that every
time a court adjudicates an as-applied constitutional claim,
prior precedential holdings dictate outcomes only where the
facts are identical or at least materially so. See Yazoo &
Miss. Valley R.R. Co. v. Jackson Vinegar Co., 226 U.S. 217, 219
(1912) (ruling that courts "must deal with the case in hand, and
not with imaginary ones"). The Court's task on a motion to
dismiss, then, is to determine whether the facts alleged in the
complaint are identical to the facts in a dispute resolved by a
precedential opinion, whether they are materially the same, or
whether they are materially different. Where the Court rules
that the factual allegations differ materially, the Court
permits discovery, without prejudice to the possibility that
discovery might reveal the case's actual facts fall within the
scope of a precedent.

The Government suggests that Shelby County's reliance on
federalism principles in announcing its holding undermines its
applicability here. See Reply 12. This Court is not so sure.

Carolene Prods. Co., 304 U.S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist.")). Ergo, a policy that once comported with equal protection principles may no longer do so because changed circumstances altered the policy's effect. In denying the motion to dismiss, the Court thus continues to apply the legal doctrines from Harris and Califano to the current case and controversy before it.

The Government protests that changed circumstances cannot allow the Plaintiffs to avoid Harris and Califano. Reply 12 (quoting Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 977 (1st Cir. 1989) for the proposition that "evaluating the continued need for, and suitability of, legislation of this genre is exactly the kind of policy judgment that the rational basis test was designed to preclude"). Montalvo-Huertas does not demand a different result because, there, the First Circuit rejected the challengers' attempt to hold the Puerto Rican government to its original reasons for enacting a law. 885 F.2d at 977. The

---

In light of Puerto Rico's status as a semi-self-governing territory, the Court queries whether federalism principles, such as those discussed in Shelby County, ought inform implicit limits on Congress's authority to govern Puerto Rico pursuant to the Territory Clause. See Adam W. McCall, Note, Why Congress Cannot Unilaterally Repeal Puerto Rico's Constitution, 102 Cornell L. Rev. 1367, 1394-96 & n.162 (2017).

Government's cited language thus does not dispose of the
Plaintiffs' argument here that a change in facts deprives the
challenged programs here of a rational basis for discrimination.

_Montalvo-Huertas_, however, offers an example of how the
actual reasons upon which a legislature relied do not control
the rational basis analysis, for the First Circuit considered
hypothetical justifications in rejecting the challenge.  _Id._ at
980-82.  To that end, _Montalvo-Huertas_ arrived at the First
Circuit after the district court had taken evidence, _id._ at 973,
which the First Circuit considered in upholding the law, _id._ at
980-82.  Denying this motion to dismiss on the ground that the
reasons that the Supreme Court used in 1980 may not apply does
not mean that (1) the Plaintiffs do not have the burden to
convince the Court going forward that those reasons are invalid;
(2) the Government cannot offer evidence that those reasons are
still valid, or (3) the Government cannot proffer new reasons,
including reasons not shared by the legislative drafters or
sponsors, to support the programs.  As the case proceeds, the
Court is mindful that its review of these programs is
"restricted to the issue whether any state of facts either known
or which could reasonably be assumed affords support for"
distinguishing between residents of Puerto Rico and residents of
the states.  See _Carolene Prods._, 304 U.S. at 154.

[58]

Accordingly, the Supreme Court's characterization of Califano in Harris does not foreclose a new challenge to the SSI program.[19]

## IV. CONCLUSION

For the foregoing reasons, this Court DENIED the Government's motion to dismiss, ECF No. 10.

**SO ORDERED**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[19] The Plaintiffs also observe that the Supreme Court held in Califano and Harris that the three above-mentioned reasons justified treating Puerto Rico differently than the states, not from other territories (some of the residents of which receive certain of the challenged benefits). Opp'n 23. The Government counters that it manages each territory independently. Reply 13 & n.16. That may be so in practice, but neither party points to authoritative materials requiring the Court to bless or reject that practice in this context. The texts of the Territory Clause and the Equal Protection Clause do not require either outcome, nor does the one case that the Government cites in support of its position. See id. (citing Tuana v. United States, 788 F.3d 300 (D.C. Cir. 2015) (reasoning that the Citizenship Clause does not mandate that American Samoans receive citizenship, but not addressing whether the extension of citizenship to other people born in territories denies American Samoans equal protection)). The Court nonetheless need not resolve whether different treatment of residents of different territories impacts the equal protection analysis because this complaint adequately alleges that Congress's distinction between Puerto Rico residents and residents of the states lacks a rational basis.