UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **Sixta Gladys Peña Martínez**, *et al.*<br><br>Plaintiff,<br><br>v.<br><br>**Alex Azar**, in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>Defendants. | Case No. 18-cv-1206 (WGY) |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

Table Of Authorities ................................................................................................. iv

Introduction ................................................................................................................ 1

Factual & Statutory Background ................................................................................ 2

    A.    The Challenged Federal Benefits Programs ................................................ 2

        1.    SSI ................................................................................................ 2

        2.    SNAP ........................................................................................... 2

        3.    LIS ............................................................................................... 3

    B.    Plaintiffs .................................................................................................... 4

    C.    Procedural History ..................................................................................... 5

Argument .................................................................................................................... 6

I.    Legal Standards Governing This Motion for Summary Judgment ..................... 6

II.    The SSI, SNAP, And LIS Programs Violate Equal Protection By Excluding U.S. Citizens Residing In Puerto Rico ..................................................................... 6

    A.    The SSI, SNAP, And LIS Programs Facially Discriminate Against Residents Of Puerto Rico ................................................................... 7

        1.    SSI ................................................................................................ 8

        2.    SNAP ........................................................................................... 9

        3.    LIS ............................................................................................... 9

    B.    There Is No Rational Basis For This Facial Discrimination ................... 10

        1.    Puerto Rico's Tax Status Does Not Rationally Justify The Discrimination In The SSI, SNAP, And LIS Programs ............ 12

        2.    The Cost Of Including Puerto Rico Cannot Justify The Discrimination In The SSI, SNAP, And LIS Programs ............ 19

        3.    There Is No Rational Risk Of Disruption To Puerto Rico's Economy ................................................................................... 21

    C.    Animus Is The Only Conceivable Explanation For The Discrimination In The SSI, SNAP, and LIS Programs ................................................... 23

D.      The Discrimination In The SSI, SNAP, And LIS Programs Triggers
        Heightened Scrutiny.............................................................................................24

Conclusion & Relief Sought ..........................................................................................25

TABLE OF AUTHORITIES

**Cases**

*AES Puerto Rico, L.P. v. Trujillo-Panisse*,
   133 F. Supp. 3d 409 (D.P.R 2015) ............................................................. 2

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ................................................................................. 6

*Bolling v. Sharpe*,
   347 U.S. 497 (1954) ................................................................................. 6

*Brown v. Board of Education*,
   347 U.S. 483 (1954) ................................................................................ 11

*Bunyan v. Camacho*,
   770 F.2d 773 (9th Cir. 1985) ................................................................... 17

*Califano v. Torres*,
   435 U.S. 1 (1978) ............................................................................. passim

*Carrasco v. Sec'y of Health, Educ. & Welfare*,
   628 F.2d 624 (1st Cir. 1980) ..................................................................... 7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................. 6

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ............................................................................... 24

*Cole v. Hous. Auth. of Newport*,
   435 F.2d 807 (1st Cir. 1970) ................................................................... 17

*First Med. Health Plan, Inc. v. Vega-Ramos*,
   479 F.3d 46 (1st Cir. 2007) ....................................................................... 9

*Gent v. Cuna Mut. Ins. Soc'y*,
   611 F.3d 79 (1st Cir. 2010) ....................................................................... 2

*Graham v. Richardson*,
   403 U.S. 365 (1971) ......................................................................... 20, 25

*Harris v. Rosario*,
   446 U.S. 651 (1980) .......................................................................... passim

*Hooper v. Bernalillo County Assessor*,
   472 U.S. 612 (1985) ............................................................................... 10

*Igartúa-de la Rosa v. United States*,
   417 F.3d 145 (1st Cir. 2005) (*en banc*) ............................................................ 7

*Lawrence v. Texas*,
   539 U.S. 558 (2003) ................................................................................................11

*Lopez v. Aran*,
   844 F.2d 898 (1st Cir. 1988) ............................................................................... 25

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*,
   485 U.S. 360 (1988) ........................................................................................ 19, 20

*Memorial Hospital v. Maricopa County*,
   415 U.S. 250 (1974) ........................................................................................ 16, 19

*Nat'l Coal. for Men v. Selective Serv. Sys.*,
   355 F. Supp. 3d 568 (S.D. Tex. 2019) ..............................................................11

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015) ...........................................................................................11

*Peña Martínez v. Azar*,
   376 F. Supp. 3d 191 (D.P.R. 2019) ....................................................... passim

*Plyler v. Doe*,
   457 U.S. 202 (1982) ........................................................................................ 21, 25

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
   136 S. Ct. 1938 (2016) .......................................................................................... 22

*Reed v. Reed*,
   404 U.S. 71 (1971) ..................................................................................................11

*Rivera-Rivera v. Medina & Medina, Inc.*,
   898 F.3d 77 (1st Cir. 2018) .................................................................................. 6

*Rochester Ford Sales, Inc. v. Ford Motor Co.*,
   287 F.3d 32 (1st Cir. 2002) ................................................................................. 6

*Rodriguez v. Popular Democratic Party*,
   457 U.S. 1 (1982) .................................................................................................... 7

*Romer v. Evans*,
   517 U.S. 620 (1996) .............................................................................................. 24

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ..................................................................................................11

*Saenz v. Roe,*
    526 U.S. 489 (1999) ........................................................................... 16, 19

*Sessions v. Morales-Santana,*
    137 S. Ct. 1678 (2017) ........................................................................ 7, 10

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ........................................................................... 16, 19

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ................................................................................. 11

*Tolan v. Cotton,*
    572 U.S. 650 (2014) ................................................................................... 6

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) .................................................................... 10, 20, 24

*United States R. Ret. Bd. v. Fritz,*
    449 U.S. 166 (1980) ................................................................................. 10

*United States v. Carolene Products Co.,*
    304 U.S. 144 (1938) ........................................................................... 11, 25

*United States v. Vaello-Madero,*
    313 F. Supp. 3d 370 (D.P.R. 2018) ........................................................ 12

*United States v. Vaello-Madero,*
    356 F. Supp. 3d 208 (D.P.R. 2019) .................................................. 12, 25

*United States v. Windsor,*
    570 U.S. 744 (2013) ............................................................................. 6, 24

*Vlandis v. Kline,*
    412 U.S. 441 (1973) ................................................................................. 16

*Windsor v. United States,*
    699 F.3d 169 (2d Cir. 2012),
    *affirmed* 570 U.S. 744 (2013) ................................................................ 20

*Zobel v. Williams,*
    457 U.S. 55 (1982) ............................................................................ 10, 16

**Statutes**

7 U.S.C. § 2012(r) ............................................................................................. 9

7 U.S.C. § 2013(a) ............................................................................................ 9

26 U.S.C. § 933 ............................................................................................................ 17

26 U.S.C. §§ 931–32 .................................................................................................... 18

42 U.S.C. § 1382(f)(1) ................................................................................................... 8

42 U.S.C. § 1382c(e) ...................................................................................................... 8

42 U.S.C. § 1395w-114(a)(3)(F) .................................................................................... 9

Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 ......................................... 9

Food Stamp Act of 1977, Pub L. No. 95- 113, 91 Stat. 913 ......................................... 9

Jones Act, Pub. L. No. 64-368, 39 Stat. 951 (1917) ..................................................... 7

Pub L. No. 91-671, 84 Stat. 2048 (1971) ...................................................................... 9

