UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

_____
                                  )
SIXTA GLADYS PEÑA MARTÍNEZ,        )
NÉLIDA SANTIAGO ÁLVAREZ,           )
MARÍA LUISA AGUILAR GALÍNDEZ,      )
GAMALY VÉLEZ SANTIAGO,             )
VICTOR RAMÓN ILARRAZA ACEVEDO,     )
MARITZA ROSADO CONCEPCIÓN,         )
ROSA MARIA ILARRAZA ROSADO,        )
RAMÓN LUIS RIVERA RIVERA, and      )
YOMARA VALDERRAMA SANTIAGO,        )
                                  )
                 Plaintiffs,       )
                                  )
        v.                         )        CIVIL ACTION
                                  )        NO. 18-01206-WGY
U.S. DEPARTMENT OF HEALTH          )
AND HUMAN SERVICES; ALEX AZAR, in  )
his official capacity as Secretary )
of Health and Human Services;      )
SONNY PERDUE, in his official      )
capacity as Secretary of           )
Agriculture; U.S. DEPARTMENT OF    )
AGRICULTURE; ANDREW SAUL, in his   )
official capacity as Commissioner  )
of Social Security;* and the SOCIAL)
SECURITY ADMINISTRATION,           )
                                  )
                 Defendants.       )
_____)


YOUNG, D.J.*                                    August 3, 2020

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER**

_____

        * Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure, Commissioner Andrew Saul is automatically substituted
as the named defendant in place of the former Acting
Commissioner of Social Security, Nancy A. Berryhill.

        * Of the District of Massachusetts, sitting by designation.

## I.    INTRODUCTION

The federal safety net is flimsier and more porous in Puerto Rico than in the rest of the nation.  Three basic federal programs created for the financially neediest Americans are off limits to residents of Puerto Rico: Supplemental Security Income ("SSI"), which provides extra income for the elderly, blind, or disabled; the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as food stamps; and the Medicare Part D Low-Income Subsidy ("LIS," also called "Extra Help"), which helps cover the cost of a prescription drug plan.  Instead of these three welfare programs Congress funds substitute initiatives on the island, but they are less generous by far. To be blunt, the federal government discriminates against Americans who live in Puerto Rico.  The question in this case is whether that discrimination is constitutional.

The nine plaintiffs ("Plaintiffs") are all U.S. citizens who reside in Puerto Rico -- by the way, Congress granted citizenship to residents of the island over 100 years ago.[1]  All of them are poor enough to qualify for at least one of the benefits programs listed above, and would otherwise be eligible, except for one problem: they live in Puerto Rico.  They have brought this case against several government defendants

---

[1] Jones Act, Pub. L. No. 64-368, § 5, 39 Stat. 951, 953 (1917).

(collectively, "the Government") claiming that excluding the Plaintiffs from those welfare programs solely because they live in Puerto Rico violates the equal protection component of the Fifth Amendment's Due Process Clause.

At bottom, this case is about "our American ideal of fairness." Bolling v. Sharpe, 347 U.S. 497, 499 (1954). Fairness can sometimes be a notion too elusive or vague to furnish a satisfying legal rule. Yet that ideal, clothed in the constitutional garb of equal protection and due process, is also the supreme law of the land. That does not mean judges decide cases crudely based on their personal sense of right and wrong. Rather, unless the law burdens a fundamental right or classifies people along suspect lines, the crucial question where the law treats people unequally is whether that discriminatory policy could be rational, the bare minimum we must expect from our government when it singles some of us out for worse treatment.

The Government argues that there is a rational basis for excluding residents of Puerto Rico from these welfare programs. In fact, it claims there are three good rationales: (1) residents of Puerto Rico are generally exempt from paying the personal federal income tax; (2) the cost of extending these programs to Puerto Rico would be very high; and (3) fully granting these benefits in Puerto Rico might disrupt the island's economy. The Government also notes that these three

reasons were accepted by the Supreme Court forty years ago when, in a pair of short decisions issued in 1978 and 1980, it rejected similar suits challenging the exclusion of Puerto Rico from certain welfare programs.[2]

This Court, guided in large part by a recent decision of the U.S. Court of Appeals for the First Circuit,[3] disagrees with the Government.  As the First Circuit explained and this Court will amplify below, the two Supreme Court precedents cited by the Government do not control this case, and none of the Government's proposed theories supplies a rational basis for these discriminatory policies against Puerto Ricans.  The income tax rationale is inadequate because the beneficiaries of these programs are, by definition, poor people who generally do not pay income tax no matter where they live.  Nor can the high cost of providing benefits to Puerto Rico residents be a standalone reason to exclude them.  Facing budgetary constraints, Congress could have spread out benefit reductions equally or it could have excluded any slice of the population -- so why pick residents of Puerto Rico?  Wanting to cut costs cannot explain who gets cut.

---

[2] Harris v. Rosario, 446 U.S. 651 (1980) (per curiam); Califano v. Gautier Torres, 435 U.S. 1 (1978) (per curiam).

[3] United States v. Vaello-Madero, 956 F.3d 12 (1st Cir. 2020).

That leaves the economic disruption theory.  The Government argues that, because of Puerto Rico's high poverty and unemployment rates, extending these benefit programs may have an especially adverse impact on labor incentives on the island. The Plaintiffs assert that this economic disruption theory is scientifically baseless, and that pumping more money into Puerto Rico would in fact boost the economy.  That may be, but the Court cannot say on this record that the theory is so empirically shaky as to be irrational per se.  Nevertheless, the economic disruption theory cannot rationally explain the categorical exclusion of residents of Puerto Rico from these particular programs.  That is so, in part, because these programs all provide uniform benefits nationwide no matter the local poverty rate or other economic variations.  Moreover, the exclusions encompass a huge segment of financially needy people (such as the elderly and people with disabilities) for whom no "incentive" is apt to place a job within reach.  In the case of SNAP, positing an economic disruption motivation for the exclusion leads to even deeper irrationality: by taking Puerto Rico out of the national SNAP program, Congress has applied SNAP's key labor-incentivizing strategies throughout the rest of the country but not in Puerto Rico.

With these rationales faltering, nothing remains to justify the discriminatory policy.  As the Court will explain in detail

below, denying needy U.S. citizens equal access to the SSI, SNAP, and LIS safety nets simply because they reside in Puerto Rico is unconstitutional, a breach of "our American ideal of fairness." Bolling, 347 U.S. at 499.  Further, the Court determines that declaratory and injunctive relief is appropriate Commonwealth-wide.  Accordingly, the Government is enjoined from enforcing the unconstitutional exclusion of otherwise eligible residents of Puerto Rico from the SSI, SNAP, and LIS programs throughout the Commonwealth of Puerto Rico.

## II.  FINDINGS OF FACT

### A.   Procedural History

The Plaintiffs filed their complaint on April 13, 2018. Compl. 1, ECF No. 1.  After a hearing held on March 27, 2019, this Court denied the Government's motion to dismiss, ECF No. 55, and on April 15, 2019 issued a Memorandum of Decision.  Peña Martínez v. Azar, 376 F. Supp. 3d 191 (D.P.R. 2019).  In late 2019, both parties moved for summary judgment.  Pls.' Mot. Summ. J. Inc. Mem. L. ("Pls.' Mot."), ECF No. 72; Defs.' Combined Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. Inc. Mem. L. ("Defs.' Mem."), ECF No. 78; Pls.' Combined Reply Supp. Pls.' Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pls.' Reply"), ECF No. 83; Reply Mem. Supp. Defs.' Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 85.

While those motions for summary judgment were pending, the
First Circuit decided a case of direct and obvious relevance,
United States v. Vaello-Madero, 956 F.3d 12 (1st Cir. 2020).
The parties had the chance to address the impact of Vaello-
Madero on this case.  Notice Suppl. Authority, ECF No. 88;
Defs.' Response Pls.' Notice Suppl. Authority, ECF No. 89.  With
the parties' consent, the Court then heard oral argument on the
motions for summary judgment as a case stated on June 4, 2020.[4]
See Tr. Case-Stated Hr'g, ECF No. 94.  The Court took the matter
under advisement and requested further briefing regarding the
nature and scope of a potential remedy.  Id. at 34-35; Pls.'
Suppl. Br. Scope Remedy ("Pls.' Remedies Br."), ECF No. 95;
Defs.' Mem. L. Remedies ("Defs.' Remedies Br."), ECF No. 96.

### B.  Case-Specific Findings

The parties have stipulated to the basic facts of this
case: how the three welfare programs operate, the Plaintiffs'
histories and ineligibility for those programs, and the likely

---

[4] "Case stated hearings provide an efficacious procedural
alternative to cross motions for summary judgment."  Sawyer v.
United States, 76 F. Supp. 3d 353, 356 (D. Mass. 2015) (citing
Continental Grain Co. v. Puerto Rico Mar. Shipping Auth., 972
F.2d 426, 429 n.7 (1st Cir. 1992)).  "In a case stated, the
parties waive trial and present the case to the court on the
undisputed facts in the pre-trial record.  The court is then
entitled to 'engage in a certain amount of factfinding,
including the drawing of inferences.'"  TLT Constr. Corp. v. RI,
Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United
Paperworkers Int'l Union Local 14 v. International Paper Co., 64
F.3d 28, 31 (1st Cir. 1995)).

cost of extending the programs to Puerto Rico residents.  See
Joint Stipulations Fact ("Joint Stip."), ECF No. 67.  They do
not dispute anything important about Puerto Rico's population or
its tax status.  In the few instances where the parties debate
factual matters (principally regarding how extending these
welfare programs to Puerto Rico would affect its economy), the
Court finds it unnecessary to make a factual determination, as
will be explained below.  Accordingly, the Court sets forth the
following findings of fact as undisputed by the parties.

### 1.   Challenged Programs

The big picture is that residents of Puerto Rico are
categorically excluded from the SSI, SNAP, and LIS programs that
operate in the fifty states, the District of Columbia, and some
territories (the Northern Mariana Islands for SSI benefits, Guam
and the U.S. Virgin Islands for SNAP).  Id. ¶¶ 6-8, 18-20, 32-
33.  Instead, the federal government funds alternative welfare
programs for Puerto Rico, but the substitute programs offer less
coverage and smaller benefits than do the SSI, SNAP, and LIS
programs.  Id. ¶¶ 11-12, 23-24, 35.

### a.   Supplemental Security Income

Supplemental Security Income, or SSI, provides additional
cash income to people who are "aged" (65 years of age or older),
"blind," or "disabled," if their income and resources fall below
specified limits.  Id. ¶ 5; 42 U.S.C. §§ 1382, 1382c.  The

statute restricts SSI benefits to "resident[s] of the United States," id. § 1382c(a)(1)(B)(i), defined as "the 50 States and the District of Columbia," id. § 1382c(e).  Residents of the Northern Mariana Islands may also qualify for benefits.  Joint Stip. ¶ 6.[5]  Residents of Puerto Rico, however, are excluded. Id. ¶ 7.[6]  Funding for the SSI program is fully drawn from the General Fund of the United States Treasury ("General Fund"). Id. ¶ 9.

In lieu of SSI, Puerto Rico operates a substitute program called Aid to the Aged, Blind, or Disabled ("AABD").  Id. ¶ 10. The AABD program is less generous than SSI in two ways: the income and resource thresholds are higher, such that many poor people would be eligible for SSI but do not make the cutoff for AABD; and even for those who qualify, the average monthly

---

[5] Congress separately made SSI program benefits available to residents of the Commonwealth of the Northern Mariana Islands. See Pub. L. No. 94-241, § 502(a)(1), 90 Stat. 263, 268 (1976) (codified at 48 U.S.C. § 1801 note, and implemented by 20 C.F.R. § 416.120(c)(10)).  Additionally, the United States District Court for the District of Guam recently ruled that excluding residents of Guam from SSI benefits violates equal protection. See Order, Schaller v. U.S. Social Security Administration, Civ. A. No. 18-00044 (D. Guam June 19, 2020), ECF No. 77 (attached in this docket at Pls.' Remedies Br., Ex. A., ECF No. 95-1).