Pub. L. No. 94-241, 90 Stat. 263 (1976) ....................................................................... 8

Pub. L. No. 97-35, 95 Stat. 357 (1981). ........................................................................ 9

Social Security Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329 .................... 8

### Federal Cases

Fed. R. Civ. P. 56 .......................................................................................................... 1

Fed. R. Civ. P. 56(a) ...................................................................................................... 6

Local Civ. R. 56 ............................................................................................................. 1

### Out of State Cases

7 C.F.R. § 271.2 ............................................................................................................. 9

20 C.F.R. § 416.120(c)(10) ............................................................................................ 8

20 C.F.R. § 416.1327(a)(1) ............................................................................................ 8

20 C.F.R. § 416.1603(c) ................................................................................................. 8

20 C.F.R. § 416.1902 ..................................................................................................... 8

20 C.F.R. § 416.215 ....................................................................................................... 8

20 C.F.R. § 416.216(a) ................................................................................................... 8

20 C.F.R. § 416.2203 ..................................................................................................... 8

20 C.F.R. § 416.702 ........................................................................................................ 8

42 C.F.R. § 423.907(a)(1) ............................................................................................... 9

Plaintiffs Sixta Gladys Peña Martínez, et al. ("**Plaintiffs**") respectfully submit this Motion for Summary Judgment and incorporated memorandum of law pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56 of the U.S. District Court for the District of Puerto Rico.

## INTRODUCTION

The U.S. Government unconstitutionally discriminates against Plaintiffs and other U.S. citizens who live in Puerto Rico. As a matter of law, three federal benefits programs—Supplemental Security Income ("**SSI**"), the Supplemental Nutrition Assistance Program ("**SNAP**"), and Medicare Part D low-income subsidies ("**LIS**")—facially exclude U.S. citizens who live in Puerto Rico from the benefits these programs grant to similarly situated U.S. citizens who live in one of the States, the District of Columbia, and certain Territories. This facial discrimination lacks even a rational basis and therefore violates the U.S. Constitution's guarantee of equal protection of the laws.

The Government relies on *Califano v. Torres*, 435 U.S. 1 (1978), and *Harris v. Rosario*, 446 U.S. 651 (1980), which concluded that, as of 1978 and 1980, the exclusion of residents of Puerto Rico from certain federal benefits programs could rationally be grounded on three interdependent factors: (1) residents of Puerto Rico do not contribute to the federal treasury; (2) excluding Puerto Rico saves money; and (3) extending benefits to Puerto Rico could disrupt its economy.

But the reasoning of *Harris* and *Califano* has been eclipsed. In the forty years since they were decided, intervening developments have eradicated each of the three factors the Court accepted back then. As of 2019, it is indisputable that residents of Puerto Rico do contribute to the federal treasury; that saving money alone cannot justify excluding a group from federal benefits; and that there is no rational risk of economic disruption from extending benefits to Puerto Rico—to the contrary, extending these benefits would provide a needed economic boost to an island ravaged by a long recession. Simply put, there is no genuine dispute of material fact that excluding U.S. citizens residing in Puerto Rico from the SSI, SNAP, and LIS programs lacks a rational basis in today's world. Accordingly, these exclusions are unconstitutional and the Court should grant summary judgment to Plaintiffs.

**FACTUAL & STATUTORY BACKGROUND**

**A.     The Challenged Federal Benefits Programs**

      **1.     SSI**

SSI is a federal benefits program run by Defendant Social Security Administration ("**SSA**").  Joint Stipulation of Facts ¶¶ 1, 5, ECF No. 67 ("**Joint Stip.**").  SSI "makes monthly payments to people who have low income and few resources, and who are": (1) "Age 65 or older"; (2) "Blind"; or (3) "Disabled children and adults."  Ex. A at 1[1]; *see also* Joint Stip. ¶ 5.  Residents of the States, the District of Columbia, and the Territory of the Northern Mariana Islands are eligible to receive SSI benefits, but residents of Puerto Rico are ineligible.  Joint Stip. ¶¶ 6–7.

In lieu of SSI, Puerto Rico administers an Aid to the Aged, Blind, or Disabled ("**AABD**") program.  *Id.* ¶ 10.  Benefits are smaller under AABD than under SSI, and eligibility requirements are stricter, such that there are residents of Puerto Rico who are ineligible for the smaller AABD benefits due to their income or resources but who would qualify for the larger SSI benefits if residents of Puerto Rico were not categorically excluded from SSI benefits.  *Id.* ¶¶ 11–12.

According to the most recent Government estimate (for fiscal year 2011), if residents of Puerto Rico were eligible for SSI benefits, over 300,000 would have received monthly SSI benefits, as compared to only 34,401 individuals who participated in the AABD program.  *Id.* ¶ 37.

      **2.     SNAP**

SNAP is a federal benefits program administered by Defendant U.S. Department of Agriculture via its component, the Food and Nutrition Service.  *Id.* ¶ 13.  SNAP provides nutrition

---

[1] Plaintiffs refer throughout this brief to facts in agency publications and on government websites attached as exhibits to the accompanying declaration of Jonathan Cooper.  Plaintiffs request that the Court take judicial notice of these facts under Federal Rule of Evidence 201(b)(2).  *See Gent* v. *Cuna Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of facts on government websites); *AES Puerto Rico, L.P. v. Trujillo-Panisse*, 133 F. Supp. 3d 409, 415 (D.P.R 2015) (same for agency publications).

2

assistance to low-income individuals whose income and assets are below specified limits. *Id.* ¶ 14. Residents of the States, the District of Columbia, and the Territories of Guam and the U.S. Virgin Islands are eligible to receive SNAP benefits, but residents of Puerto Rico are not. *Id.* ¶¶ 18–19.

In lieu of SNAP, Puerto Rico administers the Nutrition Assistance Program ("**NAP**"). *Id.* ¶ 21. But, for at least some individuals, benefits are smaller under NAP than under SNAP, and eligibility requirements are stricter, such that there are residents of Puerto Rico who are ineligible for smaller NAP benefits due to their income or assets but who would qualify for larger SNAP benefits if residents of Puerto Rico were eligible to receive SNAP benefits. *Id.* ¶¶ 23–24.

According to the most recent Government estimate (for fiscal year 2011), if residents of Puerto Rico were eligible for SNAP benefits, 1.3–2.0 million would have received monthly SNAP benefits, as compared to 1.4 million individuals who participated in NAP. *Id.* ¶ 38.

### 3.    LIS

LIS is a federal benefits program jointly administered by the SSA and by Defendant U.S. Department of Health and Human Services via its component, the Centers for Medicare & Medicaid Services ("**CMS**"). *Id.* ¶ 28. LIS subsidizes the cost of Medicare Part D coverage for low-income individuals whose income and resources are below certain limits. *Id.* ¶ 29. Residents of the States and the District of Columbia are eligible to receive LIS benefits, but residents of Puerto Rico are ineligible. *Id.* ¶¶ 29, 32.

In lieu of LIS, the federal government has provided an enhanced Medicaid allotment to Puerto Rico to help pay for prescription drug coverage for individuals who are dually eligible for Medicaid and Medicare Part D, but the amounts available from this enhanced Medicaid allotment are substantially smaller than LIS benefits. *Id.* ¶¶ 34–35; *see also* Ex. B at 5–6 ("CMS acknowledges that this benefit [the enhanced Medicaid allotment] is substantially smaller than the LIS benefit available to low-income beneficiaries in the states.").