[6] The bill passed by the House of Representatives included "Puerto Rico (with a reduced guaranteed minimum income), Guam, and the Virgin Islands" in the SSI program, but the Senate's bill -- which won the day -- removed those territories from the program.  Staff of Sen. Comm. on Finance, 92d Cong., 2d Sess., H.R. 1: Social Security Amendments of 1972: Brief Description of Senate Amendments, No. 84-712, at 40 (Comm. Print 1972).

benefit amount is smaller in the AABD program than in the SSI

program.  Id. ¶¶ 11-12.

The First Circuit recently summed up the differences

between the AABD and SSI programs:

> AABD is financed by a capped categorical matching
> grant whereby the federal government contributes 75
> percent and the territorial government contributes 25
> percent; administrative costs are split 50/50.  Like
> SSI, federal funds for AABD flow (or maybe more
> accurately trickle) from the general fund of the U.S.
> treasury.  During fiscal year 2011, the average AABD
> monthly payment was $73.85, compared to SSI payments
> of $438.05 in the fifty states and the District of
> Columbia and $525.69 in the Northern Mariana Islands.
> In fiscal year 2011, 34,401 individuals in Puerto Rico
> were enrolled in the AABD program.  The Government
> Accountability Office has predicted that, had Puerto
> Rico been extended SSI at that time, 305,000 to
> 354,000 eligible Puerto Rico residents would have
> received SSI.

Vaello-Madero, 956 F.3d at 29-30 (first citing William R.

Morton, Cong. Research Serv., Cash Assistance for the Aged,

Blind, and Disabled in Puerto Rico 12, 21 (2016); then citing

U.S. Gov't Accountability Off., GAO-14-31, Puerto Rico:

Information on How Statehood Would Potentially Affect Selected

Federal Programs and Revenue Sources ("2014 GAO Report") 82

(2014)).

Not surprisingly, the reduced coverage under the AABD

program makes it far cheaper to run than SSI.  The Government

Accountability Office has estimated that, had residents of

Puerto Rico been eligible for SSI benefits in 2011, federal

spending would have increased from the approximately $24 million spent on the AABD program to a range from $1.5 to $1.8 billion. Joint Stip. ¶ 36 (citing 2014 GAO Report 82).

### b.   Supplemental Nutrition Assistance Program

Originally called the Food Stamp Program,[7] SNAP provides assistance for people to buy food if their income and assets fall below specified limits.  Id. ¶ 14; 7 U.S.C. § 2011.  "Its universal eligibility (i.e., eligibility depends only on need) combined with the fact that benefits and caseloads rise freely with need (i.e., it expands during recessions, since the program is an entitlement and expenditures are not capped) have elevated SNAP to its status as the fundamental safety net program in the United States."[8]

---

[7] The Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, §§ 4001-4002, 122 Stat. 923, 1092, changed the name of the Food Stamp Program to the Supplemental Nutrition Assistance Program.  Congress also directed the U.S. Department of Agriculture to conduct a feasibility study regarding the inclusion of Puerto Rico in the SNAP program.  Id. § 4142, 122 Stat. at 1120; see Food & Nutrition Serv., U.S. Dep't of Agric., Implementing Supplemental Nutrition Assistance Program in Puerto Rico: A Feasibility Study (2010) ("Feasibility Study"), https://www.fns.usda.gov/snap/implementing-supplemental-nutrition-assistance-program-puerto-rico-feasibility-study.

[8] Hilary Hoynes & Diane Whitmore Schanzenbach, US Food and Nutrition Programs, in 1 Economics of Means-Tested Transfer Programs in the United States 226-27 (Robert A. Moffitt ed., Univ. of Chicago Press 2016); see also id. at 220 ("SNAP is by far the largest [nutrition] program at a cost of $74.2 billion in 2014.  Nearly one in seven Americans participated in SNAP in 2014, and the program lifted 4.7 million people, including 2.1 million children, out of poverty in 2014."); id. at 222 ("Studies consistently show that SNAP reduces food insecurity

Residents of the fifty states, the District of Columbia, Guam, the U.S. Virgin Islands, and qualifying tribal reservations are eligible for SNAP benefits.  Joint Stip. ¶ 18; 7 U.S.C. § 2012(r).  For those areas, the local government administers the program while the federal government funds the benefits and covers 50% of the administrative costs.  Joint Stip. ¶ 16.  Federal funding for SNAP comes from the General Fund.  Id. ¶ 17.

Residents of Puerto Rico are not eligible for SNAP.  Id. ¶ 19; 7 U.S.C. §§ 2013(a), 2012(r).  For several years, Puerto Rico was included in the food stamp program, but in 1981 Congress revoked eligibility for residents of the island.  See Amendments to the Food Stamp Act of 1964, Pub. L. No. 91-671, §§ 2(c), 4, 84 Stat. 2048, 2048, 2050 (1971); Food and Agriculture Act of 1977, Pub. L. No. 95-113, § 1301, 91 Stat. 913, 960 (1977); Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 116, 95 Stat. 357, 364 (1981).

Instead of the SNAP program, Puerto Rico receives a federal block grant to fund its similar Nutrition Assistance Program ("NAP").  Joint Stip. ¶¶ 21-22; 7 U.S.C. § 2028.  Yet the eligibility requirements are stricter for NAP than under SNAP,

_____

and increases health at birth, and greater exposure to SNAP in early life leads to improvements in medium-term and long-term health.").

and SNAP benefits tend to be larger.  Joint Stip. ¶¶ 23-25.[9]  The
result is that Puerto Rico's NAP program is less generous than
the SNAP benefits available to residents of the fifty states,
Guam, and the U.S. Virgin Islands.  In fiscal year 2011, the
federal government spent $1.9 billion on NAP, whereas the cost
of aggregate SNAP benefits had residents of Puerto Rico been
eligible would have ranged from $1.7 billion to $2.6 billion.
Id. ¶ 36 (citing 2014 GAO Report 78).  Moreover, average monthly
SNAP coverage would have ranged from 486,000 households to
1,140,000 households in Puerto Rico, compared to 644,176
households covered by NAP in fiscal year 2011.  Id. ¶ 37 (citing
2014 GAO Report 78).

### c.   Medicare Part D Low-Income Subsidies

Medicare Part D subsidizes private insurers' prescription
drug plans for elderly or disabled Medicare beneficiaries.  Id.
¶¶ 26-27; 42 U.S.C. § 1395w-102.  The Low-Income Subsidy ("LIS,"
also known as "Extra Help"),[10] in turn, subsidizes low-income
Medicare beneficiaries so that they can purchase a Medicare Part

---

[9] After Hurricanes Irma and Maria, Congress authorized
temporary supplemental federal funding for NAP to address food
shortages in Puerto Rico.  See Additional Supplemental
Appropriations for Disaster Relief Requirements Act of 2017,
Pub. L. No. 115-72, 131 Stat. 1224 (2017).

[10] See SSA, Program Operations Manual System (POMS) HI
03001.005, Medicare Part D Extra Help (Low-Income Subsidy or
LIS), https://secure.ssa.gov/poms.nsf/lnx/0603001005.

D insurance plan.  Joint Stip. ¶¶ 28-29; 42 U.S.C. § 1395w-114.
Residents of the fifty states may receive LIS benefits if their
income and resources do not exceed certain limits established by
Section 1395w-114(a)(3) of the Medicare statute.  Joint Stip. ¶
29.  LIS funds are available only to residents of the fifty
states and the District of Columbia; residents of Puerto Rico
are ineligible.  Joint Stip. ¶¶ 29, 32; 42 U.S.C. § 1395w-
114(a)(3)(F).

Instead of LIS, Congress sends some extra money to Puerto
Rico's Medicaid program to support prescription drug insurance,
but "benefit amounts available to residents of Puerto Rico from
this enhanced Medicaid allotment are substantially smaller than
the LIS benefits available to low-income beneficiaries in the
States."  Joint Stip. ¶¶ 34-35; 42 U.S.C. § 1396u-5(e).

LIS is not directly funded by the General Fund; its
resources are drawn from the Supplementary Medical Insurance
Trust Fund ("SMI Trust Fund").  Joint Stip. ¶ 30.  Yet the SMI
Trust Fund is itself mostly supplied by transfers from the
General Fund (totaling about 72% of program costs in 2019).  See
Medicare Board of Trustees, 2020 Annual Report of the Boards of
Trustees of the Federal Hospital Insurance and Federal
Supplementary Medical Insurance Trust Funds 11, 101 (Apr. 22,
2020), https://www.cms.gov/files/document/2020-medicare-
trustees-report.pdf ("The transfers from the Treasury reflect

the direct premium subsidy payments, amounts of reinsurance
payments, RDS amounts, low-income subsidies . . . .").

The Government Accountability Office has estimated that,
had the LIS program operated in Puerto Rico in 2011, almost half
a million (493,984) Medicare beneficiaries on the island would
have been eligible for LIS benefits.  Joint Stip. ¶ 37 (citing
2014 GAO Report 71).

### 2.   Puerto Rico's Tax and Economic Status

The parties agree on the essential features of the tax
regime and economic conditions prevailing in Puerto Rico, though
they sharply disagree as to the likely economic consequences of
enhancing welfare benefits on the island.  The Court finds the
following facts undisputed.

Residents of Puerto Rico are exempt from personal federal
income taxes unless they are employed by the federal government
or have income from sources outside Puerto Rico.  Defs.' Mem.,
Ex. A, Defs.' Statement Undisputed Material Facts Supp. Cross-
Mot. Summ. J. ("Defs.' Facts") ¶¶ 20-21, ECF No. 78-1 (citing 26
U.S.C. § 933).  About half the money in the General Fund (49.6%
in 2019) is derived from nationwide federal personal income
taxes.  Off. Management & Budget, Historical Tables, Table 2.2,

at 38, https://www.whitehouse.gov/omb/historical-tables/.[11]  Even
when they do not pay federal income tax, though, Puerto Ricans
pay various other taxes to the federal government, including
business income taxes, payroll taxes, unemployment insurance
taxes, estate and trust income taxes, estate taxes, gift taxes,
and excise taxes.  Pls.' Mem., Ex. A, Pls.' Statement Undisputed
Material Facts Supp. Mot. Summ. J. ("Pls.' Facts") ¶ 22, ECF No.
72-1.  From 2000 to 2005, residents of Puerto Rico paid more in
federal taxes than did residents of six states (Alaska, Montana,
North Dakota, South Dakota, Vermont, and Wyoming), and from all
other territories combined.  Id. ¶ 32; see also Vaello-Madero,
956 F.3d at 24-25 (comparing Puerto Rico's federal tax
contributions to those states and the Northern Mariana Islands).
In fiscal year 2019, the federal government collected
$3,528,739,000 in taxes from Puerto Rico residents.  Internal
Revenue Service, SOI Tax Stats - Gross Collections, by Type of
Tax and State - IRS Data Book Table 5,
https://www.irs.gov/statistics/soi-tax-stats-gross-collections-
by-type-of-tax-and-state-irs-data-book-table-5.

Puerto Rico's estimated population is 3.2 million people.
Defs.' Facts ¶ 22.  Wages in Puerto Rico are lower than the U.S.