### B.  Plaintiffs

Plaintiffs are nine U.S. citizens who live in Puerto Rico.  *Id.* ¶¶ 40, 50, 59, 65, 70, 85, 93. A tenth plaintiff, Juan Ramón Vélez Marrero, died while this case was pending.  *See* ECF No. 62.

Receiving SSI, SNAP, and/or LIS benefits would materially improve Plaintiffs' lives.  Each Plaintiff has meager income and resources, and most are elderly or disabled (or both).  Plaintiff Sixta Gladys Peña Martínez, who is 73, receives only $40 per month in AABD benefits and $134 per month in NAP benefits; by contrast, when she previously lived in New York, she received up to $735 per month in SSI benefits and $198 per month in SNAP benefits.  Joint Stip. ¶¶ 41–48. Plaintiffs Nélida Santiago Álvarez, Victor Ramon Ilarraza Acevedo, Ramon Luis Rivera Rivera, and Yomarra Valderrama Santiago all suffer from multiple incapacitating health conditions, *id.* ¶¶ 52, 73, 87, 95, while Rosa Maria Ilarraza Rosado has been diagnosed with a mild to moderate intellectual disability, *id.* ¶ 78.  Each of these plaintiffs receives either no AABD benefits at all or very small sums (Mr. Rivera receives $64 per month in AABD benefits), and each receives modest NAP benefits for their households, many of which include multiple children (Ms. Valderrama Santiago, for example, receives $315 per month in NAP benefits to cover food for herself and two children).  *Id.* ¶¶ 54, 57, 75, 80, 83, 89, 91, 97, 99.  Plaintiff Gamaly Velez Santiago likewise makes do with $499 per month in NAP benefits for herself and four children.  *Id.* ¶ 68.

The Government has stipulated that it is more likely than not that each of the nine remaining plaintiffs would qualify for SSI, SNAP, and/or LIS—*i.e.*, each has sufficiently low income and assets and would satisfy the other eligibility criteria—if they lived in an eligible jurisdiction rather than in Puerto Rico.  Specifically, the Government has stipulated that:

- **SSI Plaintiffs**: Six plaintiffs—Ms. Peña Martínez; Ms. Santiago Álvarez; Mr. Ilarraza Acevedo; Ms. Ilarraza Rosado; Mr. Rivera; and Ms. Valderrama Santiago—would qualify for SSI benefits that are larger than any AABD benefits they receive.  *Id.* ¶¶ 42, 47, 53, 56, 74, 76, 79, 81, 88, 90, 96, 98.

- **SNAP Plaintiffs**: Eight plaintiffs—the six above plus Ms. Velez Santiago and Maritza Rosado Concepcion—would qualify for SNAP benefits that are larger than any NAP benefits they receive. *Id.* ¶¶ 42, 49, 53, 58, 67, 69, 82, 84, 88, 92, 96, 100.

- **LIS Plaintiff**: One plaintiff—Maria Luisa Aguilar Galindez—would qualify for LIS benefits. *Id.* ¶¶ 63–64.

Plaintiffs have sued to rectify the unconstitutional discrimination that excludes them from receiving these much-needed SSI, SNAP, and LIS benefits solely because they live in Puerto Rico, even as other U.S. citizens who have equal need are able to receive this financial, nutritional, and medical assistance just because they live in a State, the District of Columbia, or certain Territories.

### C.    Procedural History

Plaintiffs filed this lawsuit on April 13, 2018.  ECF No. 1.  The Complaint pleads three equal-protection claims challenging the express exclusion of U.S. citizens residing in Puerto Rico from SSI benefits (Count I), SNAP benefits (Count II), and LIS benefits (Count III).  *Id.* ¶¶ 91–116.  Defendants moved to dismiss all claims both for a lack of jurisdiction and for failure to state a claim.  On March 27, 2019, the Court denied that motion, ECF No. 55, and on April 15, 2019, it issued a detailed opinion, ECF No. 56, reported at *Peña Martínez v. Azar*, 376 F. Supp. 3d 191 (D.P.R. 2019).  The opinion concludes that there is subject-matter jurisdiction, 376 F. Supp. 3d at 200–04,  and that Plaintiffs have stated a viable claim, *id.* at 204–19, including because *Harris* and *Califano* are not "directly applicable" and do not "bind this Court's disposition," *id.* at 216–19.

On July 26, 2019, the parties jointly stipulated to certain facts to obviate the need for fact discovery.  ECF No. 67.  On August 12, 2019, Plaintiffs served an expert report by the economist Juan Lara, Ph.D. ("**Lara Report**"), about the tax status of Puerto Rico and the prospects for economic disruption from extending SSI, SNAP, and LIS to Puerto Rico.  On October 11, 2019, the Government deposed Dr. Lara.  Ex. D ("**Lara Dep.**").  The Government has not identified any experts or served any expert reports of its own.

ARGUMENT

## I.   LEGAL STANDARDS GOVERNING THIS MOTION FOR SUMMARY JUDGMENT

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "dispute" about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The "court must view the evidence 'in the light most favorable to the opposing party,'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (citation omitted), while also ignoring "conclusory allegations, improbable inferences, and unsupported speculation," *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 87 (1st Cir. 2018) (citations omitted).

"The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact for trial." *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "This burden 'may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325). "After such a showing, the 'burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Id.* (citations omitted).

## II.   THE SSI, SNAP, AND LIS PROGRAMS VIOLATE EQUAL PROTECTION BY EXCLUDING U.S. CITIZENS RESIDING IN PUERTO RICO

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954)). The

right to equal protection of the laws applies fully in Puerto Rico. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 7 (1982) ("We have held that Puerto Rico is subject to the constitutional guarantees of due process and equal protection of the laws."); *see also Igartúa-de la Rosa v. United States*, 417 F.3d 145, 170 (1st Cir. 2005) (*en banc*) (Torruella, J., dissenting) ("The Fifth Amendment is fully applicable to the actions of the U.S. government in Puerto Rico."). The Fifth Amendment thus guarantees persons in Puerto Rico the right to equal protection of federal laws that provide benefits to those in need. *See Carrasco v. Sec'y of Health, Educ. & Welfare*, 628 F.2d 624, 630 (1st Cir. 1980) (holding unconstitutional a federal statutory provision governing Social Security disability benefits because it discriminated against a married woman in Puerto Rico).

For over a century, Puerto Rico has been "part of the United States," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1687 (2017), and residents of Puerto Rico have been American citizens, *see* Jones Act, Pub. L. No. 64-368, § 5, 39 Stat. 951, 953 (1917). "It is a fact that residents of Puerto Rico, who have greatly contributed to this nation in times of both war and peace, are as talented and as hard-working as their fellow citizens living anywhere else in the country." Ex. E at 7–8. Yet SSI, SNAP, and LIS facially exclude U.S. citizens who live in Puerto Rico—and, in particular, the nine remaining Plaintiffs—from receiving benefits that they desperately need and that are granted to similarly situated U.S. citizens in a State, the District of Columbia, and certain Territories. As explained below, this unequal distribution of benefits lacks even a rational basis and is therefore unconstitutional under the Fifth Amendment.