---

[11] Drawing from the 2018 data, the Government cites the
contribution of individual federal income taxes to the General
Fund as 50.6%.  Defs.' Facts ¶ 23.

national average.  Id. ¶ 31.  According to data from the United
States Census Bureau, Puerto Rico's poverty rate is 43.1%, which
is far worse than the national rate of 13.1% and more than
double the 19.7% rate of Mississippi, the nation's poorest
state.  See Brian Glassman, A Third of Movers From Puerto Rico
to the Mainland United States Relocated to Florida in 2018,
Census.gov (Sept. 26, 2019) ("Glassman"),
https://www.census.gov/library/stories/2019/09/puerto-rico-
outmigration-increases-poverty-declines.html.  This is not a new
phenomenon.  For decades, poverty has been significantly more
prevalent in Puerto Rico than on the mainland.  See, e.g.,
Jurisdictional Statement at 13 n.14, Harris v. Rosario, 446 U.S.
651 (1980) (per curiam) (No. 79-1294) ("Department of Commerce
statistics show that per capita income in Puerto Rico is
considerably less than half that in the United States and about
half that of the poorest state . . . ."); Jurisdictional
Statement at 8 n.7, Califano v. Gautier Torres, 435 U.S. 1
(1978) (per curiam) (No. 77-88) ("Per capita income of residents
in the United States in 1969 was $3,189; for residents of Puerto
Rico it was $981.").

### 3.  Plaintiffs

The Court will briefly recount the pertinent undisputed
facts concerning the nine Plaintiffs, all of whom are U.S.

citizens living in Puerto Rico who would likely be eligible for
SSI, SNAP, or LIS benefits were they living on the mainland.

### a.    Sixta Gladys Peña Martínez

Sixta Gladys Peña Martínez ("Peña")[12] is 74 years old and a
U.S. citizen living in Hato Rey, Puerto Rico.  Joint Stip. ¶¶
40-41.  But for her residency in Puerto Rico, Peña would likely
qualify for SSI and SNAP benefits.  Id. ¶ 42.  While living in
New York between 2008 and 2016, she received up to $735 per
month in SSI benefits and between $10 and $198 per month in SNAP
benefits.  Id. ¶ 44.  That came to an end when Peña moved to
Puerto Rico in 2017, and she now receives $40 per month in AABD
benefits and $134 per month under the NAP program.  Id. ¶¶ 46,
48.  Were she eligible for SSI and SNAP, her benefits would
likely be higher than what she now receives.  Id. ¶¶ 48-49.

### b.    Nélida Santiago Álvarez

Nélida Santiago Álvarez ("Santiago") is 65 years old and a
U.S. citizen living in Toa Alta, Puerto Rico.  Id. ¶¶ 50-51.[13]
She suffers from multiple incapacitating health conditions,

---

[12] "According to Spanish naming conventions, if a person has
two surnames, the first (which is the father's last name) is
primary and the second (which is the mother's maiden name) is
subordinate." United States v. Martínez-Benítez, 914 F.3d 1, 2
n.1 (1st Cir. 2019).  Hence, the Court refers to individual
plaintiffs by their first surname except where that would create
confusion.

[13] Her late husband, Juan Ramón Vélez Marrero, was also a
plaintiff in this suit until he passed away in October 2018.
ECF No. 62.

including asthma, high blood pressure, and cardiac conditions;
she also has an implantable cardioverter-defibrillator.  Id. ¶
52.  Santiago does not receive AABD benefits but she currently
receives $521 per month under the NAP program for herself and
her two grandchildren.  Id. ¶¶ 54, 57.  But for her residency in
Puerto Rico, Santiago would likely qualify for SSI and SNAP
benefits.  Id. ¶¶ 56, 58.

### c.   María Luisa Aguilar Galíndez

María Luisa Aguilar Galíndez ("Aguilar") is 85 years old
and a U.S. citizen living in San Juan, Puerto Rico.  Id. ¶¶ 59-
60.  But for her residency in Puerto Rico, Aguilar would likely
qualify for LIS benefits.  Id. ¶¶ 63-64.

### d.   Gamaly Vélez Santiago

Gamaly Vélez Santiago is 36 years old and a U.S. citizen
living in Toa Alta, Puerto Rico.  Id. ¶¶ 65-66.  She currently
receives $499 per month under the NAP program for herself and
four children, and but for her residency in Puerto Rico she
would likely qualify for SNAP benefits and receive more than she
now does.  Id. ¶¶ 67-69.

### e.   The Ilarraza-Rosado Family

Victor Ramón Ilarraza Acevedo ("Mr. Ilarraza Acevedo") and
Maritza Rosado Concepción, along with their daughter Rosa Maria
Ilarraza Rosado ("Ms. Ilarraza Rosado") (jointly, "the family"),
are U.S. citizens living together in Toa Alta, Puerto Rico.  Id.

¶¶ 70-71.  Mr. Ilarraza Acevedo is 50 years old and suffers from four herniated discs, tailbone pain, and bipolar disorder.  Id. ¶¶ 72-73.  Ms. Ilarraza Rosado is 24 years old; she has been diagnosed with a mild to moderate intellectual disability, is unable to read or write, and has severe retention problems.  Id. ¶¶ 77-78.  No one in the family receives AABD benefits, but the family receives $410 per month under the NAP program.  Id. ¶¶ 75, 80, 83.  But for their residency in Puerto Rico, the family would likely qualify for SSI and SNAP benefits, and their SNAP benefits would likely be greater than what they now get from the NAP program.  Id. ¶¶ 74-84.

### f.  Ramón Luis Rivera Rivera

Ramón Luis Rivera Rivera is 59 years old and a U.S. citizen residing in Toa Alta, Puerto Rico.  Id. ¶¶ 85-86.  He receives $64 dollars per month in AABD benefits and (usually) $112 dollars per month in NAP benefits.  Id. ¶¶ 89-91.  But for his residency in Puerto Rico, Rivera would likely qualify for larger SSI and SNAP benefits than he currently receives under the AABD and NAP programs, respectively.  Id. ¶¶ 88-92.

### g.  Yomara Valderrama Santiago

Yomara Valderrama Santiago is 41 years old and a U.S. citizen living in Toa Alta, Puerto Rico.  Id. ¶¶ 93-94.  She receives no AABD benefits but gets $315 per month under the NAP program for herself and her two children.  Id. ¶¶ 97, 99.  But

for her residency in Puerto Rico, she would likely qualify for SSI benefits and for larger SNAP benefits than she now receives under the NAP program.  Id. ¶¶ 96-100.

## III. RULINGS OF LAW

The Court's analysis will first lay out the legal framework governing the Plaintiffs' claims, namely, an equal protection challenge subject to rational basis review.  Next, it will summarize the First Circuit's recent opinion in Vaello-Madero, which looms large in this case.  The Court will then turn to analyze separately each of the three programs -- SSI, SNAP, and LIS -- under the rational basis standard of review.  In so doing, the Court will consider the three rationales offered by the Government: the unique tax status of Puerto Rico, the potential disruption to Puerto Rico's economy from extending full welfare benefits, and the high cost of extending the challenged programs to Puerto Rico residents.

As the Court will explain, following the precedents of the Supreme Court and the First Circuit, the exclusion of otherwise eligible residents of Puerto Rico from these three welfare programs cannot survive rational basis review.

### A.    The Legal Framework: Equal Protection under Rational Basis Review

The Plaintiffs claim that their exclusion from the SSI, SNAP, and LIS benefits programs solely because of their

residency in Puerto Rico violates their constitutional right to equal protection of the laws, a right embedded in the Fifth Amendment's Due Process Clause.  Compl. ¶¶ 91-116; see U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973) (discussing "the equal protection component of the Due Process Clause of the Fifth Amendment").  "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." Vaello-Madero, 956 F.3d at 18 (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995) (further citations omitted)).  As in Vaello-Madero, "the classification[s] subject to challenge can be defined as: individuals who meet all the eligibility criteria for SSI [or SNAP or LIS] except for their residency in Puerto Rico." Id. As this Court previously held and the First Circuit has now confirmed, the Plaintiffs' claims are subject to rational basis review.  Id.; Peña Martínez, 376 F. Supp. 3d at 209.

The rational basis standard of review is exceedingly deferential to the Government.  "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer v. Evans, 517 U.S. 620, 632 (1996); id. at 631 ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative

classification so long as it bears a rational relation to some legitimate end."). Moreover, "[e]qual protection does not 'require a legislature to articulate its reasons for enacting a statute,' and the 'conceived reason[s]' put forth in support of the statute in litigation do not need to be the same as those that 'actually motivated the legislature.'" Vaello-Madero, 956 F.3d at 18 (second alteration in original) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315, (1993)). Since the Government's proposed reason for the discriminatory policy may be hypothetical, rather than actual, the Plaintiffs bear the "burden 'to negative every conceivable basis which might support it.'" Id. (quoting Beach Commc'ns, 508 U.S. at 315; Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)).

It is no wonder that one scholar described this sort of judicial review as "minimal scrutiny in theory and virtually none in fact."[14] Yet even rational basis review has its limits; it "is 'not a toothless'" standard. Schweiker v. Wilson, 450 U.S. 221, 234 (1981) (quoting Mathews v. Lucas, 427 U.S. 495, 510 (1976)). The most obvious limit is that the Government's interest must be "legitimate," and "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate

---

[14] Gerald Gunther, The Supreme Court, 1971 Term -- Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972).

governmental interest." <u>Romer</u>, 517 U.S. at 634 (omission and emphasis in original) (quoting <u>Moreno</u>, 413 U.S. at 534).   Even when a legitimate interest is put forward, a classification must satisfy three requirements to survive rational basis review: (1) "there is a plausible policy reason for the classification," (2) "the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker," and (3) "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." <u>Armour</u> v. <u>City of Indianapolis</u>, 566 U.S. 673, 681 (2012) (quoting <u>Nordlinger</u> v. <u>Hahn</u>, 505 U.S. 1, 11 (1992)).

   B.   **<u>Vaello-Madero</u>, <u>Califano</u>, and <u>Harris</u>**

   The First Circuit's opinion in <u>Vaello-Madero</u> dealt with an equal protection challenge to the SSI program only.   It begins by grappling with the two directly pertinent Supreme Court precedents: <u>Califano</u> v. <u>Gautier Torres</u>, 435 U.S. 1 (1978) (per curiam), and <u>Harris</u> v. <u>Rosario</u>, 446 U.S. 651 (1980) (per curiam).   Both cases were summary dispositions, a posture that saps them of precedential force except with respect to "the precise issues presented and necessarily decided by those actions." <u>Vaello-Madero</u>, 956 F.3d at 21 (quoting <u>Illinois State Bd. of Elections</u> v. <u>Socialist Workers Party</u>, 440 U.S. 173, 182 (1979)).

Califano upheld the exclusion of Puerto Rico residents from the SSI program, but it was decided as a right to travel case rather than on equal protection grounds.  See id. at 20 (discussing Califano).  The Supreme Court held that rational basis scrutiny applied to SSI's exclusion of Puerto Rico residents, and that three reasons sufficed to form such a rational basis: "First, because of the unique tax status of Puerto Rico, its residents do not contribute to the public treasury.  Second, the cost of including Puerto Rico would be extremely great -- an estimated $300 million per year.  Third, inclusion in the SSI program might seriously disrupt the Puerto Rican economy."  Califano, 435 U.S. at 5 n.7 (citing Department of Health, Education, and Welfare, Report of the Undersecretary's Advisory Group on Puerto Rico, Guam and the Virgin Islands 6 (Oct. 1976) ("HEW Report")).