A.  **The SSI, SNAP, And LIS Programs Facially Discriminate Against Residents Of Puerto Rico**

The three federal benefits programs at issue in this case facially exclude U.S. citizens residing in Puerto Rico from receiving the benefits. This facial discrimination is a pure legal issue that the Court can resolve at summary judgment on the undisputed facts in the record here.

1.    **SSI**

As the SSA succinctly puts it: "People who live in Puerto Rico can't get SSI."  Ex. F at 15.
This exclusion has existed since SSI's inception.  SSI was created by Section 301 of the Social
Security Amendments of 1972, which "establish[ed] a national program to provide supplemental
security income to individuals who have attained age 65 or are blind or disabled."  Pub. L. No. 92-
603, § 301, 86 Stat. 1329, 1465.  Section 303(b) of the 1972 Amendments explicitly excludes
Puerto Rico: "[S]ections 301 and 302 . . . shall not be applicable in the case of Puerto Rico, Guam,
and the Virgin Islands."  *Id.* § 303(b), 86 Stat. at 1484.

Other statutory provisions and regulations confirm this exclusion.  The SSI statute excludes
anyone "outside the United States," 42 U.S.C. § 1382(f)(1), and it defines "United States" to cover
only "the 50 States and the District of Columbia," 42 U.S.C. § 1382(e), so Puerto Rico is out of
bounds.  Many regulations say the same.  *E.g.*, 20 C.F.R. §§ 416.120(c)(10), 416.215, 416.216(a),
416.702, 416.1327(a)(1), 416.1603(c) (all defining "United States" to cover "the 50 States," "the
District of Columbia," and "the Northern Mariana Islands"); 20 C.F.R. § 416.1902 (defining
"State" as "a State of the United States, the District of Columbia, or the Northern Mariana
Islands"); 20 C.F.R. § 416.2203 (similar).  As the SSA puts it:  "For SSI purposes, we consider
Puerto Rico to be outside the United States."  Ex. A at 18.

Although U.S. citizens residing in Puerto Rico are excluded from SSI, residents of another
Territory—the Northern Mariana Islands—are not.  In 1976, Congress enacted a separate statute
that extends SSI benefits to the Northern Mariana Islands.  Pub. L. No. 94-241, § 502(a)(1), 90
Stat. 263, 268 (1976).  That is why the regulations cited above define "United States" to include
the Northern Mariana Islands but not Puerto Rico for purposes of SSI benefits.  In sum, federal
statutes and regulations authorize SSI benefits for U.S. citizens in need who reside in a State, the

District of Columbia, and the Northern Mariana Islands, while expressly excluding U.S. citizens in Puerto Rico who have no less need.

### 2. SNAP

Residents of Puerto Rico are likewise excluded from SNAP.  Originally known as the food stamp program, SNAP was created by the Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703.  In the 1970s, the Government extended the food stamp program to Guam, Puerto Rico, and the U.S. Virgin Islands.  *See* Pub L. No. 91-671, §§ 2(c), 4, 84 Stat. 2048, 2048, 2050 (1971); Food Stamp Act of 1977, Pub L. No. 95-113, § 1301, 91 Stat. 913, 958–79.  In the 1980s, however, the Government barred residents of Puerto Rico from the food stamp program, while leaving residents of Guam and the U.S. Virgin Islands eligible.  Pub. L. No. 97-35, § 116, 95 Stat. 357, 364 (1981).

Other statutory provisions and regulations reinforce this exclusion.  The SNAP statute limits eligibility to households in a "State," 7 U.S.C. § 2013(a), and it defines "State" to encompass only "the fifty States, the District of Columbia, Guam, the Virgin Islands of the United States, and [certain Indian reservations]."  7 U.S.C. § 2012(r); *see also* 7 C.F.R. § 271.2 (same definition of "State").  Federal statutes and regulations thus authorize SNAP benefits for U.S. citizens in need of nutritional assistance who live in a State, the District of Columbia, Guam, and the U.S. Virgin Islands, but not for U.S. citizens in Puerto Rico who have no less need.

### 3. LIS

Residents of Puerto Rico are also explicitly excluded from LIS.  The LIS statute provides: "In the case of a part D eligible individual who is not a resident of the 50 States or the District of Columbia, the individual is not eligible to be a subsidy eligible individual under this section . . . ." 42 U.S.C. § 1395w-114(a)(3)(F); *see also First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 49 (1st Cir. 2007) (noting this exclusion).  Regulations likewise codify this exclusion.  *E.g.*, 42 C.F.R. § 423.907(a)(1) ("Low-income Part D eligible individuals who reside in the territories are

not eligible . . . .").  As the SSA puts it, to qualify for LIS (which it also calls "Extra Help," *see* Ex. G): "You must reside in one of the 50 states or the District of Columbia."  Ex. H at 1.  Anyone else—including a U.S. citizen in Puerto Rico—is ineligible.  In short, federal statutes and regulations authorize LIS benefits for U.S. citizens in need who live in the States and the District of Columbia while expressly excluding U.S. citizens living in Puerto Rico who have no less need.

**B.**     **There Is No Rational Basis For This Facial Discrimination**

"When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause."  *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618 (1985).[2]  "Generally a law will survive that scrutiny if the distinction rationally furthers a legitimate state purpose."  *Id.*  Although rational-basis review is a deferential standard, it "'is not a toothless one,' and will not be satisfied by flimsy or implausible justifications for legislative classification, proffered after the fact by Government attorneys."  *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 184 (1980) (citations omitted).  Indeed, the Supreme Court has struck down under rational-basis review multiple statutory provisions that distributed Government benefits to groups in an unequal and irrational fashion.  *E.g.*, *Hooper*, 472 U.S. at 618; *Zobel v. Williams*, 457 U.S. 55, 60–61 (1982); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973).

To survive an equal-protection challenge—whether under rational-basis review or heightened scrutiny—the challenged statute must have a *current* justification.  As this Court previously recognized, it "is a long-standing constitutional principle" that "a policy that once comported with equal protection principles may no longer do so because changed circumstances

---

[2] *Hooper* involved an equal-protection claim under the Fourteenth Amendment rather than the Fifth Amendment, which applies in this case.  But the "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Morales-Santana*, 137 S. Ct. at 1686 n.1 (citation omitted).

altered the policy's effect." *Peña Martínez*, 376 F. Supp. 3d at 217–18; *see also Shelby County v. Holder*, 570 U.S. 529, 536 (2013) (statute that "imposes current burdens . . . must be justified by current needs") (citation omitted); *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938) ("Where the existence of a rational basis for legislation whose constitutionality is attacked" is under examination, "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."); *Nat'l Coal. for Men v. Selective Serv. Sys.*, 355 F. Supp. 3d 568, 575–77, 582 (S.D. Tex. 2019) (granting summary judgment to plaintiffs on claim that excluding women from selective service registration violates equal protection, notwithstanding Supreme Court's contrary decision in *Rostker v. Goldberg*, 453 U.S. 57 (1981), given changed circumstances since *Rostker*).

Indeed, over the years, the U.S. Supreme Court has repeatedly held that classifications of individuals deemed acceptable in benighted times are, upon further consideration and evidence, unconstitutional. *E.g.*, *Lawrence v. Texas*, 539 U.S. 558 (2003) (sexual orientation); *Reed v. Reed*, 404 U.S. 71 (1971) (sex); *Brown v. Board of Education*, 347 U.S. 483 (1954) (race). "If rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied. This Court has rejected that approach . . . ." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015).