Harris, another summary reversal, was an equal protection case but it did not concern SSI.  446 U.S. at 651-52.  Rather, it addressed federal block grants under the Aid to Families with Dependent Children ("AFDC") program, a distinguishing feature that Vaello-Madero deemed meaningful.  956 F.3d at 21.  Harris rehearsed the same three reasons validated by Califano and held that the AFDC's differential treatment of Puerto Rico residents did not violate the Equal Protection Clause.  446 U.S. at 651-52 (citing Califano, 435 U.S. at 5).  Since Califano was not an

equal protection case and Harris addressed a block grant
program, Vaello-Madero concluded that "the [Supreme] Court has
never ruled on the validity of alleged discriminatory treatment
of Puerto Rico residents as required by the SSI program under
the prism of equal protection."  956 F.3d at 21.

    The First Circuit found additional support for
distinguishing Harris and Califano from the fact that the
government had "abandon[ed]" the third reason accepted by the
Supreme Court, namely that extending benefits to residents of
Puerto Rico might somehow disrupt its economy.  Id. at 22-23.
Vaello-Madero struggled to "decipher" "this now defunct
argument" and described this rationale as of a "dubious nature."
Id. at 23.  Although the First Circuit dismissed this rationale
only in the context of "not[ing] its abandonment" as a means of
distinguishing Califano and Harris, id., rejecting this theory
was in fact necessary to Vaello-Madero's holding because a
successful challenge must "negative every conceivable basis
which might support" the classification, id. at 18 (quoting
Beach Commc'ns, 508 U.S. at 315).

    Having liberated itself from the constraints of Califano
and Harris, the First Circuit proceeded to analyze the SSI
program's exclusion of Puerto Rico residents under rational
basis review.  Id. at 23.  It noted that excluding residents of
Puerto Rico "is clearly irrelevant to the stated purpose of the

program, which is to provide cash assistance to the nation's
financially needy elderly, disabled, or blind." Id. It then
searched for another legitimate purpose to which the
classification may be rationally related, analyzing the two
explanations offered by the government (drawn from Califano and
Harris): Puerto Rico's tax status and the high cost. Id.

Vaello-Madero started with the argument that "the unique
tax status of Puerto Rico" supplies a rational basis for
excluding its residents from SSI benefits. Id. at 24. The
First Circuit noted that the Supreme Court's statement that
residents of Puerto Rico "do not contribute to the public
treasury" is mistaken. Id. (quoting Califano, 435 U.S. at 5
n.7). In fact, "[t]he residents of Puerto Rico not only make
substantial contributions to the federal treasury, but in fact
have consistently made them in higher amounts than taxpayers in
at least six states, as well as the territory of the Northern
Mariana Islands." Id. The government conceded this point, of
course, and instead narrowed the argument to focus on the fact
that Puerto Rico residents generally do not pay income tax. Id.
Yet the First Circuit ruled it irrational to link income tax
payments to SSI benefits, since SSI is a means-tested program
available only to those with limited income while the federal
income tax is a progressive tax that generally exempts low-
income individuals: "How can it be rational for Congress to

limit SSI benefits 'to exclude populations that generally do not pay federal income taxes' when the very population those benefits target do not, as a general matter, pay federal income tax?" Id. at 27.

Having dispensed with the arguments relating to Puerto Rico's tax status and the potential disturbance to its economy, the First Circuit turned to the final rationale offered by the government: saving money.  Id. at 28.  Vaello-Madero firmly held "that cost alone does not support differentiating individuals." Id. at 29 (emphasis in original).  Since it had already rejected all other rationales, the cost-saving argument could not stand alone.  The First Circuit therefore held that the exclusion of Puerto Rico residents from SSI benefits lacked a rational basis in violation of the equal protection component of the Fifth Amendment, adding that "such exclusion of the residents of Puerto Rico is declared invalid."  Id. at 32.

C.   Supplemental Security Income (SSI)

As just discussed, the First Circuit has already ruled that the exclusion of Puerto Rico residents from the SSI program runs afoul of equal protection and is therefore invalid.  Id.  That holding binds this Court.  Since the Government here makes an argument it abandoned in Vaello-Madero, however, this opinion will further explain why, upon the undisputed record before this

Court, it is irrational to deny residents of Puerto Rico SSI benefits.

### 1.   The Economic Disruption Theory in the SSI Context

The First Circuit had no need to address the economic disruption argument, since it determined that the government had "abandon[ed]" that point.  Id. at 23.  Yet the Government does press that theory in this Court.  See Defs.' Mem. 31-35.  In brief, the theory is that Congress could rationally believe that welfare benefits tend to disincentivize employment, and that, given the high poverty and unemployment rates in Puerto Rico, such labor disincentives would have an especially disruptive effect on the island's economy.  Id. 31-33.

More will be said about the economic disruption theory below.  In the context of SSI, this theory cannot be called rational.  SSI benefits are available only to those low-income people who are "aged, blind, or disabled."  42 U.S.C. § 1382(a)(1).  Assuming that the labor disincentive theory is accurate (or could be considered plausible by a rational Congress),[15] it makes no sense to wield that policy against the

---

[15] The Plaintiffs argue that this theory is empirically false.  They cite, for example, two of the 2019 Nobel Prize laureates for Economics who assert that "[t]here is no evidence that cash transfers make people work less."  Pls.' Reply 20 (quoting Ex. B., Abhihit V. Banerjee & Esther Duflo, Good Economics for Hard Times 289 (2019), ECF No. 83-3).  The Plaintiffs' expert states that "[p]roviding additional benefits to residents of Puerto Rico boosts -- and certainly does not

aged, blind, or disabled -- groups that, through no fault of
their own, are barely present in the work force.  This is
certainly the case for people living with disabilities or
blindness.  See, e.g., Mark Duggan, Melissa S. Kearney &
Stephanie Rennane, The Supplemental Security Income Program, in
2 Economics of Means-Tested Transfer Programs in the United
States 45 (Robert A. Moffitt ed., Univ. of Chicago Press 2016)
("Nonelderly adults who participate in SSI have very low labor
force attachment, with just 4 percent having nonzero earnings in
2013.  Because of this, the issue of work disincentives is
perhaps not as pertinent as it is for other means-tested
transfer programs.").  It follows that the relationship between
the denial of SSI benefits for blind or disabled residents of
Puerto Rico and any conceivable labor-incentive impact is "so
attenuated as to render the distinction arbitrary or

_____

disrupt -- an economy that has been ravaged.  For example, in
the wake of Hurricane Maria, Congress temporarily increased NAP
benefits for residents of Puerto Rico, which led to a temporary
increase in retail sales and quicker recovery from the
hurricane's effects -- not any disruption."  Pls.' Mem. 22
(citing Report Juan Lara, Ph.D. 21-22, ECF No. 74).

    Under the rational basis standard of review, however, it is
not this Court's job to decide whether the economic disruption
theory is correct.  It is enough that it "rationally may have
been considered to be true by the governmental decisionmaker."
Nordlinger, 505 U.S. at 11.  The Plaintiffs have not shown that
Congress could not rationally believe this theory to be true.

irrational."  City of Cleburne v. Cleburne Living Center, Inc.,
473 U.S. 432, 446 (1985).

The economic disruption theory is slightly -- but only
slightly -- more rational as applied to the "aged," defined as
those 65 years old and above.  42 U.S.C. § 1382c(a)(1)(A).
Indeed, though the Government was not required to produce any
statistical evidence, it has pointed to a published study
concluding that, for the aged population, there is "stronger
evidence that the SSI program creates labor supply
disincentives" and that the "magnitude[] of the estimated
effects are substantial."  Defs.' Mem. 32 (quoting Decl. Daniel
Riess, Ex. 11, David Neumark & Elizabeth T. Powers, The Effect
of the SSI Program on Labor Supply: Improved Evidence from
Social Security Administrative Files, 65 Social Security
Bulletin 45, 46 (2004), ECF No. 79-11).  The Court assumes that
Congress could rationally have believed this to be true.

Even so, this empirical foundation is tenable only up to a
point.  The study cited by the Government relates to just one
category of SSI recipients (the aged) and only to a small subset
of that category, those who are near the age of 65.  See Neumark
& Powers, supra, at 45 ("Because eligibility for this program is
conditioned on an income test and an asset test, the incentives
embedded in the program could lead individuals to reduce both
labor supply and saving at ages leading up to eligibility for

the aged component of the program."). This reasoning obviously has no application to the blindness and disability categories of SSI eligibility, which make up the lion's share of SSI recipients.[16] Nor does it apply to the many elderly SSI recipients who are too old to work, including at least one of the Plaintiffs here. Indeed, as the Supreme Court has recognized, SSI was designed precisely for those people who cannot work. See Califano v. Jobst, 434 U.S. 47, 57 n.17 (1977) ("[S]ome people who because of age, disability, or blindness are not able to support themselves through work may receive relatively small social security benefits. Contributory social insurance, therefore, must be complemented by an effective assistance program." (alteration in original) (quoting H.R. Rep. No. 92-231, at 147 (1971))).

In some cases, even under rational basis review, the legislative classification is so overbroad that it cannot be considered a rational means of pursuing the posited objective. In Quinn v. Millsap, a unanimous Supreme Court held that a land-ownership requirement to sit on a local board was not a rational

---

[16] See Social Security Administration, Annual Report of the Supplemental Security Income Program 31 (2020), https://www.ssa.gov/OACT/ssir/SSI20/ssi2020.pdf (noting that "[i]n December 2019, 1.2 million aged individuals received federally administered SSI payments" in contrast with "6.9 million blind or disabled recipients of federally administered SSI payments").

[32]

means of ensuring that board members had a high level of communal knowledge and attachment, since it is obvious that many community members who do not own real property are similarly knowledgeable and attached.  491 U.S. 95, 107-08 (1989) (citing Turner v. Fouche, 396 U.S. 346, 363-64 (1970)).  Likewise, it is irrational to deny SSI benefits to all elderly, blind, or disabled residents of Puerto Rico in poverty in order to offset labor disincentives when it is evident that the rationale does not apply to the great majority of those people.  Even under the rational basis standard, the legislature must employ "means more finely tailored to achieve the desired goal" when the classification so far outstrips its purported reasons.  Id. at 109 (quoting Turner, 396 U.S. at 364).

        This is not to say, of course, that Congress must select "the least restrictive means of achieving its legislative end." Heller v. Doe, 509 U.S. 312, 330 (1993).  Congress is free to legislate imprecisely, settling for "only 'rough justice.'" Lyng v. International Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 485 U.S. 360, 372 (1988) (quoting Ohio Bureau of Emp. Servs. v. Hodory, 431 U.S. 471, 491 (1977)). Nonetheless, its "broad legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." Jobst, 434 U.S. at 55.  Almost by definition, the typical

recipients of SSI have negligible impact on labor supply. Accordingly, the economic disruption theory cannot rationally explain Congress's categorical exclusion of Puerto Rico residents from the SSI program.

### 2.    The Income Tax Exemption in the SSI Context

The First Circuit next turned to the rationale relying on the exemption of Puerto Rico residents from personal federal income taxes.  Vaello-Madero's central point on this score is that it is irrational to tie SSI benefits to Puerto Rico's federal income tax exemption because SSI is a means-tested program benefiting the poor, a population that generally does not pay income tax even on the mainland.  956 F.3d at 25-27. That reasoning is compelling and, in any case, binds this Court.

In litigation regarding the exclusion of Guam residents from SSI benefits, the Government has argued that the First Circuit erred in failing to acknowledge that people whose income is unstable may be required to pay income taxes in one year but not another, "and Congress rationally did not base SSI eligibility on those fluctuations."  Resp. Pl.'s Suppl. Br. 3, Schaller v. Social Security Administration, Civ. A. No. 18-00044, ECF No. 75 (D. Guam May 13, 2020).  Thus, "it was rational for Congress to draw the line at a community-wide, rather than an individual, level."  Id.