Here, the only rationale the Government has advanced for the facial discrimination in the SSI, SNAP, and LIS programs are the three factors the Supreme Court accepted in *Harris* and *Califano* forty years ago: (1) "Puerto Rican residents do not contribute to the federal treasury"; (2) "the cost of treating Puerto Rico as a State under the statute would be high"; and (3) "greater benefits could disrupt the Puerto Rican economy." *Harris*, 446 U.S. at 651–52; *accord Califano*, 435 U.S. at 5 n.7. Crucially, these three factors are, as this Court previously concluded,

"interdependent"; none is "independently sufficient" to justify the exclusion of residents of Puerto Rico. *Peña Martínez*, 376 F. Supp. 3d at 208, 210–11. A rational basis for the SSI, SNAP, and LIS exclusions thus depends on each leg of this three-legged stool remaining sound today. Moreover, as this Court has already concluded, while *Harris* and *Califano* may mandate rational-basis review, they do not control the outcome of this case, especially given the changes that have occurred in the forty years since they issued. *Id.* at 206, 207– 09, 216–19.

There is no genuine dispute of material fact that every one of these three factors is currently inapplicable: (1) Puerto Rico residents *do* contribute to the federal treasury; (2) the cost of extending benefits to residents of Puerto Rico cannot, by itself, justify their exclusion; and (3) there is no rational risk that extending benefits would disrupt Puerto Rico's economy. This Court should thus grant summary judgment that the challenged exclusions lack a rational basis.

1.    **Puerto Rico's Tax Status Does Not Rationally Justify The Discrimination In The SSI, SNAP, And LIS Programs**

"[T]he proposition stated in *Harris* that 'Puerto Rican residents do not contribute to the federal treasury' is erroneous." *United States v. Vaello-Madero*, 313 F. Supp. 3d 370, 374 (D.P.R. 2018). Although U.S. citizens residing in Puerto Rico are exempt from certain federal taxes, they are obligated to pay numerous others, including federal income taxes on certain sources of income, payroll taxes, estate taxes, excise taxes, and gift taxes. *See United States v. Vaello-Madero*, 356 F. Supp. 3d 208, 215 n.9 (D.P.R. 2019) ("A significant percentage of United States citizens in Puerto Rico—contrary to popular belief—must pay federal taxes."); Lara Report at 10–12.

Below are three charts depicting the amounts of different federal taxes collected by the IRS from residents of Puerto Rico as well as from residents of certain other States and Territories. As Chart 1 shows, the IRS has collected over $72 billion in federal taxes from residents of Puerto Rico since 2000 through a variety of different types of taxes:

**Chart 1: IRS Gross Collections from Puerto Rico, FY2000–FY2018[3]**

| Type of Federal Tax | Amount Collected |
|---|---|
| **Business Income Tax** | $9.2 billion |
| **Individual Income Tax & Federal Insurance Contributions Act ("FICA") Tax** | $56.3 billion |
| **Individual Income Tax & Self-Employment Insurance Contributions Act ("SECA") Tax** | $6.0 billion |
| **Unemployment Insurance Tax** | $649.8 million |
| **Estate & Trust Income Tax** | $6.0 million |
| **Estate Tax** | $63.2 million |
| **Gift Tax** | $2.8 million |
| **Excise Tax** | $480.1 million |
| **Total** | **$72.8 billion** |

As Chart 2 shows, the total amount of federal taxes collected from Puerto Rico since 2000 is comparable to the total amounts collected from other States during the same timeframe—such as Vermont ($70.0 billion) and Wyoming ($74.9 billion)—and the amount collected from Puerto Rico dwarfs the amount collected from all other Territories *combined* (only $12.9 billion):

**Chart 2: IRS Gross Collections from Certain Places, FY2000–FY2018[3]**

| | Alaska | Montana | Puerto Rico | Vermont | Wyoming | All Other Territories[4] |
|---|---|---|---|---|---|---|
| **Total** | $84.4 billion | $84.4 billion | $72.8 billion | $70.0 billion | $74.9 billion | $12.9 billion |

---

[3] Sources: Exs. I–N at tbl. 6 (2000–2005 IRS Data Books); Exs. O–AA at tbl. 5 (2006–2018 IRS Data Books); *see also* Lara Report at 15–16.

[4] "All Other Territories" includes "U.S. Armed Service members oversees and Territories other than Puerto Rico." Exs. I–N at tbl. 6; Exs. O–AA at tbl. 5.

As Chart 3 shows, the amount of federal taxes that the IRS collected just from Puerto Rico in Fiscal Year 2018 ($3.4 billion) is also comparable to the amounts collected from multiple other States, such as Alaska ($5.2 billion), Vermont ($4.4 billion), and Wyoming ($4.9 billion), and it continues to vastly exceed the amount collected from all other Territories combined ($722 million):

**Chart 3: IRS Gross Collections by Type of Tax and Certain Places, Fiscal Year 2018[5] (numbers are in thousands of dollars)**

| Federal Tax | Alaska | Puerto Rico | Vermont | Wyoming | All Other Territories[6] |
|---|---|---|---|---|---|
| **Business Income Tax** | $111,474 | $19,383 | $81,587 | $78,787 | $2,087 |
| **Individual Income Tax & FICA Tax** | $3,867,475 | $2,855,792 | $3,210,332 | $2,348,215 | $540,811 |
| **Individual Income Tax & SECA Tax** | $1,128,043 | $430,349 | $1,023,301 | $1,825,826 | $124,973 |
| **Unemployment Insurance Tax** | $12,172 | $22,612 | $8,858 | $7,507 | $4,115 |
| **Railroad Retirement Tax** | $2,204 | $0 | $3,427 | $794 | $0 |
| **Estate & Trust Income Tax** | $90,128 | $593 | $40,802 | $303,836 | $46,729 |
| **Estate Tax** | $19,307 | $1,694 | $17,669 | $307,343 | $0 |
| **Gift Tax** | $351 | $51 | $118 | $3,985 | $2 |
| **Excise Tax** | $56,223 | $112,860 | $31,433 | $54,356 | $4,042 |
| **Total** | **$5,287,377** | **$3,443,334** | **$4,417,527** | **$4,930,650** | **$722,760** |

The federal tax burden on Puerto Rico has increased significantly since *Harris* was decided in 1980. That year, the IRS collected only $738 million in federal taxes from Puerto Rico, *see* Ex. GG at 51 tbl. 1, less than one-fourth of the $3.4 billion it collected in 2018, *see* Ex. AA at tbl. 5.

---

[5]   Source: Ex. AA at 11–12 (2018 IRS Data Book); *see also* Lara Report at 14–16.

[6]   "All Other Territories" includes "U.S. Armed Service members oversees and Territories other than Puerto Rico."  Ex. AA at 11–12.