[34]

This argument is unpersuasive.  It is possible that some SSI recipients in the fifty states paid income taxes in previous years.  By the same token, however, it is possible that some Puerto Rico residents paid income taxes in previous years, whether because they were employed by the federal government, had income from outside the island, or lived on the mainland. Moreover, if residency in Puerto Rico was selected as a proxy for past payment of income tax, that is an unacceptably arbitrary choice of proxy when Congress could directly have tied benefits to past income tax payments.  See, e.g., Williams v. Vermont, 472 U.S. 14, 23 n.8 (1985) ("Under rational-basis scrutiny, legislative classifications are of course allowed some play in the joints.  But the choice of a proxy criterion -- here, residence for State of use -- cannot be so casual as this, particularly when a more precise and direct classification is easily drawn.").  Finally, it is far from clear that rewarding past payment of income taxes is a legitimate governmental interest.  Cf. Vaello-Madero, 956 F.3d at 26 ("The Equal Protection Clause prohibits such an apportionment of state services" designed to reward "the past tax [or intangible] contributions of its citizens." (alteration and emphasis in original) (quoting Zobel v. Williams, 457 U.S. 55, 63 (1982); Shapiro v. Thompson, 394 U.S. 618, 632-33 (1969))).

Accordingly, the Court follows the First Circuit in ruling that denying SSI benefits solely because of residency in Puerto Rico violates the equal protection component of the Due Process Clause.

**D.   Supplemental Nutrition Assistance Program (SNAP)**

Before analyzing the exclusion of Puerto Rico residents from the SNAP program, it is necessary to explain why the Supreme Court's precedent in Harris does not control.  In Harris, the Supreme Court (in a summary reversal) held that the AFDC's less generous benefits for Puerto Rico residents had a rational basis and therefore did not violate equal protection. 446 U.S. at 651-52.  In Vaello-Madero, the First Circuit distinguished Harris on the grounds that it "pass[ed] upon differential treatment of block grants under the AFDC program." 956 U.S. at 21 (emphasis in original).  The First Circuit did not explain why the block grants were a significant distinguishing feature, though conceivably that distinction might implicate all three of the rational bases approved in Califano and Harris.  In any event, because the NAP (Puerto Rico's substitute for SNAP) program also operates as a block grant, 7 U.S.C. § 2028, Vaello-Madero might be read as indicating that Harris would control here.

The Court rejects that reading of Vaello-Madero, which indicated only that "block grants" were a distinguishing feature

of Harris but not its sole one.  Indeed, Harris is palpably
distinguishable in several other critical respects.  First, AFDC
benefits varied by state,[17] whereas SNAP eligibility standards
are uniform, 7 U.S.C. § 2014(b).[18]  Moreover, Harris depended
upon contemporary factual assessments about Puerto Rico's labor
market that are now forty years old -- and the facts may have
changed, as Vaello-Madero noted.  See 956 F.3d at 23.  For
instance, Congress removed Puerto Rico from SNAP the year after
Harris was decided.  See Omnibus Budget Reconciliation Act of
1981, Pub. L. No. 97-35, § 116, 95 Stat. 357, 364 (1981).
Additionally, the island's economic status and its political and
financial relationship to the federal government have since been
tossed and turned by the repeal of the corporate tax credit,
numerous devastating hurricanes and earthquakes, a slide into
bankruptcy, and the creation of a federal board governing the
island's financial affairs.  See Financial Oversight & Mgmt. Bd.
for P.R. v. Aurelius Inv., LLC, 140 S. Ct. 1649, 1673-74 (2020)
(Sotomayor, J., concurring in the judgment); Vaello-Madero, 956
F.3d at 22 n.10.  The Supreme Court's summary decision in

---

[17] See Shea v. Vialpando, 416 U.S. 251, 253 (1974) (noting
that, under the AFDC, states "are given broad discretion in
determining both the standard of need and the level of
benefits"); Elizabeth Chief, Need Determination in AFDC Program,
42 Social Security Bulletin 11 (Sept. 1979).

[18] The same is true of the LIS program.  See 42 U.S.C.
§ 1395w-114(a)(3).

Harris, involving a substantively different welfare program and
resting on 40-year-old facts, does not control this case.

Guided by Vaello-Madero, the Court will now analyze the
Government's proposed rationales supporting the exclusion of
Puerto Rico residents from the SNAP program.

### 1.   The Income Tax Exemption and the Public Fisc

The Government's first and third rationales supporting the
exclusion of Puerto Rico residents from the SNAP program -- that
they generally do not pay federal income tax and that granting
them SNAP benefits would cost a lot of money -- have already
been conclusively disposed of by the First Circuit in Vaello-
Madero.  SNAP is a means-tested program similar to SSI.  See 7
U.S.C. § 2014(c)-(e) (establishing gross income test, resource
test, net income limit, and income deductions); see also 7
C.F.R. § 273.9 (calculating income and deductions).  "Thus," as
with the SSI program, "the idea that one needs to earn their
eligibility by the payment of federal income tax is antithetical
to the entire premise of the program."  Vaello-Madero, 956 F.3d
at 27.  Since "any individual eligible for [SNAP] benefits
almost by definition earns too little to be paying federal
income taxes,"[19] it is irrational to deny residents of Puerto

---

[19] The standard federal income tax deduction is $12,400 for
single tax filers who are not elderly or blind.  Vaello-Madero,
956 F.3d at 27 n.23 (citing I.R.C. §§ 63(c)(2)(C),
63(c)(7)(A)(ii)).  The current federal poverty guidelines set

Rico access to SNAP benefits because they generally do not pay federal income taxes.  Id.; see supra III.C.2.

Likewise, the First Circuit's holding "that cost alone does not support differentiating individuals" applies with equal force to the SNAP program.  Vaello-Madero, 956 F.3d at 29 (emphasis in original).  Since the cost-saving rationale cannot stand on its own and the income tax rationale is no good, the classification must be propped up by a different theory if it is to survive scrutiny.

### 2.    Economic Disruption Theory in the SNAP Context

The only other theory the Government offers supporting the exclusion of Puerto Rico residents from SNAP benefits is the fear of economic "disrupt[ion]."  Defs.' Mem. 31 (quoting Califano, 435 U.S. at 5 n.7).  In a nutshell, this theory posits that welfare programs tend to depress labor supply and that these negative effects would be aggravated in Puerto Rico due to its high rates of poverty and unemployment.  Id. at 31-33.[20]  In

the poverty level at $12,760 annual income for a single-person household.  Annual Update of the HHS Poverty Guidelines, 85 Fed. Reg. 3,060 (Jan. 17, 2020).  Eligibility for SNAP is tied to the federal poverty guidelines income levels; SNAP also allows deductions, imposes a resource test, and has a higher income limit for households containing an elderly or disabled member. See 7 U.S.C. § 2014(c)-(e); 7 C.F.R. § 273.9.

[20]  See also Jurisdictional Statement at 8, Califano v. Gautier Torres, 435 U.S. 1 (1978) (per curiam) (No. 77-88) ("The standard of living in Puerto Rico is significantly lower than that of the United States, and the extension to it of the SSI program -- which provides maximum benefits that are not

fact, the Government has cited a study of NAP in Puerto Rico reasoning that "[b]ecause the percentage of the Puerto Rican population affected by the adverse work incentives in the NAP is much larger than the percentage of [other] Americans affected by food stamp-induced disincentives, it seems likely that the negative effects on the Puerto Rican labor supply will also be larger." Decl. Daniel Riess, Ex. 10, Gary Burtless & Orlando Sotomayor, Labor Supply and Public Transfers, in The Economy of Puerto Rico: Restoring Growth 101 (Susan M. Collins et al. eds. 2006), ECF No. 79-10.

The Plaintiffs raise two arguments in rebuttal. First, they contend that the economic disruption theory is empirically false. Pls.' Reply 19. The Plaintiffs' expert, Dr. Juan Lara, observes that "[a] post-hurricane 'experiment' with a temporary increase in NAP funding is a case study of how equal treatment in the challenged programs would help Puerto Rico's economy." Report Juan Lara, Ph.D. ("Lara Report") 9, ECF No. 74.[21]

---

substantially lower than the average income in Puerto Rico -- would in effect provide a significant disincentive to gainful employment and threaten further to disrupt Puerto Rico's already ailing economy.") (footnotes omitted).

[21] Dr. Lara explained that "[t]he Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017 provided a temporary $1.27 billion increase in federal funds for NAP," and gathered data "show[ing] that retail sales increased at double-digit rates for much of 2018, the year after the hurricane. While not all of this growth is due to the additional inflow of NAP funds, there is no doubt that sales of food products purchased by NAP beneficiaries were an important

Moreover, Congresswoman Velázquez has correctly noted that the
HEW report cited by Califano, 435 U.S. at 5 n.7, cuts against
the economic disruption theory.  In fact, that report expressly
states that "the Food Stamp implementation in Puerto Rico has
shown that a large influx of assistance does not necessarily
disrupt the economy."  HEW Report 6; see Congresswoman Nydia M.
Velázquez's Amicus Curiae Br. Supp. Pls.' Opp'n Defs.' Mot.
Dismiss 5-7, ECF No. 43.  Be that as it may, an empirical attack
is generally unavailing on rational basis review, as explained
above.  See supra note 15.

Nonetheless, even if Congress could believe that nutrition
assistance depresses labor supply, its exclusion of Puerto Rico
from the SNAP program must be "a rational effort to deal with
these concerns."  Moreno, 413 U.S. at 536.  Here, the creation
of a separate program for Puerto Rico is not a rational step in
that direction since, "in practical effect, the challenged
classification simply does not operate so as rationally to
further the prevention of [economic disruption]."  Id. at 537
(emphasis added).

One serious problem is that, by excising Puerto Rico from
the national program, Congress has effectively exempted the NAP
program from the major pillar of its plan to combat SNAP's labor

_____

part of the unusual strength of retail sales in the post-
hurricane period."  Lara Report 22.

disincentives: limiting benefits to no more than three months'
worth over three years for able-bodied adults without dependents
between ages 18 and 49 (dubbed "ABAWDs") unless certain work
requirements are met.  See 7 U.S.C. § 2015(o); Supplemental
Nutrition Assistance Program: Requirements for Able-Bodied
Adults Without Dependents, 84 Fed. Reg. 66,782 (Dec. 5, 2019).
The ABAWD time limit and work requirement, among other work-
incentive strategies, were added as part of the welfare reform
overhaul wrought by the Personal Responsibility and Work
Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, §
824, 110 Stat. 2105, 2323 (1996).  Congress intended to
"promote[] work over welfare and self-reliance over dependency"
by "applying tough work standards."  H.R. Rep. 104-725, at 261
(1996).  Economists may debate whether SNAP's work requirements
in fact promote the desired labor supply effects,[22] as they
debate whether SNAP depresses labor supply at all.  Congress has
evidently made its empirical assumptions and the Court must
respect them.  Yet these work requirements do not apply to the
NAP program.[23]  It is baffling that this strategy would be

_____

[22] See generally Colin Gray, Adam Leive, Elena Prager,
Kelsey Pukelis & Mary Zaki, Employed in a SNAP? The Impact of
Work Requirements on Program Participation and Labor Supply
(July 2020) (unpublished manuscript), available at:
http://www.terpconnect.umd.edu/~mzaki/papers/SNAP_Work%20Require
ments.pdf.

[23] See Feasibility Study, supra note 7, at 38-39
(summarizing the different work requirements in SNAP and NAP);

implemented everywhere except Puerto Rico, where Congress supposedly was most anxious about SNAP's disruptive economic effects.  How can excluding Puerto Rico from the SNAP program be a rational means to counteract welfare dependency when the linchpin of SNAP's anti-dependency policy -- the strict work requirement -- is thereby made inapplicable in Puerto Rico?