Since 1980, there have been significant structural changes in federal tax policy towards Puerto Rico. In particular, from 1921 through 2005, the Government provided a special federal corporate tax incentive that significantly benefitted Puerto Rico's economy. *See* Ex. HH at 50–56. In 1996, the Government repealed that incentive with a ten-year phase-out period. *See id.* at 54; *Peña Martínez*, 376 F. Supp. 3d at 212. As a result, in 2006 Puerto Rico fell into a recession that lasted over a decade. *See* Lara Report at 19; Ex. E at 8–14. Before 2006, the amount collected annually from Puerto Rico also exceeded the annual collections from six individual States (Alaska, Montana, North Dakota, South Dakota, Vermont, and Wyoming) and from all other Territories combined. *See* Exs. I–N at tbl. 6; *see also* Congresswoman Nydia M. Velázquez's Amicus Brief, ECF No. 43, at 10 & n.8. These States began surpassing Puerto Rico as the island's economy entered recession in the mid-2000s. *See* Exs. O–AA at tbl. 5; Lara Report at 13–14. Remarkably, between 2005 and 2018, the IRS annually collected an average of $3.6 billion from residents of Puerto Rico, despite the fact that the economy was mired in a recession for most of that time. Lara Report at 13. The recent 2017 tax reform may further increase federal tax collections from Puerto Rico, although it is too soon to estimate its impact. *Id.* at 19.

In short, contrary to unsupported statements in *Harris* and *Califano*, there is no genuine dispute of material fact that Puerto Rico residents do contribute to the federal treasury. And given that Puerto Rico contributes a similar amount to the federal treasury as certain States, and more than other Territories whose citizens are not denied the benefits at issue here, the Government cannot rationally rely on the size of Puerto Rico's contribution to the federal treasury to justify the exclusion of residents of Puerto Rico from SSI, SNAP, and LIS benefits.

Previously, this Court stated that it "interprets the Supreme Court's statement generously" on this issue, suggesting that the Supreme Court "possibly meant to point out that Puerto Ricans

did not . . . pay income taxes," which "fund the Government's general operations," including SSI benefits, whereas the "payroll taxes" they do pay "do not go to the general public treasury, but into Social Security and Medicare trust funds, so they do not supply Congress's general funds." *Peña Martínez*, 376 F. Supp. 3d at 209, 213.  In other words, this Court has generously treated the statements in *Harris* and *Califano* as indicating that the relevant factor is whether the excluded class of persons pays the specific type of taxes that funds the particular benefits program at issue.

Plaintiffs respectfully maintain that this generous interpretation does not match what the Supreme Court actually said.  And given that the Supreme Court made the point not once, but twice—*see Califano*, 435 U.S. at 5 n. 7 ("because of the unique tax status of Puerto Rico, its residents do not contribute to the public treasury"); *Harris*, 446 U.S. at 652 ("Puerto Rican residents do not contribute to the federal treasury")—the Supreme Court should be taken at its word that the factor it was relying on was that Puerto Rico residents do not contribute to the federal treasury at all, not that they do not pay taxes into Congress's general funds.

In any event, even accepting this generous interpretation, it does not rationally justify the exclusions at issue in this case for four reasons.  ***First***, as a matter of law, excluding a class of persons from a benefit just because they do not pay the particular type of tax that funds that benefit is incompatible with the Supreme Court's repeated holdings that the guarantee of equal protection prohibits the Government from apportioning benefits and services "according to the past tax contributions of its citizens," as such reasoning "would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection."  *Saenz v. Roe*, 526 U.S. 489, 507 (1999); *Zobel*, 457 U.S. at 63; *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 266 (1974); *Vlandis v. Kline*, 412 U.S. 441, 450 n.6 (1973); *Shapiro v. Thompson*, 394 U.S. 618, 632–33 (1969); *see also Cole v. Hous. Auth. of Newport*, 435 F.2d 807, 813 (1st Cir.

1970) ("[O]ne could urge that it is reasonable for a municipality to give preference to its older residents . . . to recognize those who have a prior claim on its charity [based on their prior tax contributions].  This facially appealing proposition does not withstand analysis."); *Bunyan v. Camacho*, 770 F.2d 773, 775 (9th Cir. 1985) ("[A] state may not apportion welfare benefits according to the past tax contributions of applicants.").

**Second**, as a matter of fact, Puerto Rico residents *do* pay federal income taxes and other taxes that supply Congress's general funds.  Although residents of Puerto Rico are generally exempt from federal income tax on income earned from sources in Puerto Rico, they must pay federal income taxes on income earned from sources outside of Puerto Rico and on income earned as a federal employee in Puerto Rico.  *See* 26 U.S.C. § 933; *see also* Ex. BB at 15; Ex. EE at 13–14; Lara Report at 10.  As reflected in Charts 1–3 above, residents of Puerto Rico must also pay federal business income taxes, estate taxes, excise taxes, and gift taxes, all of which go into Congress's general funds.  *See* Ex. C at R-2; Ex. BB at 7–13, 15–18; Lara Report at 10–13.  Residents of Puerto Rico have paid billions of dollars in these types of taxes.  *See* Chart 1, above.  Moreover, the poverty rate in Puerto Rico is 43.1%, which is more than double the highest poverty rate of any State (Mississippi at 19.7%), and more than triple the U.S. national rate of 13.1%.  Ex. CC at 3–4.  So the partial exemption from federal income tax "may not cost the federal fisc much at all, given that tax's progressivity."  *Peña Martínez*, 376 F. Supp. 3d at 213; *see also* Lara Report at 18.  And despite the partial federal income tax exemption, residents of Puerto Rico have still paid similar or greater amounts of federal taxes as compared to residents of certain other States and as compared to residents of all other Territories combined.  *See* Charts 2–3, above.  The exclusion of U.S. citizens in Puerto Rico from SSI, SNAP, and LIS benefits therefore cannot rationally be based on the notion that these citizens do not contribute to Congress's general funds.

*Third*, Congress has not limited SSI and SNAP benefits to jurisdictions that pay federal income taxes into the general public treasury.  Residents of Guam, the Northern Mariana Islands, and the U.S. Virgin Islands are eligible for SSI or SNAP benefits, but they generally do not pay federal income taxes.  *See* 26 U.S.C. §§ 931–32; *see also* Ex. BB at 5–8.  Indeed, residents of Puerto Rico *pay more taxes into Congress's general funds* than residents of these Territories.  That is true both in terms of the amount of taxes paid (*see* Charts 2 and 3, above) and in terms of the types of taxes paid, as residents of Puerto Rico must pay federal income taxes on income earned from sources outside of Puerto Rico or from federal employment, whereas residents of Guam, the Northern Mariana Islands, and the U.S. Virgin Islands generally pay only local income taxes.  *See id.*; *see also* Ex. DD at 8–11, 20, 22, 24–25, 28–29.  It is therefore wholly arbitrary and irrational to exclude residents of Puerto Rico from SSI and SNAP benefits based on how much they contribute to Congress's general funds when residents of other Territories, which contribute even less, are eligible.  Notably, *Harris* and *Califano* ruled only that the Government could "treat Puerto Rico differently from *States*."  *Harris*, 446 U.S. at 651–52 (emphasis added).  The Supreme Court did not hold that there is a rational basis for unequal treatment among *Territories*.  Here, there is no rational basis for excluding Puerto Rico from SNAP and SSI while making those benefits available to other Territories.

*Fourth*, LIS benefits are not funded directly from Congress's general funds; rather they are funded by the Supplementary Medical Insurance Trust Fund.  Joint Stip. ¶ 30.  This Trust Fund, in turn, is funded by transfers from the general fund and also by monthly premiums paid by Medicare beneficiaries.  Ex. FF at 11, 30.  Medicare beneficiaries in Puerto Rico pay monthly premiums just as beneficiaries in the States and the District of Columbia do.  *See* Ex. E at 23–24, 26–27.  So even assuming that residents of Puerto Rico do not contribute to Congress's general funds—which, as

explained above, is untrue—that would not rationally justify the LIS exclusion, given that general funds alone do not finance LIS.