Moreno illustrates the defect in the Government's theory of economic disruption in the context of SNAP's exclusion of Puerto Rico residents.  There, Congress had denied food stamps to households in which the members were unrelated to one another. Moreno, 413 U.S. at 529.  The Supreme Court cast about for a rational basis for this exclusion.  The sparse legislative history suggested that it "was intended to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program," a purpose the Supreme Court deemed illegitimate. Id. at 534.  The government argued, however, that excluding households of unrelated people from food stamps was "rationally

---

Financial Oversight and Management Board for Puerto Rico, 2020 Fiscal Plan for Puerto Rico 82 (May 27, 2020) ("Unlike mainland Supplemental Nutritional Assistance Program (SNAP) benefits, NAP does not include a work/volunteer requirement.").  The federal Financial Oversight and Management Board for Puerto Rico is currently attempting to implement NAP work requirements similar to those in SNAP, asserting that "a NAP work/volunteer requirement is critical to increasing labor market participation and the potential growth anticipated from human capital and welfare reforms."  Id.  Yet Congress has not required Puerto Rico's NAP program to implement those requirements.

related to the clearly legitimate governmental interest in
minimizing fraud in the administration of the food stamp
program." Id. at 535. The Supreme Court rejected this
rationale for two reasons. First, other provisions of the Food
Stamp Act addressed fraud, which raised "considerable doubt"
that the challenged classification "could rationally have been
intended to prevent those very same abuses." Id. at 536-37.
Second, and more important, the statute did not effectively
prevent fraud by unrelated persons since it allowed them to
"avoid the 'unrelated person' exclusion simply by altering their
living arrangements." Id. at 537. The "practical operation" of
the exclusion impacted "not those persons who are 'likely to
abuse the program' but, rather, only those persons who are so
desperately in need of aid that they cannot even afford to alter
their living arrangements so as to retain their eligibility."
Id. at 538 (emphases in original).

The Government's economic disruption theory as applied to
SNAP suffers from a similar flaw. Residents of Puerto Rico are
categorically denied SNAP benefits, the theory goes, in order to
avert labor disincentives. Congress substituted SNAP on the
island with a separate program funded by a block grant. Yet
that new program lacks the chief work-favoring features of the
national SNAP system. It turns out, perversely, that the
practical operation of Puerto Rico's ouster from SNAP is to

eliminate the major work incentives that Congress built into the national program. Puerto Rico's block-grant funded program comes with no comparable work-requirement strings attached. That is not a rational way of forestalling SNAP's potential labor disincentives in Puerto Rico.[24]

The irrationality of the statutory scheme is underscored by the Plaintiffs' second argument. The Plaintiffs assert that the Government has "chosen to treat U.S. citizens residing in New York just the same as U.S. citizens residing in Guam or D.C. or Montana or Alaska. And once the government has . . . in a sense disavowed its economic disruption theory as to those jurisdictions, it may not, without violating the equal protection clause, assert this disincentive-to-work theory only when it comes to Puerto Rico." Tr. Case-Stated Hr'g 28. The Court agrees, though the argument requires some unpacking.

It is not quite right that the Government has "disavowed" the economic disruption theory everywhere but Puerto Rico. As

---

[24] It is irrelevant that Congress excluded Puerto Rico from the food stamp program fifteen years before introducing the work requirements. What matters is not whether Congress acted rationally in 1981, but whether the legislative scheme is rational today. See United States v. Carolene Products Co., 304 U.S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."). That nearly a quarter-century has gone by in which SNAP's work requirements apply everywhere but Puerto Rico highlights the irrationality of excluding Puerto Rico from SNAP as a means of incentivizing labor on the island.

just noted, Congress was quite bothered by the specter of welfare dependency and imposed tight restrictions on nutrition assistance designed to avoid this problem.  The trouble is that Congress, confronted with essentially the same problem on the mainland and in Puerto Rico, employed two wildly different legislative solutions.  According to the Government's theory, moreover, Congress made SNAP eligibility in Puerto Rico hinge upon the local poverty rate when, in the rest of the country, eligibility is untethered to local poverty rates.

Congress crafted SNAP to "establish uniform national standards of eligibility" for aid, 7 U.S.C. § 2014(b) (emphasis added), notwithstanding the obvious economic disparities and varying poverty levels across the nation.  The importance of uniform national standards rests on the assumption that "[n]utritional needs, unfortunately, do not rise and fall with State welfare standards, and they do not recognize or respect State boundary lines."  General Farm Program and Food Program, Hearings Before the H. Comm. on Agric., 91st Cong. 8 (1969) (statement of Secretary Hardin).[25]  Given that legislative choice, why is Puerto Rico treated differently?

The Government suggests that the reason is because Puerto Rico is especially poor.  Defs.' Mem. 32-33.  At first blush,

---

[25] The Nixon Administration's original bill of 1969, introduced in the House by Congresswoman May and in the Senate

the Government has a point.  The poverty rate in Puerto Rico is over 40%, more than twice that of the poorest state, Mississippi.  See Glassman, supra II.B.2.  Yet residents of Mississippi, with a poverty rate approaching 20%, fall under the same SNAP criteria used in states with poverty rates below 10%. They are treated equally while residents of Puerto Rico are not. It is true that no state has a poverty level near that of Puerto Rico.  Still, there are certainly parts of the country eligible for SNAP despite comparable rates of poverty as in Puerto Rico. For instance, Congress made SNAP available to "eligible households within [a] State," 7 U.S.C. § 2013(a), and defined "State" to include "the fifty States, the District of Columbia, Guam, the Virgin Islands of the United States, and the reservations of an Indian tribe whose tribal organization meets the requirements of this chapter for participation as a State

---

by Senator Aiken, already contained the key language requiring the Secretary of Agriculture to "establish uniform national standards of eligibility."  H.R. 12222, 91st Cong. § 3 (1969). The House Report explains that the amendments "contained modifications to the present law sought by the Administration." H.R. Rep. No. 91-1402, at 9 (1971).  It further noted:

> Secretary of Agriculture Clifford M. Hardin testified before the committee on July 15, 1969.  At that time he outlined the Administration's goals and discussed its legislative purpose.  The Secretary and his key advisors conferred with the committee on proposals relating to the Food Stamp Program in the ensuing months on an informal basis on several occasions.

Id.  The passage quoted above is from that testimony of Secretary Hardin.

agency," id. § 2012(r) (emphasis added).[26]  In 1981, when
Congress removed Puerto Rico from SNAP coverage but left in
tribal reservations, those reservations had poverty rates
similar to Puerto Rico's.[27]  Severe poverty and the problem of
work disincentives apparently posed no obstacle to providing
full SNAP coverage on American Indian reservations.

To be sure, rational basis review can tolerate some logical
inconsistency.  See Flemming v. Nestor, 363 U.S. 603, 612 (1960)
("[I]t is irrelevant that the section does not extend to all to
whom the postulated rationale might in logic apply.").  If the

---

[26] The statute explains that "'State agency' means . . . the
tribal organization of an Indian tribe determined by the
Secretary to be capable of effectively administering a food
distribution program under section 2013(b) of this title or a
supplemental nutrition assistance program under section 2020(d)
of this title."  7 U.S.C. § 2012(s).

[27] See Ronald L. Trosper, American Indian Poverty on
Reservations, 1969-1989, in Changing Numbers, Changing Needs:
American Indian Demography and Public Health 178 (Gary D.
Sandefur, Ronald R. Rindfuss & Barney Cohen eds. 1996)
(analyzing census data for 23 reservations and noting that, in
1979, "Indians were extremely poor," with a rate of 43% "of all
families on these reservations that were in poverty" compared
with 10% nationwide).  It should be noted that those numbers
were an improvement from 1969, when the family poverty rate on
those reservations was 57%, id., yet Congress expressly included
tribal reservations in the SNAP program in the Food and
Agriculture Act of 1977, Pub. L. No. 95-113, § 1301, 91 Stat.
913, 960 (1977).  Though Native American poverty is far above
the national average, it has fallen somewhat in recent decades.
See Randall K.Q. Akee & Jonathan B. Taylor, Social and Economic
Change on American Indian Reservations: A Databook of the US
Censuses and the American Community Survey: 1990-2010, at 40-45
(2016), https://www.issuelab.org/resources/33154/33154.pdf.

[48]

problem were only that Congress focused on economic disruption
in Puerto Rico and not in Indian reservations, the
classification might survive.  After all, "reform may take one
step at a time, addressing itself to the phase of the problem
which seems most acute to the legislative mind."  Williamson v.
Lee Optical of Oklahoma Inc., 348 U.S. 483, 489 (1955).  Yet the
irrationality runs much deeper here.  It is one thing for a
legislative line to be imperfectly drawn.  It is quite another
when one group has been "singl[ed] out" for unfavorable
treatment based on a posited theory that obviously is not being
applied to the rest of the country.  City of Cleburne, 473 U.S.
at 450; see also James v. Strange, 407 U.S. 128, 140 (1972)
("[T]he Equal Protection Clause 'imposes a requirement of some
rationality in the nature of the class singled out.'" (quoting
Rinaldi v. Yeager, 384 U.S. 305, 308-09 (1966))).

In City of Cleburne, the Supreme Court held that a city
council's denial of a zoning permit to a group home for people
with intellectual disabilities was unconstitutional, since it
"rest[ed] on an irrational prejudice against the mentally
retarded."  473 U.S. at 450.  To reach that conclusion, the
Supreme Court had to reject several alternative rationales
proposed by the city council, including that the home "was
located on 'a five hundred year flood plain'"; that the zoning
ordinance could rationally have been "aimed at avoiding

concentration of population and at lessening congestion of the streets"; and "the expressed worry about fire hazards, the serenity of the neighborhood, and the avoidance of danger to other residents." Id. at 449-50.  All of these hypothetical rationales, while legitimate and rational on their own terms, bore the same fatal flaw: they "obviously fail[ed] to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit." Id. at 450.

A similar glaring inconsistency dooms the Government's economic disruption theory here.[28]  Recognizing that human nutritional needs are the same everywhere, SNAP deliberately embraces uniform national standards while mitigating potential economic disruption via other mechanisms.  Local poverty rates vary widely across the country, yet Congress chose not to tie SNAP eligibility to that metric.  To do so only in Puerto Rico defies rationality.[29]  The Constitution may abide a system

---

[28] City of Cleburne found unconstitutional animus, an argument the Plaintiffs also raise here with respect to all three programs.  See Pls.' Mem. 24.  In light of the Court's conclusion that all reasonably conceivable rationales have been negated, the Court need not reach this alternative argument.

[29] To be perfectly accurate, Congress also excluded American Samoa and the Northern Mariana Islands from SNAP benefits along with Puerto Rico.  Joint Stip. ¶ 20.  The populations of those tiny islands are dwarfed, however, by the rest of the country and Puerto Rico itself.  Cf. Defs.' Mem. 26-27 (discussing "relatively smaller population sizes" of certain territories).

advancing legitimate governmental ends even when the plan works
to the disadvantage of the poorest locales.  To achieve "local
control" of schools, for example, states may allow schools to be
funded by local property taxes even though this inevitably
starves poorer districts of education resources.  San Antonio
Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 44-55 (1973).  Yet
that is a far cry from invoking a broadly applicable policy only
in a very poor region.  Rodriguez did not suggest that it would
be rational to adopt a well-funded centralized school system
throughout the state but single out one especially poor district
for "local control."  That is what the Government's economic
disruption rationale purports to do here.