In sum, however one construes the Supreme Court's statements in *Harris* and *Califano* about the tax contributions of Puerto Rico residents, it is indisputable that those statements are not true today and that excluding residents of Puerto Rico from SSI, SNAP, and LIS benefits on the basis of the federal taxes they pay would be arbitrary and irrational given that these benefits are made available to residents of States and Territories that pay the same or less in federal taxes.

**2.    The Cost Of Including Puerto Rico Cannot Justify The Discrimination In The SSI, SNAP, And LIS Programs**

As this Court previously ruled, "the second reason cited in *Harris* and *Califano*, to save money, cannot support a finding of rational basis on its own." *Peña Martínez*, 376 F. Supp. 3d at 211.  It is well settled that "the State's legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens." *Saenz*, 526 U.S. at 507.  While "protecting the fiscal integrity of Government programs" is a legitimate concern, this "does not mean that Congress can pursue the objective of saving money by discriminating against individuals or groups." *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 373 (1988); *accord Memorial Hospital*, 415 U.S. at 263 ("[A] State may not protect the public fisc by drawing an invidious distinction between classes of its citizens, so appellees must do more than show that denying free medical care to new residents saves money.") (citation omitted); *Shapiro*, 394 U.S. at 633 ("[A State] may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program.  But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens.  It could not, for example, reduce expenditures for education by barring indigent children from its schools. . . .  The saving of welfare costs cannot justify an otherwise invidious classification.");

*Graham v. Richardson*, 403 U.S. 365, 374–75 (1971) (same). Excluding any arbitrarily chosen group of individuals from a benefits program would save money, but arbitrary distinctions are incompatible with the Fifth Amendment's guarantee of equal protection of the laws. *See Windsor v. United States*, 699 F.3d 169, 186–87 (2d Cir. 2012), *affirmed* 570 U.S. 744 (2013). "Congress cannot categorically exclude a non-suspect class of people—*e.g.* red-haired citizens—from federal benefits programs simply to save money." *Peña Martínez*, 376 F. Supp. 3d at 211.

For example, in *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, the Supreme Court struck down under rational-basis review the statutory exclusion of unrelated persons living in the same household from the food stamp program (which later became SNAP); only households of related persons were eligible for these federal benefits. The Government contended that the exclusion was rational because households of unrelated persons were more likely to defraud the Government out of benefits and therefore the exclusion saved money. *Id.* at 537–38. The Supreme Court rejected this purported rationale, concluding that "in practical operation," the classification "excludes from participation in the food stamp program . . . *only* those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements so as to retain their eligibility." *Id.* at 538. The Court held that such an exclusion was "wholly without any rational basis" and therefore unconstitutional under the Fifth Amendment. *Id.* The Supreme Court's cases "thus make clear that something more than an invocation of the public fisc is necessary to demonstrate the rationality of selecting [one group], rather than some other group, to suffer the burden of cost-cutting legislation." *Lyng*, 485 U.S. at 377.

The Government's interest in saving money therefore cannot, by itself, justify excluding from SSI, SNAP, and LIS the U.S. citizens residing in Puerto Rico who would otherwise qualify. Having chosen to spend Government dollars by granting SSI, SNAP, and LIS benefits to needy

U.S. citizens who reside in the States, the District of Columbia, and certain Territories, it is arbitrary and irrational for the Government to then seek to save money by excluding equally or more needy U.S. citizens just because they happen to live in Puerto Rico.  It is no more costly to award SSI benefits to an eligible citizen in Puerto Rico than it is to award SSI benefits to an identical citizen living in Vermont, Wyoming, or the Northern Mariana Islands.  A policy of avoiding paying benefits to residents of Puerto Rico for "cost-saving" reasons amounts to nothing more than a "concise expression of an intention to discriminate." *Plyler v. Doe*, 457 U.S. 202, 227 (1982).  Such an arbitrary and irrational justification cannot justify the Government's exclusion.

### 3.     There Is No Rational Risk Of Disruption To Puerto Rico's Economy

There is no genuine dispute of material fact that the third factor cited in *Harris* and *Califano*—extending federal benefits might disrupt Puerto Rico's economy—is wholly irrational. As this Court previously stated, "for this reason to satisfy the rational basis requirement, the Court must be able to locate some economic theory explaining how extending these benefits would disrupt Puerto Rico's economy." *Peña Martínez*, 376 F. Supp. 3d at 215.  The Court further noted that it "has not found one on its own.  Accordingly, for this explanation to suffice, the Government must string together some story by which the extension of SSI, SNAP, and LIS to Puerto Rico residents might disrupt Puerto Rico's economy, aside from its expense." *Id.* at 215–16.

Discovery has confirmed that no economic theory supports this "disruption" theory. Plaintiffs have produced the expert report of economist Dr. Juan Lara, who opines that "[t]here is no theory that supports the claim that increased benefits under the challenged programs will disrupt Puerto Rico's economy."  Lara Report at 23–24.  Tellingly, the Government has not offered any expert of its own or produced any evidence that would support the notion that extending SSI, SNAP, and LIS benefits might disrupt Puerto Rico's economy.  Indeed, when SNAP was extended to Puerto Rico in the 1970s, there was no evidence of economic disruption.  *See* ECF No. 43-1 at

6 ("**1976 HEW Report**").  Nor has the Government identified any economic disruption suffered by the Northern Mariana Islands when SSI was extended to it in the 1970s or by Guam and the U.S. Virgin Islands when SNAP was extended to them in the 1970s.

To the contrary, extending SSI, SNAP, and LIS benefits to low-income individuals in Puerto Rico would *help*, not disrupt, Puerto Rico's economy, by ensuring that all U.S. citizens who live in Puerto Rico have financial, medical, and nutritional security equal to that of U.S. citizens living in the States or the District of Columbia.  Lara Report at 20–23.  That is especially true now given that Puerto Rico has been mired in an economic crisis for over a decade, a crisis that was terribly exacerbated by Hurricane Maria and Puerto Rico's municipal bankruptcy.  *Id.* at 6–8; *see also Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1942 (2016) ("Puerto Rico and its instrumentalities are in the midst of a fiscal crisis.").  Providing additional benefits to residents of Puerto Rico boosts—and certainly does not disrupt—an economy that has been ravaged.  For example, in the wake of Hurricane Maria, Congress temporarily increased NAP benefits for residents of Puerto Rico, which led to a temporary increase in retail sales and quicker recovery from the hurricane's effects—not any disruption.  *See* Lara Report at 21–22; Lara Dep. 42:21–43:1 ("We saw an infusion of Federal money for relief after the hurricanes, and an infusion of Federal money for repairs and reconstruction immediately after the hurricanes.  And, for the first time in twelve years, we saw economic growth in Puerto Rico.").  Extending SSI, SNAP, and LIS benefits would similarly strengthen Puerto Rico's economy by providing a needed infusion of additional dollars.  *See* Lara Dep. 52:3–16 ("After many years of seeing retail sales flat, to see this kind of growth, two digit growth, sustained for a long number of months is unbelievable.  And, you can tell that it has to do with the injection of money . . . .  So, the four billion dollars coming in annually from these programs would definitely have a strong impact.").  The increase in demand provoked

by the infusion of capital will create additional economic activity to satisfy said demand, resulting in a positive effect on the economy. The notion that granting benefits to U.S. citizens in need could somehow be disruptive is therefore irrational.