Moreover, it is not the case that Congress neglected to
address SNAP's potential economic disruption in other parts of
the country while focusing on Puerto Rico.  Congress has
addressed this issue nationwide, including in 1996 when it
passed major welfare reform legislation designed to offset those
undesirable labor dynamics.  Yet its approach outside the island
was radically different.  Congress wielded a scalpel on the
mainland and a buzz saw in Puerto Rico.  The economic disruption
theory cannot explain that choice, nor can it make sense of the
presence of a work requirement everywhere except Puerto Rico --

---

The exclusion of those islands therefore does not ameliorate the
problem of "singling out" Puerto Rico for worse treatment.

where the hypothesized risk of economic disruption is most acute.

The only plausible explanation for the wholesale exclusion of Puerto Rico from the SNAP program is a budgetary one.  Cf. Lyng, 485 U.S. at 370 (noting that the "[m]ost obvious" purpose of a different food stamp exclusion, "given its source in [the Omnibus Budget Reconciliation Act of 1981], is to cut federal expenditures").  Keeping the national budget under control is certainly a fine goal, and the legislative history reveals that, in 1981, Congress had good reason to be concerned about "the size and expense of the food stamp program in Puerto Rico."  S. Rep. No. 97-139, at 68 (1981); see id. (noting that "the food stamp program in Puerto Rico accounts for approximately 10 percent of national program costs," since "[a]pproximately 58 percent of the Puerto Rican population receive food stamp aid, while the national average is 10 percent, and no State has a participation rate higher than 21 percent (M[i]ssissippi)").  Yet a desire to cut costs is not on its own a sufficient rationale for denying benefits to needy and otherwise eligible U.S. citizens living in Puerto Rico.  See Vaello-Madero, 956 F.3d at 28-30.  Funds could just as well have been saved by spreading out benefit reductions equally or denying them to any other slice of the population (such as people in other locales, or those with certain color hair or particular birthdays, etc.).

A separate, non-arbitrary reason is needed if the classification is to survive scrutiny.

### 3.   Mismanagement and Abuse in 1981

The legislative history of the exclusion of Puerto Rico from SNAP suggests another possible rationale: "[T]he Puerto Rican food stamp program has been plagued by reports of mismanagement and abuse, cited by both the General Accounting Office and the Department's Office of the Inspector General." S. Rep. No. 97-139, at 68 (1981).  The Government does not here espouse the "mismanagement and abuse" argument.  That theory may rightly be deemed "abandon[ed]." Vaello-Madero, 956 F.3d at 23. Yet rational basis review demands that no stone be left unturned.  Peeking under this rock, however, the Court sees nothing to sustain the exclusion of Puerto Rico residents from SNAP.  Even were Puerto Rico's reported program mismanagement a rational basis for the exclusion in 1981, the nuts and bolts of policing fraud and errors in the nation's food stamp program have fundamentally changed in the decades since.  This is largely due to technological innovations; computer deficiencies in the 1970s were apparently a major part of the federal government's frustrations with Puerto Rico's management of its food stamp program.  See U.S. Gov't Accountability Off., CED-78-84, Problems Persist in the Puerto Rico Food Stamp Program, the Nation's Largest ii-v, 28-49 (1978),

https://www.gao.gov/assets/130/122549.pdf (detailing "the
formidable array of problems confronting the existing computer
system," id. at iv).

To understate matters, technology has advanced by leaps and
bounds in the last forty years.  With respect to concerns of
fraud and mismanagement in the SNAP program, there are now "six
data matches [that] have been statutorily mandated as part of
the SNAP certification process" and several optional ones.
Randy Alison Aussenberg, Cong. Research Serv., Errors and Fraud
in the Supplemental Nutrition Assistance Program (SNAP) 18-20
(updated Sept. 28, 2016),
https://fas.org/sgp/crs/misc/R45147.pdf.  Today, by all
accounts, "SNAP fraud is relatively rare."  Id. at 2.  In the
face of these efficiency-enhancing developments, no rational
Congress could rely on 40-year-old reports of mismanagement and
abuse to justify denying hundreds of thousands of needy U.S.
citizens residing in Puerto Rico the food support available to
the rest of the nation.  Cf. Shelby County v. Holder, 570 U.S.
529, 556 (2013) ("It would have been irrational for Congress to
distinguish between States in such a fundamental way based on
40-year-old data, when today's statistics tell an entirely
different story.  And it would have been irrational to base
coverage on the use of voting tests 40 years ago, when such

tests have been illegal since that time."). Perhaps that's why the Government does not offer this as a rational basis.

Accordingly, the Court rules that the Plaintiffs' exclusion from SNAP benefits solely on the basis of their residency in Puerto Rico violates their right to equal protection derived from the Fifth Amendment.

### E.    Medicare Part D Low-Income Subsidy (LIS or Extra Help)

The third program challenged by the Plaintiffs on the basis of its categorical exclusion of Puerto Rico residents is the Medicare Part D Low-Income Subsidy (LIS), also known as Extra Help.  See 42 U.S.C. § 1395w-114(a)(3)(F); First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 49 (1st Cir. 2007) (explaining that Congress created LIS after prohibiting "state Medicaid programs -- but not territory Medicaid programs -- from paying for any portion of prescription drug costs" (citing 42 U.S.C. §§ 1395w-114, 1396u-5(e))).  In support of the exclusion of Puerto Rico residents from LIS benefits, the Government offers the same three rationales as it did for the analogous SSI and SNAP exclusions.

In light of this Court's and the First Circuit's conclusions explained above, it follows that the LIS program's exclusion of Puerto Rico residents also violates the equal protection component of the Fifth Amendment.  LIS is the same in all relevant respects as SSI and SNAP; nor has the Government

suggested any possible basis to distinguish it from the other programs.  Like SSI and SNAP, the LIS program is means-tested. 42 U.S.C. § 1395w-114(a).  That rules out the income tax exemption as a rational basis for excluding residents of Puerto Rico.  See Vaello-Madero, 956 F.3d at 23-28; supra III.C.2; III.D.1.  The LIS program also establishes uniform eligibility and benefits standards across the nation.  See 42 U.S.C. §1395w-114(a).  Moreover, although the statute is not explicit on the matter, the Government extends LIS benefits to residents of Indian reservations as well.[30]  The economic disruption argument fails here for essentially the same reasons as it did regarding the SSI and SNAP programs.  See supra III.C.1; III.D.2.

In one respect, the economic disruption theory is somewhat more rational as an explanation for Puerto Ricans' ineligibility for LIS benefits than for SNAP benefits, since the SNAP program has the added irrational quirk of applying the work requirement everywhere except Puerto Rico.  See id.  That distinction does not save the classification here.  Recipients of SSI are

_____

[30] See, e.g., Social Security Administration, Tribal Benefits Coordinator Guide 39 (Sept. 2019), https://www.ssa.gov/people/aian/materials/pdfs/Tribal_Benefits_Coordinator_Guide.pdf.  Indeed, the federal government, acting under congressional authorization, has offered grants in an effort "to help eligible Native American elders in accessing the Low Income Subsidy program (LIS)."  Availability of Program Application Instructions for Tribal MIPPA Program Funds, 83 Fed. Reg. 30,180 (June 27, 2018).

categorically eligible for LIS benefits.  42 U.S.C. § 1395w-
114(a)(3)(B)(v)(I).  In Puerto Rico, that category is estimated
to include over 60% of those who would be eligible for LIS --
between 305,000 to 354,000 individuals out of 493,984 Medicare
beneficiaries who would have been eligible for LIS in 2011.
Joint Stip. ¶ 37.  Yet the exclusion of Puerto Rico residents
bars even these elderly, blind, or disabled recipients who,
almost by definition, do not substantially affect labor supply.
See supra III.C.1.  More generally, "Medicare is a federally
funded medical insurance program for the elderly and disabled."
Fischer v. United States, 529 U.S. 667, 671 (2000).  Those
populations are not major participants in the labor market as a
rule, and among them are doubtless very large groups who cannot
be gainfully employed.  In other words, an inability to work is
typical of the class of Puerto Rico Medicare beneficiaries who
would otherwise be eligible for LIS.  See Jobst, 434 U.S. at 55
("The broad legislative classification must be judged by
reference to characteristics typical of the affected classes
rather than by focusing on selected, atypical examples.").

Considering the makeup of likely beneficiaries, an across-
the-board exclusion of all residents of Puerto Rico from LIS
benefits, while granting uniform benefits on the mainland
without regard to local economic conditions, is not a rational
means of preventing economic disruption on the island.  Cf.

Quinn, 491 U.S. at 108-09; Williams, 472 U.S. at 23 n.8;
Nordlinger, 505 U.S. at 35 (Stevens, J., dissenting) ("[I]n some
cases the underinclusiveness or the overinclusiveness of a
classification will be so severe that it cannot be said that the
legislative distinction 'rationally furthers' the posited state
interest.").

Finally, as the First Circuit explained, the cost of
providing LIS benefits for residents of Puerto Rico may be high,
but that concern standing alone cannot justify discrimination.
See Vaello-Madero, 956 F.3d at 28-30.

The Court rules that there is no "reasonably conceivable
state of facts that could provide a rational basis" for the
categorical exclusion of otherwise eligible Puerto Rico
residents from the LIS program.  Beach Commc'ns, 508 U.S. at
313.  Therefore, denying LIS benefits to the Plaintiffs solely
because of their residency in Puerto Rico violates their due
process right to equal protection.

> **F.   Conclusion of Rulings of Law**

For the reasons given above, the Court rules that no
rational basis supports the categorical exclusion of otherwise
eligible residents of Puerto Rico from the SSI, SNAP, and LIS
benefit programs.  These exclusions on the basis of residency in
Puerto Rico are therefore unconstitutional.

The parties have not briefed the issue of severing these
unconstitutional statutory provisions from other parts of the
statutory scheme, nor is it clear that "there is a live
controversy over the question of severability." Seila Law LLC
v. Consumer Fin. Protection Bur., 140 S. Ct. 2183, 2208 (2020)
(plurality opinion).  Thus, the Court issues no rulings on
severability.  Nevertheless, the Court observes that it would be
both inequitable and manifestly contrary to congressional intent
to extend the SSI, SNAP, and LIS programs to residents of Puerto
Rico in addition to the existing AABD, NAP, and enhanced
Medicaid allotment funds.  The Constitution demands equality,
not double benefits.

**IV.  REMEDY**

The Plaintiffs request "[a] declaration that the above-
cited provisions of the SSI, SNAP, and Medicare statutes (and
any relevant implementing regulations) that discriminate on the
basis of status as resident of Puerto Rico are unconstitutional"
and "[a]n order enjoining Defendants from enforcing such
discriminatory provisions of the SSI, SNAP, and Medicare
statutes (and any relevant implementing regulations)."  Compl. ¶
117.  They also pray for costs and attorneys' fees and any other
relief the Court deems just and proper.  Id.  The Government
argues that "the sole appropriate remedy would be relief limited
to the nine individual plaintiffs in this action," since "[a]ny

remedy extending beyond this scope would be inconsistent with
Article III standing requirements and fundamental principles of
equity."  Defs.' Remedies Br. 1.

The Government does not challenge the validity or
appropriateness of either declaratory or injunctive relief with
respect to the nine Plaintiffs.  Rather, the brunt of the
dispute about the remedy relates to whether the Court can or
should extend the remedy beyond these Plaintiffs to similarly
situated residents of the Commonwealth of Puerto Rico.

### A.   The Legal Standard

"[A] plaintiff seeking a permanent injunction must satisfy
a four-factor test before a court may grant such relief."
Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156 (2010)
(alteration in original) (quoting eBay Inc. v. MercExchange,
L.L.C., 547 U.S. 388, 391 (2006)).  "A plaintiff must
demonstrate: (1) that it has suffered an irreparable injury; (2)
that remedies available at law, such as monetary damages, are
inadequate to compensate for that injury; (3) that, considering
the balance of hardships between the plaintiff and defendant, a
remedy in equity is warranted; and (4) that the public interest
would not be disserved by a permanent injunction."  Id. at 156-
57 (quoting eBay, 547 U.S. at 391).