Nor do *Harris* and *Califano* dictate otherwise. The supposed threat of disruption to the Puerto Rico economy that the Supreme Court cited in *Harris* and *Califano* was based on the 1976 HEW Report. *See Califano*, 435 U.S. at 5 n.7 (citing 1976 HEW Report). But, as this Court previously recognized: "that report does not put forward an economic theory supporting the conclusion that Puerto Rico's 'inclusion in the SSI program might seriously disrupt the Puerto Rican economy.' In fact, that report cites the example of the Food Stamp Program, which Congress had extended to Puerto Rico, as 'show[ing] that a large influx of assistance does not necessarily disrupt the economy.'" *Peña Martínez*, 376 F. Supp. 3d at 208 (citing Congresswoman Nydia M. Velázquez's Amicus Brief, ECF No. 43, at 5–7; 1976 HEW Report at 6). It is therefore unclear what threat of disruption the Supreme Court was concerned about. *Id.* ("[T]he Supreme Court never explained what it meant—either in *Califano* or *Harris*—when it reasoned that extending benefits programs might 'disrupt' the Puerto Rican economy.").

In any event, circumstances have changed in Puerto Rico since 1980, including changes in tax policy, the lengthy recession, municipal bankruptcy, and the devastation wrought by Hurricane Maria. Given these changes, "the Government cannot justifiably base its current policy on 1980 concerns about disrupting the Puerto Rican economy." *Id.* at 214.

C.     **Animus Is The Only Conceivable Explanation For The Discrimination In The SSI, SNAP, and LIS Programs**

The Supreme Court has also held in a number of cases postdating *Harris* and *Califano* that a classification's failure to bear any plausible relationship to a valid public purpose may reveal that the classification is in fact motivated by illegitimate animus toward the targeted group, and thus

necessarily violates equal protection.  *E.g.*, *Romer v. Evans*, 517 U.S. 620, 634–35 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–50 (1985).  Where a law is so arbitrary as to "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected," *Romer*, 517 U.S. at 634, then a court must scrutinize the reasons the Government offers with greater vigor.  For example, in *Windsor*, the Supreme Court held that the exclusion of married same-sex couples from a multitude of federal benefits, including the estate tax exemption for surviving spouses, "violates basic due process and equal protection principles applicable to the Federal Government" because the law had the illegitimate purpose of disparaging same-sex marriages.  570 U.S. at 769–75.  "The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group."  *Id.* at 770 (quoting *Moreno*, 413 U.S. at 534–35).

This Court previously noted that "[i]n the four cornerstone animus cases—*Windsor*, *Romer*, *Cleburne*, and *Moreno*—the [Supreme] Court found both that the laws lacked any rational economic justification and that they were based on disapproval of a disfavored group."  *Peña Martínez*, 376 F. Supp. 3d at 216.  The same is true here.  As described above, there is no rational economic justification for excluding U.S. citizens residing in Puerto Rico from SSI, SNAP, and LIS.  The exclusions are so arbitrary and irrational that the only explanation is that they are reflect the Government's desire to withhold aid from a disfavored group of U.S. Citizens.  Accordingly, these exclusions are also unconstitutional due to the impermissible animus that infects them.

**D.      The Discrimination In The SSI, SNAP, And LIS Programs Triggers Heightened Scrutiny**

Plaintiffs recognize that this Court previously ruled in this case that *Harris* and *Califano* require the application of rational-basis review.  *Id.* at 205–10.  Plaintiffs respectfully disagree and maintain that *Harris* and *Califano* have been superseded by the Supreme Court's more recent cases

with respect to the applicable standard of review, and that heightened scrutiny should apply to classifications that disadvantage residents of Puerto Rico.    Plaintiffs briefly reiterate below their argument for heightened scrutiny to preserve the issue for any future appeals.

Heightened scrutiny is warranted where the class discriminated against is a discrete and insular minority that is politically powerless and that has suffered a history of discrimination. *See Plyler*, 457 U.S. at 216–24 & n.24; *Graham*, 403 U.S. at 371–72; *Carolene Products*, 304 U.S. at 152 n.4.  "It would be difficult to imagine a more 'discrete and insular' minority, both geographically and constitutionally, than the residents of Puerto Rico." *Lopez v. Aran*, 844 F.2d 898, 913 (1st Cir. 1988) (Torruella, J., concurring in part and dissenting in part); *see also Vaello-Madero*, 356 F. Supp. 3d at 214 ("United States citizens residing in Puerto Rico are the very essence of a politically powerless group, with no Presidential nor Congressional vote, and with only a non-voting Resident Commissioner representing their interests in Congress.").  Residents of Puerto Rico have also been subject to a history of pervasive discrimination.  *See* ECF No. 18 at 18–19; Amicus Brief of Allard K. Lowenstein International Human Rights Clinic, ECF No. 40, at 1–2.  Heightened scrutiny should therefore apply to the exclusions of U.S. citizens residing in Puerto Rico from SSI, SNAP, and LIS benefits.  *See id.* at 16–19; *see also Lopez*, 844 F.2d at 913 (Torruella, J., concurring in part and dissenting in part).  And given that these exclusions lack even a rational basis, they would also fail under heightened scrutiny.  *See Vaello-Madero*, 356 F. Supp. 3d at 214 ("[T]he SSI statutory exclusion also fails under a heightened scrutiny standard.").

## CONCLUSION & RELIEF SOUGHT

Because there is no genuine dispute of material fact, the Court should grant summary judgment to Plaintiffs, enter a declaratory judgment that it is unconstitutional to exclude Plaintiffs from the SSI, SNAP, and LIS programs based on their residence in Puerto Rico, and enjoin Defendants from excluding Plaintiffs from the SSI, SNAP, and LIS programs based on their residence in Puerto Rico.

Dated:  October 25, 2019

Respectfully submitted,

REICHARD & ESCALERA, LLC

QUINN EMANUEL URQUHART &
SULLIVAN LLP


*/s/ Rafael Escalera Rodríguez*
**Rafael Escalera Rodríguez**
USDC-PR No. 122609
escalera@reichardescalera.com

*/s/ Kathleen M. Sullivan*
**Kathleen M. Sullivan**
(admitted *pro hac vice*)
kathleensullivan@quinnemanuel.com

*/s/ Alana Vizcarrondo-Santana*
**Alana Vizcarrondo-Santana**
USDC-PR No. 301614
vizcarrondo@reichardescalera.com

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000

255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913
Telephone: (787) 777-8888

*/s/ Derek L. Shaffer*
**Derek L. Shaffer**
(admitted *pro hac vice*)
derekshaffer@quinnemanuel.com

1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 538-8000

*/s/ Efrén Rivera Ramos*
**Efrén Rivera Ramos**
USDC-PR No. 121914
efrenriveraramos@gmail.com

85 Cervantes St., Apt. 8
San Juan, PR 00907
Telephone: (787) 428-6088


*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2019, I electronically filed the foregoing Memorandum with the Clerk of the Court using the CM/ECF System, which will send notice of this filing to counsel for all parties.

/s/ *Alana Vizcarrondo-Santana*
Alana Vizcarrondo-Santana