"A district court has broad discretion to fashion an
appropriate equitable remedy, but the relief imposed should be

'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'"  United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 336 (1st Cir. 2003) (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)).  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  Yamasaki, 442 U.S. at 702.  Nonetheless, like all other forms of relief, both declaratory and injunctive relief must comport with Article III standing requirements.  See, e.g., Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

**B.   Applying the Four-Factor Test for an Injunction**

The Court begins with the traditional four-factor test for a permanent injunction, of which the first prong is irreparable injury.  Here, the Plaintiffs, along with all other applicants denied these benefits on account of residency in Puerto Rico, have undoubtedly suffered irreparable injury by virtue of losing out on SSI, SNAP, and LIS benefits.  As the District Court for the Southern District of New York has cogently explained:

> Persons who establish eligibility for SSI benefits and
> food stamps are living at society's edge, well below
> the poverty line.  While welfare benefits are money or
> money's equivalent, their denial almost universally
> has been regarded as irreparable injury because
> welfare recipients depend upon them not merely as a
> convenient medium of exchange, but to sustain life.

Abreu v. Callahan, 971 F. Supp. 799, 821 (S.D.N.Y. 1997); see
also District of Columbia v. U.S. Dep't of Agric., No. 20-119
(BAH), 2020 WL 1236657, at *30 (D.D.C. Mar. 13, 2020) ("Going
without food is an irreparable harm."); Haskins v. Stanton, 794
F.2d 1273, 1276-77 (7th Cir. 1986).

Similar considerations support a finding of irreparable
harm for wrongful denial of prescription drug benefits under
LIS.  See, e.g., United Steelworkers of Am., AFL-CIO v. Textron,
Inc., 836 F.2d 6, 8 (1st Cir. 1987) (employee life insurance and
medical benefits); Maine Ass'n of Interdependent Neighborhoods
v. Petit, 647 F. Supp. 1312, 1315-16 (D. Me. 1986) (Medicaid
benefits).

The second factor asks whether the "remedies available at
law, such as monetary damages, are inadequate to compensate for
that injury."  Monsanto, 561 U.S. at 156 (quoting eBay, 547 U.S.
at 391).  Here, as the Plaintiffs point out, monetary damages
are unavailable because the federal government has not waived
sovereign immunity for such suits.  See Lane v. Pena, 518 U.S.
187, 192 (1996); Edelman v. Jordan, 415 U.S. 651, 676-77 (1974).

The third factor is whether, "considering the balance of
hardships between the plaintiff and defendant, a remedy in
equity is warranted."  Monsanto, 561 U.S. at 157 (quoting eBay,
547 U.S. at 391).  Here, the severe hardships to the needy
Plaintiffs (several of whom are elderly or disabled), as well as

[62]

similarly situated applicants in Puerto Rico, are undeniable.
On the Government's side, an injunction providing relief to the
nine Plaintiffs would impose a relatively light burden in
comparison, while an injunction running across the Commonwealth
would of course entail major financial liabilities in the
billions of dollars.  Confronted with denials of social security
and food stamp benefits, courts generally treat the balance of
hardships as tipping in favor of the claimants.  See, e.g.,
Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983) (SSI
benefits).  This is true even when an injunction would impose
serious statewide financial burdens.  See, e.g., Pashby v.
Delia, 709 F.3d 307, 329 (4th Cir. 2013) (North Carolina
Medicaid benefits for disabled adults); Briggs v. Bremby, No.
No. 3:12cv324(VLB), 2012 WL 6026167, at *19 (D. Conn. Dec. 4,
2012) ("Considering the Plaintiffs' vital and essential interest
in the timely receipt of food stamps and the resultant harm
suffered through the loss of timely benefits, the balance of
hardships tips decidedly in favor of the Plaintiffs and
outweighs any injury caused by requiring the Defendant to do
what was already required under the Act.").

Moreover, given this Court's conclusions that the
exclusions of Puerto Rico residents from the SSI, SNAP, and LIS
programs are unconstitutional, it is not clear "how enforcing
compliance imposes any burden on" the Government, since such an

[63]

"injunction merely seeks to prevent the defendants from shirking their responsibilities under" the law.  Haskins, 794 F.2d at 1277; accord Withrow v. Concannon, 942 F.2d 1385, 1388 (9th Cir. 1991).  Accordingly, the Court finds that the balance of hardships tips in favor of the Plaintiffs.

The fourth factor asks whether "the public interest would not be disserved by a permanent injunction." Monsanto, 561 U.S. at 157 (quoting eBay, 547 U.S. at 391).  This factor "merge[s]" with the previous factor (balancing the hardships) "when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  The Government's (and the public's) interest consists in the formidable drain on the public fisc, which the Court acknowledges.  Yet this cannot stand in the way of vindicating the constitutional rights to equal protection of residents of Puerto Rico.  This is especially true here, where those who are wrongfully denied benefits are among society's neediest members.  As the Ninth Circuit stated:

> It is not only the harm to the individuals involved that we must consider in assessing the public interest. Our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges . . . .  It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time.

Lopez, 713 F.2d at 1437.

The Court agrees and finds that an injunction covering the Plaintiffs or similarly situated individuals throughout the Commonwealth of Puerto Rico would not disserve the public interest.  The Plaintiffs' proposed injunction (whether it covers them alone or is territory-wide) satisfies the four-factor test.  That does not end the analysis, because the Government argues that a remedy extending beyond the Plaintiffs is unavailable.  The Court will now take up that question directly.

### C.    The Court's Authority to Provide Relief Beyond the Plaintiffs in this Case

No class has been certified here, nor have the Plaintiffs moved for class certification.  The Government contends that this fact divests the Court of authority to issue Commonwealth-wide relief under Article III standing requirements and traditional equitable principles.  Defs.' Remedies Br. 1-7.  The Court disagrees.

"[T]he question as to the authority of a court to issue . . . . nationwide, or universal, injunctions, as well as the propriety of such injunctions, has spawned a veritable cottage industry of scholarly articles in the past few years."  City of Chicago, v. Barr, 961 F.3d 882, 912 (7th Cir. 2020) (collecting authorities).  The Supreme Court, at any rate, has approved injunctions that extend beyond the parties, even when no class

has been certified.  Consider, for example, Weinberger v.
Wiesenfeld, 420 U.S. 636 (1975).  There, the district court
denied the plaintiff's motion for class certification in an
equal protection challenge to a federal benefit program.
Wiesenfeld v. Secretary of Health, Educ. & Welfare, 367 F. Supp.
981, 986-87 (D.N.J. 1973).  The court nevertheless issued
nationwide declaratory and injunctive relief, and that decision
was affirmed by the Supreme Court.  Wiesenfeld, 420 U.S. at 653.

     Indeed, even the most strident critics of nationwide
injunctions acknowledge that equitable relief has traditionally
been provided to nonparties in some scenarios.  Thus, "one of
the recognized bases for an exercise of equitable power was the
avoidance of 'multiplicity of suits,'" though "these 'proto-
class action[s]' were limited to a small group of similarly
situated plaintiffs having some right in common."  Trump v.
Hawaii, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring)
(alteration in original) (quoting Samuel L. Bray, Multiple
Chancellors: Reforming the National Injunction, 131 Harv. L.
Rev. 417, 426-27 (2017)).  See also Mila Sohoni, The Lost
History of the "Universal" Injunction, 133 Harv. L. Rev. 920,
924 (2020) ("Under the principles which in the federal system
distinguish cases in law from those in equity, the circuit court
of the United States, sitting in equity, can make a
comprehensive decree covering the whole ground of controversy,

[66]

and thus avoid the multiplicity of suits that would inevitably arise under the statute." (quoting Smyth v. Ames, 169 U.S. 466, 517 (1898) (emphasis provided by Sohoni)).  "Therefore," as the Seventh Circuit recently concluded, "there is a substantial historical basis for the concept of injunctive relief that extends to the benefit of nonparties."  City of Chicago, 961 F.3d at 914.

Of course, though this case concerns federal defendants and a congressional statute, the relief requested here is not "nationwide" or "universal" or "cosmic"; it does not implicate the concerns of "gamesmanship and chaos" that plague nationwide injunctions.  Department of Homeland Sec. v. New York, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring).  Rather, the injunction has application only in Puerto Rico, a territory within a single judicial circuit that has already ruled on much of the substantive issues in this case.  A territory-wide injunction is analogous to a statewide injunction.

In Horne v. Flores, the Supreme Court indeed observed that "[i]t is not even clear that the District Court had jurisdiction to issue a statewide injunction when it is not apparent that plaintiffs . . . had standing to seek such relief."  557 U.S. 433, 471 (2009).  Yet the Supreme Court still remanded the case with instructions that "the District Court should vacate the injunction insofar as it extends beyond [the class] unless the

court concludes that Arizona is violating the [federal law] on a statewide basis." Id. at 472 (emphasis added); see also Rodgers v. Bryant, 942 F.3d 451, 458 (8th Cir. 2019). The Court will follow a similar standard here.

**D.   The Propriety of Territory-Wide Relief**

The Supreme Court's instruction in Horne that the district court vacate its statewide injunction unless it found a statewide violation reflects the principle that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." Yamasaki, 442 U.S. at 702. Likewise, the First Circuit vacated declaratory relief that went beyond the plaintiffs and provided "essentially class-wide relief" despite the lack of class certification when the plaintiffs had neither alleged nor proven "that the failures [we]re systemic." Diaz-Fonseca v. Puerto Rico, 451 F.3d 13, 39, 42 (1st Cir. 2006). In cases of systemic violations, however, "[t]he concern with multiplicity of litigation is a valid factor in assessing the appropriate scope of injunctive relief." City of Chicago, 961 F.3d at 919.

There is no doubt that the constitutional violations here are systemic. The Government admits that it is systematically denying SSI, SNAP, and LIS benefits to all applicants residing in Puerto Rico, and avers that it will continue to do so regardless of the rulings of this Court or the First Circuit --

unless this Court orders it to stop.  <u>See</u> Tr. Case-Stated Hr'g
11-14.  A multiplicity of litigation is inevitable and in fact
has already begun, since the Social Security Administration has
not followed the First Circuit's ruling that denying SSI
benefits on the grounds of Puerto Rico residency is
unconstitutional.  <u>See</u> <u>Ruiz</u> v. <u>Social Security Administration</u>,
Civ. A. No. 20-01240-GAG (D.P.R. May 26, 2020) (resident of
Puerto Rico suing for SSI benefits following <u>Vaello-Madero</u>).

    Accordingly, the Court rules that territory-wide
declaratory and injunctive relief is appropriate in this case.

**V.   ORDER**

    For the foregoing reasons, judgment shall enter for the
Plaintiffs on all counts.  This Court GRANTS the Plaintiffs'
request for declaratory and injunctive relief, and now provides
the following remedy:

    1.    The Court declares that it is unconstitutional to deny
the Plaintiffs, as well as all otherwise eligible
individuals, Supplemental Security Income (SSI),
Supplemental Nutrition Assistance Program (SNAP), and
Medicare Part D Low-Income Subsidy (LIS) benefits
solely due to their residency in Puerto Rico.

    2.    The Court enjoins the Government from enforcing the
unconstitutional provisions and implementing
regulations of the SSI, SNAP, and LIS programs,

insofar as they exclude residents of Puerto Rico,
against the Plaintiffs and all similarly situated
applicants residing in the Commonwealth of Puerto
Rico.

3.   The Court grants the Government's request for a 60-day
administrative stay of the injunction, except as to
the nine named Plaintiffs in this case.


**SO ORDERED**

                                    /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE